MOSS POINT LUMBER COMPANY *v.* HARRISON COUNTY.

[42 South. Rep., 290, 873.]

1. SCHOOL LANDS. *Sixteenth sections. Code* 1880, § 732. *Leases. Construction.*

    A conveyance by the board of supervisors of sixteenth section school land, under Code 1880, § 732, authorizing the same for a term of ninety-nine years, is, under the statute, a mere lease, the estate conveyed a leasehold, governed by the principles applicable to estates for years, and it does not give a right in the fee.

2. SAME. *Waste. Liability of tenant.*

    A tenant for years, unless exempted by the terms of his lease, is liable for waste as an incident of the character of his estate, without reference to the number of years his tenancy may run.

3. SAME. *Statute of Marlbridge. Statute of Gloucester.*

    While the English statutes of Marlbridge and Gloucester, declaring a tenant for years liable for waste, have no force as statutes in Mississippi, the principle announced by them is a part of the law of the state.

4. SAME. *Laws governing leases. Repeals. Code* 1880, § 3.

    A lease of school lands for a term of ninety-nine years, made in 1882 in conformity with Code 1880, § 732, prescribing how sixteenth section school lands should be leased, is to be construed according to the provisions of that code; all preceding acts upon the subject having been repealed by Code 1880, § 3, providing that all acts and parts of acts the subject whereof were revised, consolidated, and reënacted in said code should be repealed.

5. SAME. *Laws* 1818, 1824, 1833. *Declaratory statutes.*

    The sixteenth section acts of 1818 and 1824, while expressly prohibiting a tenant of sixteenth section school lands from committing waste, did not create liability, but merely declared the common law rule on the subject, and the omission of the provision from the act of 1833 and subsequent acts did not affect a tenant's liability for waste.

6. SAME.   *Construction.*

The phrase, "the right, title, use, interest, and occupation," as used in the statutes providing that lessees of school lands shall be vested with "the right, title, use, interest, and occupation of" the lands, must be construed as used in connection with the character of the estate which is authorized to be conveyed, which is a leasehold estate, and it conveys only such right, title, use, interest, and occupation as go with a leasehold estate.

7. SAME.   *Laws* 1833.   *Construction.*

The act of 1833, authorizing the leasing of sixteenth section school lands for ninety-nine years, did not affect a tenant's liability for waste as declared in the act of 1818, providing for three-year leases, and the act of 1824, providing for five-year leases.

8. SAME.   *What constitutes waste.   Timber cutting.*

The cutting of timber' for commercial purposes by a tenant for years is waste.

9. SAME.   *Extent of tenant's right.*

A tenant for years may cut timber for clearing so much of the leased premises as the needs of his family and himself may require, and he may clear for cultivation such portions as a prudent owner in fee would clear for that purpose, leaving necessary timber for the permanent use of the inheritance.

10. SAME.   *Rule for determining waste.*

What constitutes waste by a tenant for a term of years is determined by a consideration as to whether or not an act done results in injury to the inheritance; and whether or not an act is waste is determined by the conditions which exist at the time the act is committed.

11. SAME.   *Timber valueless at date of lease.*

A tenant for years is guilty of waste if he cut timber from the leased premises for sale and use it beyond his right as tenant, although it was valueless at the time of the making of the lease.

12. SAME.   *Purposes of the lease.   Presumptions.*

A lessee of sixteenth section school land is presumed, in the absence of a stipulation in the lease to the contrary, to have taken the land for agricultural purposes and only with such rights as go with a lease of lands.

89 Miss.—29

13. SAME. *Liability of an assignee.*

The assignee of a ninety-nine-year lease of sixteenth section school lands who commits waste thereon by cutting the timber for commercial purposes, is liable therefor just as the original tenant would have been.

14. SAME. *Duty of courts. Condition of country.*

To ascertain the rights of a lessee of sixteenth section school lands for a term of ninety-nine years, the courts must, where the terms of the lease are plain and the rights which go with it measured by law, seek the true definition of the term "lease" and cannot depart therefrom because of the conditions of the country at the time the lease was made.

15. SAME. *Statutory construction.*

The provisions of the statute authorizing the leasing of sixteenth section school lands for ninety-nine years, which required the lessees to pay taxes and gave them the right to sue for waste, were not inconsistent with the idea that they took only a leasehold estate and did not enlarge such estate into a freehold.

16. COURTS. *Rule of Decision. Stare Decisis.*

Where a question has been settled by the supreme court, it should be treated as no longer open for review, unless the evil resulting from the principle established be manifest and mischievous.

FROM the chancery court of Harrison county.

HON. THADDEUS A. WOOD, Chancellor.

Harrison county, the appellee, was complainant in the court below; the lumber company, the appellant, was defendant there.

From a decree overruling a demurrer to the bill of complainant the defendant appealed to the supreme court. The facts are fully stated in the several opinions delivered in the case.

The case was twice decided; at first the decree appealed from was reversed and remanded and the suit dismissed; upon suggestion of error a rehearing was granted—Justice TRULY leaving the bench and being succeeded by Justice MAYES after the first decision and before the second hearing. The second decision affirmed the decree, from which the appeal was taken.

*Ford & White, and Green & Green,* for appellant.

While the lease in controversy was made under the code of 1880, it is necessary to consider and define the status of sixteen sections, from the beginning.

1.   The United States acquired title to Mississippi territory by the cession from the state of Georgia of April 24, 1802, Hutch. Code, 1848, pp. 55, 56, whereby: "The state of Georgia cedes to the *United States all the right, title and claim which the said* state has to the jurisdiction and soil of the land situated," etc.

Then by the first clause of said cession it is provided that out of the proceeds of the sales of the lands ceded to the United States, Georgia was to be first paid $1,250,000; and, third, "that all lands ceded by the agreement *to the United States,* after satisfying the above-mentioned payments of $1,250,000 to the state of Georgia, and the grants recognized by the preceding conditions, be considered *as a common fund of the United States,* Georgia included," etc.

By the act of congress, May 10, 1800, 2 U. S. Stat., p. 69, supplemental to the act authorizing the establishment of Mississippi territory, section 7, it is provided: "That nothing in this act shall in any respect impair the right of the state of Georgia to the jurisdiction, or of the said state, or any person or persons to the soil of said territory, but the rights and claims of the said state, and all persons interested, are hereby declared to be affirmed and available as if this act had never been made;" and by section 10 the commissioners appointed were authorized to compromise, and to receive on behalf of the United States a cession of any lands therein mentioned, or of the jurisdiction thereof on such terms as to them shall appear reasonable."

It thus appears that under this act Georgia had the title to the lands in 1800, and provision was then made for acquiring Georgia's title by the United States, and this was done by the Georgia cession of 1802.

Whether the United States took title, as trustee, under the Georgia cession, as held in *Jones* v. *Madison County,* 72 Miss., 777 (s.c., 18 South. Rep., 87), *supra,* or not, this essential proposition is conceded by both lines of contention; viz: That the sixteenth sections were a trust for school purposes with the inhabitants of the township as *cestui que trust.*

The decisions of our court prior to *Jones* v. *Madison County,* had uniformly held that the title to these lands was in the United States, with power in the state, within the limits of the trust, to make regulations in regard thereto. *Moreton* v *Grenada,* 8 Smed. & M., 773 (1847), per Sharkey; *Phillips* v. *Burrus,* 13 Smed. & M., 36 (1849), per Sharkey; *Hester* v. *Crisler,* 36 Miss., 681 (1859), per Harris; *Windham* v. *Chisholm,* 35 Miss., 531 (1858), per Handy; *Rabb* v. *Supervisors,* 62 Miss., 594 (1894), per Arnold; *Chamberlain* v. *Lawrence Co.,* 71 Miss., 985 (s.c., 15 South. Rep., 40) (1894), per Cooper; and while these cases, we insist, set forth the correct rule, they were overruled by *Jones* v. *Madison County, supra.* The presumption would be that this court will follow its own last decision and leave the final decision of these matters to the federal courts, it being a federal question.

The rules announced in *Jones* v. *Madison County* favor our contention here, for it is there *expressly decided that the lands were a trust for the inhabitants of the township.* It matters not who the trustee is, the rights of the *cestui que trust* cannot be legislatively or otherwise impaired.

The court, with all deference, in *Jones* v. *Madison County,* 72 Miss., 777 (s.c., 18 South. Rep., 87), fell into error by relying upon *Gaines* v. *Nicholson,* 9th How., U. S., and upon the assumption that the state of Georgia, and not the United States, was donor, and in following *Long* v. *Brown,* 4 Ala., and other cases, contrary to the express decision of *Trustee* v. *State,* 14 How., U. S., *supra.*

The clear distinction between *Long* v. *Brown,* 4 Ala., as re-

cited in *Jones* v. *Madison County,* p. 799-800, and the status
of these titles in Mississippi is that the *act of congress admitting
Alabama* as a state declared that sixteenth sections *shall be
granted to the inhabitants of such township* for the use of
schools, while the *act of congress admitting Mississippi con-
tains no such provision.* Hutch. Code, p. 59.

It is difficult to understand that the supreme judges of
this state, who were familiar with the early history of the state,
and of the reasons for the act of 1833, Hutch. Code, 213, 214,
should have, from the earliest times, and contemporaneously
with the happening of the events, interpreted these acts of con-
gress as being the source of the title to the sixteenth sections,
and in holding that the legal title was and continued to be in
the United States, if that had not been the true interpretation.
This was the interpretation by congress in the passage of the
act of congress of 1852, code of 1857, p. 696. This was the
accepted interpretation of these titles by the supreme court of
the United States, by congress, by the legislature, and by
the supreme court of this state for a great number of years,
and it was for the court in *Jones* v. *Madison County* to erro-
neously discover, for the first time, that this interpretation was
a mistake. Judge COOPER, who delivered the opinion in the
case of *Jones* v. *Madison County,* had concurred in the opinion
of *Bolivar County* v. *Coleman,* 71 Miss., 832, in which it was
held that if the record did not affirmatively show the consent
of the heads of families, the lease was void, and this was over-
ruled by *Jones* v. *Madison County.* Neither court nor counsel
cited or referred to *Davany* v. *Koon,* 45 Miss., 71, on this
point, which disapproved *Phillips* v. *Doe,* 13 Smed. & M., 35,
and approved *Wray* v. *Doe,* 10 Smed. & M., 453, as applicable
to leases under the act of 1833 and the act of 1841, and apply-
ing the maxim *Omnia rite esse acta presumuntur.*

There is no reference in "An ordinance for the government
of the Territory of the United States northwest of the River

Ohio," of July 13, 1787 (Laws, etc., relating to Public Lands, p. 256), to the sixteenth sections. The only parts of said ordinance pertinent to the origin of Mississippi is transcribed into Hutchinson's Code, p. 53.

Under "An ordinance for ascertaining the mode of disposing of lands in the Western Territory," May 1785 (Laws, etc., relating to Public Lands), two years before the ordinance for the government of the northwest territory, it was provided: That the territory ceded by individual states to the United States which had been purchased of the Indian inhabitants shall be disposed of as follows: Surveys are to be made, and "There shall be reserved for the United States out of every township, the four lots, being numbered 8, 11, 26, 29, and out of every fractional part of a township so many lots of the same number as shall be found therein for further sale. There shall be reserved the lot No. 16 of every township for the maintenance of public schools within said township," etc.

Ordinance 23 (Laws, etc., relating to Public Lands, p. 362), styled "Powers of the board of treasury to contract for the sale of the western territory," of July 13, 1787, authorizes the board of treasury to contract for the sale of certain tracts of land to be surveyed and contents ascertained by the United States geographer, the purchaser within seven years to lay off the tract into townships and fractions according to the land ordinance of May 20, 1785; "the lot No. 16 in each township, or fractional part of township, to be given perpetually for the purposes contained in said ordinance." And this purpose was for "the maintenance of public schools within said township."

The title to the land composing the state of Mississippi was, in 1802, under this Georgia cession, vested in the United States.

The United States then proceeded to dispose of the lands thus vested in it, and by the act of 1803, Hutch. Code, 1848, p. 563, it established a commission to settle the British and Span-

ish titles, and to sell the lands to pay Georgia, and generally to dispose of said lands by sale; and congress, by section 12 of that act, Hutch. Code, 568, for the first time, and long prior to the survey of the lands, reserved the sixteenth sections in each township from sale, providing: "That all the lands aforesaid, not otherwise disposed of, excepted by virtue of preceding sections of this act, shall, with the exception of the section number sixteen, which shall be reserved in each township for the support of schools within the same . . . be offered for sale," etc.

Thus the trust is created by congress not in or for the state, but the title to the land then being in the United States was reserved from sale "for the support of schools within the same" (township).

Congress proceeded, after creating this *trust,* to make it effective by the *creation of trustees;* and so, prior to the organization of the state and prior to its admission, congress passed the act of 1815 (3 U. S. Stats., p. 163), providing that the county courts in each county in Mississippi Territory are authorized to appoint not exceeding five agents "who shall have power to let out or lease for the purpose of improving the same the sections of land reserved by congress for the support of schools lying within the county, for which the agents respectively are appointed, or to let them out at an annual rent, as they shall judge proper," and said agents, under the direction of the county courts, shall impartially apply the proceeds arising from the rents of each section to the purpose of education and to no other use whatsoever, within the particular township, "according to the true intent of the reservation made by congress," and in every case, whether of lease for the improvement of the lots, or for an annual rent, the lessee "shall be bound in a suitable penalty not to commit waste on the premises by destroying of timber or removing of stone, or any other damage that may be done to the same, whether by persons residing

thereon or others, the damage to be divided one-half to the agents and one-half to the same purpose as the proceeds of rent from the land. That every lease made under this act shall be limited to the period of the territorial form of government in said territory, and shall cease to have force or effect after the first day of January next succeeding the establishment of a state government."

Under this act of congress the policy of leasing for a short period of time or term was established, and, in contemplation of the early organization of the state, it was provided that the leases should expire with the territorial government in 1817. It is to be noted, also, that this act of congress, as does the code of 1892, confers the power of appointment of these agents or trustees upon the county court—board of supervisors.

Two years later, in 1817, congress passed the act enabling the people to organize Mississippi as a state. Hutch. Code, p. 59. Under this act the constitution of 1817 was ordained.

This court, in *Jones* v. *Madison County,* has gone over the phases of the question as to the source of the title, and has decided the proposition as to the federal questions set up against our contentions. But if *Jones* v. *Madison County* is right, which we deny, still our position is sound.

In *Trustees of Vincennes University* v. *State of Indiana,* 14 How., 268, 274, *supra,* it was held: "In the states where school lands have been reserved, the legislatures have enacted laws to carry out and effectuate the benign policy of the general government. Special authority has been given to individuals elected, in the respective townships, to lease the lands, sue for rents, etc., exercising, to some extent, corporate powers. The citizens within the township are the beneficiaries of the charity. The title to these lands has never been considered as vested in the state; and it has no inherent power to sell them, or to appropriate them to any other purpose than for the benefit of schools. For the exercise of the charity under the lease, the

title is in the township. No patent has been issued by the federal government, in such cases, as it has not been considered necessary. For the sale of school lands the consent of congress has been obtained, as that changes the character of the fund," and, that the title remained in abeyance upon the creation of the trust until the lands were surveyed, and until the appointment of trustees for the township; and that the trust was *a private one* for the citizens of the township; and not a delegation of *governmental functions,* and that it is beyond the power of the legislature to divest the title out of the township trustees, or to legislate prejudicially to the trust (p. 275-6). See also *Ould* v. *Washington Hospital,* 95 U. S., 313.

It is particularly to be noted that this, being an interpretation by the federal court of federal statutes, and of a federal treaty —the Georgia cession—held that "for the exercise of the charity under the lease the title is in the township," and that it was beyond the power of the state to divest the title out of the township trustees.

The legislature proceeded, after the act of congress became inoperative by its own terms, to execute what it believed to be the proper methods of dealing with the trust. The policy first adopted, as will be seen by reference to some of the acts, was that short leases (Act 1818, Hutch Code, 205), three years and five years, etc., should be made (Acts 1824, pp. 17, 19). The trustees under these leases were empowered expressly to sue tenants and others for damages for cutting timber, etc. (sec. 4, p. 19). See also Acts 1830 (Acts 1824-1836, p. 253), for leasing by trustees for twelve years in Claiborne county; act of 1830 (Acts, 1824-1836, p. 302), authorizing trustees in Pike, Wayne, Jones, Covington and Copiah counties to lease for fifteen years; and *Id.,* p. 330, those in Madison, Jefferson, Claiborne, Monroe and Lowndes at not less than $5 per acre, but by consent of the heads of families at not less than $2 per acre; and p. 332, authorizing the trustees of Wilkinson county to lease for five

years; and reciting that transient persons, such as wood-cutters, are destroying the timber, and conferring the powers recited in sec. 4 (Act, 1824, *supra*), as to suing for cutting the timber; and it is to be noted that it required the creation of a statutory liability in these leases for years for cutting timber.

The acts of 1824, *supra,* was amended (Acts, 1824-1836, p. 97), by the acts of 1828, providing that the trustees of a certain township might lease for ninety-nine years at not less than $10 per acre.

Such was the discordant policy of the legislature prior to 1833, and it evidenced the necessity of a change of policy which would bring greater revenue to the township school fund and make these wild lands marketable. The short leases had proved failures. These sixteenth sections, in 1833, were primeval forests, and no one would accept a lease for these short terms, especially with all of their incidents of liability for waste under said section 4. The acts of 1824, as also the act of congress of 1815, in making the tenants liable for cutting the timber, and only permitting use of the timber for reasonable estovers, imposed conditions unsuited to the leasing of the lands in their then condition, and the then existing conditions in the state made a change imperative.

Think of leasing lands in 1833, without privilege of using the timber on it except for estovers, when the whole state was a howling wilderness of forests. The Natchez trace was about the only road across the state; markets and produce *non est,* and Indians about the only inhabitants. Such was the condition of the state in 1833 that the trees were a burden to the land, of *no market value whatever,* and were gladly burned to get them out of the way; in some degree like the delta country up to a few years ago, and before railroads penetrated it and made a market, and, hence, a value for timber.

Such were the conditions which confronted the legislature in 1833, when it became absolutely necessary to do something

with these sixteenth sections to make them produce a revenue to the township school fund.

The legislature, by the act of 1833, changed the whole sys-tem, and *repealed all former acts.* Acts, 1824-1836, 452 Codi-fied, omitting repealing section, Hutch. Code, 1848, pp. 213, 214. Thereby the trustees *at the request of the heads of families,* were authorized, at auction, to "lease said section . . . for the term of ninety-nine years," upon a credit of one, two, three and four years, with promissory notes, to "operate as a lien and special mortgage on the land . . . ; and it shall be the duty of said trustees on the final payment of the money . . . *to convey the right, title, use, interest* and occupation of said sections . . . to the lessee or lessees for and during and until the full end and term of ninety-nine years." (Italics ours.) The proceeds of sale of the lease were to be invested in the bank stock. Full payment was required before any title passed to the lessee. *Sexton* v. *Board,* 86 Miss., 380 (s.c., 38 South. Rep., 636), *supra.*

It will be at once noted that this was not to be an ordinary lease upon a rent reserved, *but the sale of a term in gross for a specific sum,* and that term to be ninety-nine years. It is, also, to be noted that while all former acts· had authorized leases, they never, as did this one, prescribe the *estate the grantor was to convey,* and the words he was to use; and from this it· is manifest that the legislature intended that the sale should pass *more than a mere ordinary leasehold interest.* Call-ing it a lease does not make it one, if its legal effect be other-wise. *Cunningham* v. *Davis,* 62 Miss., 368.

Effect must be given to the operative words of the grant. Here the deed of the trustee, at the request of the heads of families (the *cestui que trust*), was to convey the *right, title, use, interest and occupation of said sections,* for, during and until the full end and term of ninety-nine years. These are not the apt words of a lease. The intent was that the pur-

chaser of the term of ninety-nine years, for a gross sum prepaid, should be more than a mere lessee; and that, for that period or term he should enjoy the estate *as if he was owner.* The language used to define the estate granted is the same as that used by the Georgia cession to the United States (Hutch. Code, p. 55), "right, title, interest," etc. The grant was not only to convey the *right, title and interest,* but also *"the use and occupation."* "A grant of the 'title' in the strict application to real property, denotes a collection of all the facts of ownership." 26 Am. & Eng. Ency. Law (1st ed.), p. 20, note 1.

So if the grant had stopped with the "title" for the term of ninety-nine years it would have vested in the grantee "all of the facts of ownership," and this would mean the enjoyment during that period of the right of property, right of possession and possession.

A deed conveying the "right, title and interest" in land passes the estate of the grantor in the land then existing. *Brown* v. *Jackson,* 3 Wheaton, 452; *Allison* v. *Thomas,* 72 Cal., 564; *Bramlett* v. *Roberts,* 68 Miss., 323 (s.c., 10 South. Rep., 56); *Chapman* v. *Sims,* 53 Miss., 154.

If the owner grants the "right, title and interest" and the "use and occupation" in land during ninety-nine years, it would pass title to the grantee to the land with all of the incidents of ownership *during that period.*

The covenant for use and occupation is one for quiet enjoyment, and was added manifestly to exclude the implication that a covenant for the quiet enjoyment was not embraced in the lease. 18 Am. & Eng. Ency. Law (2d ed.), 612.

The rule is that the terms of the deed are to be *construed most favorably* to the grantee; and this rule applies to even public grants where a consideration is paid for them. 17 Am. & Eng. Ency. Law (2d ed.), 14, 15. The grant of the "right, title and interest" of the trustee and of the *cestui que trust* is incompatible with any reserved right in the reversioner. *Dur-*

*ing that period* the deed creates a *determinable fee* to end upon the passage of ninety-nine years. The language is not as ordinarily used, "demise, lease and to farm let," during the term of ninety-nine years, 18 Am. & Eng. Ency. Law (2d ed.), 599, ·but this broader and more comprehensive language *is directed to be used in the enabling act.* Theretofore, the acts directed a lease without prescribing the terms of the grant; and this created merely a lease, and with the incidents of the act of 1824, sec. 4, of statutory liability for injury to the reversion. But this act of 1824 *is repealed* by the act of 1833, and the new grant is authorized upon new terms, without liability for waste, and creating a new and different estate in the grantee. The very language used in this act of 1833 is shown to have been the work of a lawyer. It avoids the use of the apt words of a lease; it guards against the implication against a covenant for quiet enjoyment; it provides that the estate is to continue, not as ordinarily, for and during the full term of ninety-nine years, but "for and during and *until the full end and term* of ninety-nine years." It reserves a lien for the purchase money, not upon the leasehold interest, but to "operate as a lien and special mortgage on the *land.*" Instead of rent reserved it requires prepayment of purchase money before any title vests. *Sexton* v. *Board, supra.*

The leasehold, as a separate entity, is specially subjected to taxation, and it is the only title of any lessee or lease which was expressly and separately taxed from the reversion in the land; and then only such are taxed as were made after the act of 1833 (Revenue act of 1841, Hutch. Code, p. 188); and in case of sale for taxes "the title of the lessee. . . . shall be conveyed." Hutch. Code, 188-9. To confirm this interpretation the act of 1841 (Hutch Code, p. 221) amending the act of 1833, provided:

"The lessees of the sixteenth sections, and all other school lands, shall be authorized to, and may maintain and carry on,

all such suits at law or in equity, immediately after the leasing, as they could or might maintain or carry on were they the *fee simple* owners of the leased premises except against the lessors."

If all rights of action of fee simple owners were vested in the lessee against the world, except the lessors, then, it is conclusive evidence that their estate was more than a lease.

The *lessee* under this act of 1833 could sue in trespass for cutting trees, an injury to the reversion, under this act, as was expressly held in *Davany* v. *Koon*, 45 Miss., 71. This could only be sustained on the ground that the trees belonged to the lessee and not to the reversioner.

There is no requirement that the proceeds of such recovery should be accounted for by the lessee to the lessors. Manifestly, this act of 1841 conferred the same rights of action as to the property as if the lessee was owner in fee, and, thus, is affirmatively declared the construction for which we contend. That more was intended than an ordinary lease is clear from the amendments thereto by Arts., Hutch. Code, 19, 24, 26, pp. 219, 221, 226. The calls of the grant can only be satisfied by vesting a determinable fee in the grantee during the period of ninety-nine years.

The legislature manifestly thought that such was the effect of the grant, for after these grants, the matter so vital, ordinarily, as these sixteenth sections, lapsed into forgetfulness. The code of 1857 only renews the taxation of the leases, and has nothing to say as to the sixteenth sections. Thirty-six years afterwards, and after the constitution of 1869, in the new atmosphere after the war, there were provisions in the code of 1871, ch. 39, in regard thereto, and the title to the sixteenth sections was there treated as vested in the lessees, as is shown by sec. 2056, code of 1871, validating contracts for the purchase money.

There is nothing in any of the codes, nor since the act of 1824, giving the right to sue for cutting timber, or for waste,

or creating any liability therefor.    A statutory lease must be measured by the statue and not by the common law.

The trustees became a *quasi* corporation against whom the statute of limitation ran.    *Marshall* v. *Hamilton,* 41 Miss., 229 ; *Carmichael* v. *Trustees,* 2 How. (Miss.), 84 ; *Connell* v. *Wood-ward,* 5 How. (Miss.), 665 ; *Bishop* v. *McDonald,* 27 Miss., 371 ; *Pressley* v. *Ellis,* 48 Miss., 575 ; *Brown* v. *Supervisors,* 54 Miss., 233 ; *Jones* v. *Madison County,* 72 Miss., 806 (s.c., 18 South. Rep., 87).

Such is the status of the leases under the act of 1833.

In 1880, ch. 16, code of 1880, secs. 732-744, the legislation confirms this interpretation, and as the lease in the instant case arises under the code of 1880, its provisions should be carefully noted.

Section 732 provides that "whenever a majority of the resident heads of families (minors and females not excepted)" *the cestui que trust,* shall petition therefor the board of supervisors shall appoint "three intelligent citizens of the township *to appraise said land,* who shall do so, and make report, under oath, to such board *of the value of such land;* and thereupon, said board of supervisors shall direct that said land be leased to the highest bidder for the term of ninety-nine years" (Italics ours.)

It is to be noted that the *land,* not the term of ninety-nine years, and as if for the sale of the entire interest therein, is to be valued.

Section 733 provides that said lease shall be made "under the direction of the president of the board of supervisors, or of some person or persons appointed therefor by the board of supervisors, for ninety-nine years, on a credit of one, two, three and four years," to be evidenced by promissory notes, *with good sureties, payable to the president of the board of supervisors,* and said notes, with interest, "shall operate as a lien and special *mortgage on the lands* until the payment thereof," and the president of the board of supervisors shall execute and deliver to the

lessees of said lands a written lease thereof, for the period of ninety-nine years, the said lessee paying the expense of the execution and delivery of such instrument. (Italics ours.)

By section 734 the majority of the resident heads of families may by petition have such leasing for any number less than ninety-nine years.

Section 735 provides, *"In no case shall said lands be leased for less than their appraised value,* and in all cases sufficient sureties shall be required of the lessee for the performance of his obligation, whether the lease be for ninety-nine years, or a less term."

By section 736 the notes shall be delivered to the county treasurer and be collected by him, and if not paid, shall by him be placed in the hands of the district attorney for suit, and the money when collected may be loaned as the board of supervisors may direct, the interest thereon to be paid over to the township trustees elected by the inhabitants of that township.

Section 737 applies to divided townships.

Section 738 provides that the money derived from the sale or lease of section number sixteen, or other section in lieu thereof, reserved *by act of congress of the United States,* shall be applied for the support of schools within the township for which such section of land was so reserved.

By section 739 the board of supervisors is given the management and control of such money, and, in case of division of township between two counties, to apportion it.

Section 740 provides that on the money arising from the sale or lease of sixteenth sections, the interest shall be annually applied for the support of schools, "within the township for which such section was *reserved by act of congress"* . . . "and the trustee of such township may institute any proper legal or equitable proceedings to compel a due observance of the rights of the inhabitants of the township, as to the money arising from the disposition of said school section." (Italics ours.)

By section 741 "the heads of families in any township may elect three trustees for such township to represent the inhabitants thereof. in all matters pertaining to the section number sixteen   .   .   .   or the money arising from any disposition of such section, which trustees shall have the power to receive, manage and control the annual income from said land or money, and shall apply it for the support of schools within said township, in such manner as to secure the benefits thereof to the inhabitants of such township; and said trustees may maintain all actions or suits which may be necessary to secure to the inhabitants of the township their rights to the sixteenth section thereof or other land in lieu thereof or the income arising therefrom, for the support of schools within such township."

Section 742 provides for the election of trustees, and section 743 for use of unidentified money. And by section 744 it is provided: "The board of supervisors of any county may sue for and collect any money due for any school land or money loaned or in any manner due, which constitutes any part of a school fund to be applied for the support of schools in such county."

It is particularly to be noted that the code of 1880 provides for a *valuation of the land,* and for a lease of ninety-nine years at *not less than such valuation,* and at a gross sum, but does not require pre-payment of purchase money to vest title, security being substituted for such reservation of title. The trustees are provided for, and it is more than once repeated that the sixteenth sections were "reserved by act of congress." Under these provisions, as under the act of 1833, the lessee takes a qualified fee for the ninety-nine years. The purchase price represents *not less than the value of the land;* the dominant idea being that a lease for ninety-nine years—as long as the average of three lives—carries with it more than the ordinary incidents of a lease.

In *Montague* v. *Smith,* 13 Mass., 403, a lease for nine hun-

89 Miss.—30

dred and ninety-nine years was regarded, to all intents and purposes, a fee simple estate charged with a ground rent.

By Acts 1884, p. 90, the trustees were required to give bond, and by Acts 1886, p. 33, the trustees were required to file an account, semi-annually, with the clerk of the board of supervisors, and code of 1880, sec. 739, was so amended that the board of supervisors "may maintain all actions and suits necessary to secure to the inhabitants of the township their rights to such section or other land, with proceeds, rental or income thereof."

And said section 741 was so amended that "in case the board of supervisors shall *reject* or refuse to secure the inhabitants of the township their right to said section or money arising therefrom, or the income or rental thereof, if the board of supervisors shall fail to pay over to said trustees any such income or annual rental when collected as provided in section 736, the said trustees may maintain any suit necessary to secure to *state* (such) inhabitants of the township their rights to said section or money, or to the proceeds, income or annual rental therefrom."

Nothing is said in the code of 1880, nor in this act of 1886, as to any suits for waste. The controlling idea is that the land itself had passed, when leased, beyond any present interest, and attention is given to taking care of the money arising therefrom.

Chapter 123, code of 1892, proceeds upon the same theory, and seeks to ascertain the status of the title, and when the leases will expire, and to care for the money arising from the leases; but not since Laws 1824, § 4, *supra,* has there been any statute in regard to suits against timber cutters for waste.

It is true that in *Chamberlain* v. *Lawrence County,* 71 Miss. (1894), 949 (s.c., 11 South. Rep., 40), under sec. 744, code of 1880, *supra,* because the money if recovered would constitute a part of the school fund, held that

the board of supervisors could sue a stranger in trespass for damages for cutting trees on the school land, and that the title and possession of the land, if it had never been lawfully leased by public authority, remained in the United States, which cannot be disseized. This case could hardly be maintained in holding that because the money would belong to the school fund, if recovered, that a suit could be maintained in trespass *quare* by a stranger to the legal title. It is overruled in its holding that because the title was in the United States it could not be disseized by *Jones* v. *Madison County,* 72 Miss., *supra.* It refers as authority to Code 1880, § 744, ignoring the amendment by the act of 1886, and holds, directly opposite to *Rabb* v. *Supervisors,* 62 Miss., *supra,* that under the code of 1880 the board could sue. This section 744, or the amendment by the act of 1886, was not brought forward in the code of 1892, and, hence, cannot now avail.

To maintain trespass *quare* the plaintiff must have title and possession. *Gathings* v. *Miller,* 76 Miss., 651 (s.c., 24 South. Rep., 964); *Page* v. *Davidson,* 22 Ill., 111, *supra;* 22 Ency. Pl. & Pr., 1906, *supra.*

A disseizee cannot maintain trespass *quare* until re-entry. *Alliance Trust Co.* v. *Hardwood Co.,* 74 Miss., 588 (s.c., 21 South. Rep., 396); *Wesson* v. *Miller,* 58 Miss., 831; *Chamberlain* v. *Board,* 71 Miss., *supra.*

In *Davany* v. *Koon,* 45 Miss. (April, 1871), 71, *supra,* it was held that the *lessees* under the act of 1833, and under the act of 1841, *supra,* could maintain trespass and recover for cutting trees from sixteenth sections. The court saying, p. 75: "The township trustees, and, in special circumstances, the board of police, are authorized by law *to sell for a limited time the school lands."*

With this judicial interpretation of the status of the lessee, and of the effect of the lease, the code of 1880 was enacted, providing for the sale (lease) of the lands for a limited term at not less than the appraised value of the lands.

The decision in *Davany* v. *Koon* is incompatible with any right in the *lessor* to recover for cutting the trees. This interpretation is confirmed by *Bond* v. *Griffin,* 74 Miss. (1897), 599 (s.c., 22 South. Rep., 187), where the lessee recovered *in replevin the value of the trees cut and removed by a trespasser—* the logs not being found.

Also, by *State* v. *Fitzgerald,* 76 Miss. (1898), 502 (s.c., 24 South. Rep., 872), under code of 1892, where the state purchased at tax sale the interest of the lessee of the sixteenth section, and the state, as such purchaser, brought replevin against a trespasser for the timber cut and removed, and recovered therein. The title of the lessee only, under the statute, could be sold for taxes, and upon the lessees' title this recovery for the timber was held.

Thus by three decisions the title of the lessee to the timber, even after it has been cut and removed, has been maintained.

In *Learned* v. *Ogden,* 80 Miss., 769 (s.c., 32 South. Rep., 278), it was held as between the tenant by the curtesy and the reversioner that when trees are severed for profit they become personalty, and in which the tenant *by operation of law* has no interest, and that the reversioner may maintain an action therefor, or for damages to the inheritance.

The rule is different with a tenant for years. He is not liable for waste at common law. His liability for waste was created by statute of Marlebridge, Hen. III; 1 Wash. Real. Prop. (6th ed.), 270; 2 Minors Inst., p. 112; 2 Taylor Land & T. (9th ed.), sec. 686.

This statute of Marlebridge is not a part of the jurisprudence of Mississippi. *Jordan* v. *Roach,* 32 Miss., 482.

Section 4, Acts 1824, created a liability for waste, but that was repealed by the act of 1833, and has never been re-enacted.

The case of *Warren County* v. *Gans,* 80 Miss., 76 (s.c., 31 South. Rep., 539), varies from *Davany* v. *Koon; Bond* v. *Griffin, and State* v. *Fitzgerald, supra,* in some de-

gree, but we respectfully insist that case, so far as it militates against these cases, should not be followed. The court could not be blamed for being misled. It appears from the reported case that while the appellant filed an elaborate brief and made such erroneous contentions as that said sec. 4, act of 1824, was a part of the statutory scheme under the act of 1833, and without citation of any of the cases, *supra,* and contending that at common law the lessee was liable for waste; and the brief for appellee does not cite a single statute or authority to show that the common law rule as to tenants by operation of law as to waste did not apply; and so the court had the right to take for granted that the said rule of the common law was applicable.

The opinion makes no reference to the act of 1833, nor to other acts, nor to cases in this state, and contrary to *Jordan* v. *Roach, supra,* holds that the ancient English statutes are in force here.

That the lessee acquired more than a mere leasehold estate is further evidenced by the act of 1902, ch. 78, acts of 1902, which provides that upon proof made of existence of the lease, the court may decree confirmation of the title of the lessee "and such decree shall vest in the complainant a good and perfect title to the term of the lease for the time fixed in such decree." If it is decreed that the lease was illegally made, that an account is to be taken of the amount of money, principal and interest, actually paid upon the lease, and of the rents, issues and profits arising from such land, less the cost of any necessary, permanent, valuable, and not ornamental improvements made upon the land. This is the equity rule of a *bona fide* purchaser for value. It is thus clear that the legislature interpreted valid leases to confer a good and perfect title to the term of the lease; and even when there had been an invalid lease made, that there should be an accounting in good faith, in which the lessee should get back his money and interest, and be charged with rents,

issues and profits, less improvements made. Not a squint at liability for damages in trespass for injury to the reversion by cutting the trees, even as to an invalid lease; but, on the contrary, if the lessee in such void lease made improvements, they were to be compensated therefor. If such should be the statutory rule in dealing with an illegal "and void" lease, it must be apparent that a valid lease conveyed an estate not subject to accounting of any character.

In the case at bar *the value of the land was appraised,* under the code of 1880, and the bill avers that the land is of no value without the timber. Thus, we have a tract of land of no value except for the timber—not suited to tillage—leased at a price representing the value of the land, and in which, it is contended, the sole right of the lessee is to clear for the impossible purpose of tillage.

The act of 1898, ch. 41, and that of 1904, ch. 124, evidence still further the idea that the timber was severable, in the eye of the law, from reversion, authorizing a sale of the merchantable timber and wood therefrom, and, also, to lease for turpentine purposes, and this irrespective of any tillage

Section 211, Constitution 1890, also makes this manifest, for it authorizes a lease for such period as may be deemed proper in consideration of the *improvement* thereof. Thus separating the classes of leases, and so far from prohibiting the cutting of timber, it encourages the cutting of timber from "uncleared lands."

To make efficient the beneficial enjoyment of a lease for ninety-nine years, when in the course of nature the mature timber trees then existing would be destroyed by lapse of time, and the forest at the date of the lease would not be that at its termination, and when the only timber on it at the termination would be that allowed to grow up thereon during the term, it would be necessary to permit the lessee to use the timber for profit. Else, why, under the code of 1880, should the *land* be

appraised and the lessee be required to pay *at least, this value of the land,* and which, in the instant case, was the value only for the timber. Essentially, in such case, it was a sale of the timber only, as the timber alone gave this value to the land.

*Longino, Willing & Wilson,* for appellee.

We maintain that the lessee, or his assignee, of a sixteenth section can only cut timber (1) for the purpose of clearing for cultivation such portions of the land as a prudent owner in fee would clear for that purpose, provided he leaves enough timber and wood as may be necessary for the permanent use of the estate. (2) That his right to open and clear for cultivation wild and uncultivated lands is that of a prudent owner having regard for the amelioration of the inheritance. (3 That the tenant can cut timber for the purpose of clearing land only for immediate cultivation, in which event he can appropriate the proceeds to his own benefit, but that he cannot cut timber for sale without making himself amenable for waste.

The court will see at a glance that our contention is founded upon the opinion rendered in the case of *Warren County* v. *Gans,* 80 Miss., 76 (s.c., 31 South. Rep., 539), and it seems strange to us that we should be called upon to defend our position in view of the able opinion of the court in that case.

Counsel for appellant, however, in their brief, challenge the correctness of the decision of the court in that case, and earnestly insist that it ought to be overruled. We submit that the decision in the case above quoted is sound in principle, supported by incontrovertable logic, and by the overwhelming weight of authority which leads irresistably to the conclusion reached by the court.

Inasmuch, however, as counsel have challenged the correctness of that decision, we will attempt to marshal in invincble array the authorities in support of the conclusion of the court in that case.

Counsel for appellant contend that in Mississippi a tenant for years cannot commit waste, and in support of that novel position they cite the fact that at the common law the tenant for years is not liable for waste, but that his liability was created by the statute of Marlebridge, Henry III. They then proceed to argue on the authority of *Jordan* v. *Roach,* 32 Miss., 482, that this statute of Marlebridge, not being a part of the jurisprudence of Mississippi, there is no law against the commission of waste by the tenant for years, the only law ever on the statute books of Mississippi on that subject being sec. 4 of the act of 1824, which counsel solemnly contend was repealed by the act of 1835, and has never been re-enacted.

Counsel contend that the court, in rendering the decision in the case of *Warren County* v. *Gans, supra,* must have been misled, because counsel for appellant in that case filed "an elaborate brief in which he took the erroneous view that sec. 4, act of 1824, was a part of the statutory scheme under the act of 1833, and without citation of any of the cases" contended that at common law the lessee was liable for waste.

We propose to show later on that sec. 4, act of 1824, was not repealed by the act of 1833, but that it remained in full force and effect.

We submit that neither of these acts has any bearing whatever on the question we are now discussing. We propose to show, both upon reason and authority, that a tenant for years is liable for waste, not only in England by the statute of Marlebridge, *but in almost every state of the Union, and especially in Mississippi, by a multiplicity of decisions of the courts of last resort.*

The position contended for by counsel for appellant is not founded upon reason and principle. Let us suppose a case by way of illustration:

"A leases to B 640 acres of land, of which 140 are in cultivaton, on which have been erected valuable improvements. The

balance of the land, we will say, is covered with a fine growth of yellow pine timber. For a small annual rental the possession of the estate is delivered to the tenant for years. No restrictions are placed in the lease as to the commission of waste, either voluntary or permissive, because to do so would be an idle performance, the law implying that the tenant will do no lasting damage to the inheritance, and that he will farm the estate according to the dictates of good husbandry. B, the tenant, learning that the statute of Marlebridge has not been re-enacted in Mississippi, and, on the authority of *Jordan* v. *Roach, supra,* that he is unimpeachable for waste, proceeds in flagrant disregard of the rights of his landlord, to cut and convert into lumber the timber standing on the 500 acres of land, worth at present prices, about $15,000. He tears down the buildings erected on the premises, destroys orchards, ornamental shrubs and shade trees of a hundred years' growth, thus bringing utter destruction and ruin upon the estate of the reversioner, and yet we are told by counsel for appellant that the tenant for years is unimpeachable for waste in Mississippi, and the landlord is utterly without remedy to redress the flagrant violation of his rights by the tenant. To such an *illogical* conclusion does the argument of counsel for appellant lead.

Not only is the position contended for by appellant unsound in principle, but it is contrary to the overwhelming array of authority. "The rule is now universal that unless exempted by the terms of his lease from responsibility for waste, a tenant for years is responsible for voluntary waste of the premises." 30 Am. & Eng. Ency. Law (2d ed.), 259, and the long list of authorities cited in note 6, thereunder.

"A tenant, regardless of the duration of his lease term, is liable for voluntary or permissive waste." *Boefer* v. *Sheridan,* 42 Mo. App., 226.

"Unless excepted by the terms of his lease from responsibility for waste, a tenant for life or years is responsible for waste

committed upon the demised premises." *Con. Coal Co.* v. *Savit,* 57 Ill. App., 659.

"The liability of tenant for waste does not depend upon negligence, but is imposed on ground of public policy." "In the absence of some agreement to the contrary, the tenant is responsible for all waste however or by whomsoever committed, except if occasioned by the act of God, the public enemy, or the act of the reversioner himself." *Parott* v. *Barney,* Fed. Cas., 1st Sawyer, 423; *Nitroglycerin case,* 85 U. S., 524.

"Felling trees by a tenant for years renders him liable to another for waste." *Robinson* v. *Kline,* 70 N. Y., 147. See, also, *Parkins* v. *Cox,* 3 N. C., 339; *Robertson* v. *Meadows,* 73 Ind., 43; *Chappel* v. *Hill,* 60 Mich., 167; *Kidd* v. *Dennison,* 6 Barb. (N. Y.), 9; *Jones* v. *Whitehead,* 1 Pars. Eq. Cas., 304.—4 Clark, 330.

The statutes of Marlebridge and Gloucester had to do with the remedy. Tenants for years and life, at the common law, could commit waste, regardless of the statutes above referred to. See Smith's Manual of Common Law, pp. 100 to 106 inclusive; Co. Litt., p. 53; 2d Blackstone's Commentaries, p. 281.

In *Walton* v. *Lowrey,* 74 Miss., 487 (s.c., 21 South. Rep., 243), the court held that a lease of land for one year gave no authority to cut timber except for repairs.

This question has been forever set at rest, however, by the decision of this court in the case of *Warren County* v. *Gans,* *supra.* Let us quote from that opinion: "By the common law of England, 'waste' is defined with great accuracy, and ancient statutes there have made tenants for years liable for waste. The doctrine has been adopted in this country so far as it is suitable to our condition and circumstances as a new and growing country, and, in a more or less modified form, is administered in most, if not all, of the states of the American Union." (80 Miss., 81.)

Counsel for appellant contend that the common law doctrine

of waste does not apply in Mississippi because in its earliest days the conditions were totally different from those in England, when the whole state was a "howling wilderness" of forest, the Natchez trace the only road across the state; when markets and produce *non est,* and Indians were the only inhabitants.    That the trees were a burden to the land, of no market value whatever, and were gladly burned to get them out of the way.' That there were no railroads, and no market for timber, and that therefore it had no value.    For these reasons they contend that the conclusions reached by the court in the case of *Warren County* v. *Gans* were inadvised and hasty.

You would imagine that counsel had discovered some new argument, the irresistible logic of which would overthrow the decision in the case above mentioned.    *Not so, however;* the *"howling wilderness"* argument was made by learned counsel for appellee on the trial of the *Gans* case.    Let us quote from their brief a few moments:    "This theory is borne out by the surrounding conditions at that time.    These sixteenth sections were most of them nothing more or less than *'howling wildernesses.'*    The very purpose of leasing them out for a period of ninety-nine years was to have them settled up by the farmers and planters of the country, and have them cleared up and put in cultivation, and made profitable.    If they were not leased for this purpose, the question is, what were they leased for?"

In reply to this argument the court in its decision of the *Gans* case said:    "The rigid rule of the common law that a tenant of a particular estate could not cut timber, except for estovers only, is in many jurisdictions modified so as to allow him to cut off the timber for clearing so much of the estate as the needs of his family may require for their support, though the timber be destroyed thereby.    And he may clear for cultivation such portions of it as a prudent owner in fee

would clear for that purpose, provided he leaves enough timber and wood as may be necessary for the permanent use and enjoyment of the inheritance. His right to open and clear for cultivation wild and uncultivated lands is that of a prudent owner in fee, having a regard for its amelioration as an inheritance. When the particular tenant cuts timber in the process of clearing the land for immediate cultivation, he can appropriate it or its proceeds to his own benefit, but he cannot cut the timber for sale without making himself amenable for waste."

Nor was this any new interpretation of the law.

The "howling wilderness" argument was long ago made and duly allowed for. We refer the court to the opinion in the case of *Cannon* v. *Barry,* 59 Miss., 289, which contains the following: "The *locus in quo* consists of twelve hundred acres of land, of which about three hundred acres only are arable, the balance being swampy in character and heavily timbered. When the defendant took possession the arable portion was in such condition that it was wholly unproductive for the first year thereafter. By rebuilding the fences, clearing thirty or forty acres additional, removing some of the tenant's cabins to other locations, and building several new ones, he has brought up the rental of the place to something less than three hundred dollars per annum, exclusive of the amounts expended each year in making these improvements. In accomplishing these results he has freely cut and used the growing timber on the place, of which there is a superabundance for this and all other purposes. In so doing, as well as in removing the cabins and perhaps in other respects, he has unquestionably been guilty of that which would be deemed wasted under the English authorities, but which we cannot pronounce to be such under the state of things existing with us, and under the circumstances of this case. The condition of this country and that of England are wholly dissimilar, and that which would be a safe test there is altogether inapplicable

here. With us, speaking generally, it may be said that nothing will ordinarily be held to constitute waste which is dictated by good husbandry, and promotes rather than diminishes the permanent value of the property as an estate of inheritance. That such has been the nature and effect, in the name of the acts of the defendant, is incontestably established by the testimony in the case."

See, also, *Learned* v. *Ogden,* 80 Miss., 769 (s.c., 32 South. Rep. , 278), from which we quote the following: "*While the law of waste, as established in England, is modified in its transportation to this country to suit the conditions of a new and uncleared country, and to allow a tenant for life to open wild lands for necessary cultivation, or to change the course of agriculture, without being liable for waste, yet the cutting down of trees for his mere profit is here, as there, considered waste. A tenant by the courtesy, as an incident to his estate, may take reasonable estovers of all kinds, and he may cut timber to pay taxes, or to improve the land, and when so cut it belongs to the tenant, and not to the reversioner. But the cutting down by the tenant of trees for sale is waste, and the felling of trees by the tenant or others for a sale of them is an injury to the inheritance, for which the reversioner have their appropriate action.*"

We thus see that in the *Gans case,* and in the cases of *Learned* v. *Ogden* and *Cannon* v. *Barry, supra,* due regard has been given to the changed condition of affairs in a new country like Mississippi, and the strict rules of the law as to waste, according to the common law of England, have been radically changed in Mississippi, and that the above mentioned cases have modified the rigid rule of the common law on that subject so as to conform to the changed condition of affairs.

Thus we see that there is nothing in the "howling wilderness" argument which has not already been contended for and duly allowed by the decisions of this court.

See to the same effect *McCoy* v. *Wait,* 51 Barb., 225. From that case we quote the following:

"The doctrine of waste in common law is not in its strictness applicable to the conditions of things in this country, but the law remains with us, as in England, that such cutting of tree or timber as will work a permanent injury to the freehold or inheritance in the absence of a specific license, is waste, for which an action will lie in equity by injunction or at law for damages."

See, also, *Robinson* v. *Kine,* 70 N. Y., 147; *Parkins* v. *Cox,* 3 N. C., 339; *Dickinson* v. *Jones,* 36 Ga., 97; *Robertson* v. *Meadows,* 73 Ind., 43; *Ward* v. *Sheppard,* 3 N. C., 283; *Moorhouse* v. *Cotheal,* 22 N. J. Law (2 Zab.), 521; *Vandusen* v. *Young,* 29 N. Y., 9; *Jackson* v. *Brownson,* 7 Johns, 227; *Selden* v. *Mann,* 2 N. Y. Leg. Abs., 329; *Thurston* v. *Mustin,* 3 Chanch. C. C., 335; *Fleming* v. *Collins,* 2 Del. Ch., 230; *Bustman* v. *Jones,* 34 Minn., 547; *Boefer* v. *Sheridan,* 42 Mo. App., 226; *Consolidated Coal Co.* v. *Savits,* 57 Ill. App., 659.

Where the whole of a farm, when leased, is in a wild and unsettled state, with the exception of a few acres, and for the use of which the lessee agrees to pay rent, the parties will be held to have intended that the lessee should be at liberty to fell part of the timber in order to fit the land for cultivation; but this right will not authorize the lessee to destroy all the timber and thereby work irreparable injury to the premises or permanently diminish their value, and when he cuts the trees upon the demised premises, not for the purpose of preparing the land for cultivation, *but for the sake of the profit to be derived from the sale of the timber,* he is guilty of waste. *Kidd* v. *Dennison,* 6 Barb. (N. Y.), 9.

This is a case exactly in point and supports in every particular the decision of the *Gans case.*

See, also, *Jones* v. *Whitehead,* 1 Pars. Eq. Cas. 304—4 Clark, 330. See, also, vol. 30, Am. & Eng. Ency. Law (2d ed.), pp.

238, 239, 240, 241, 242, 243, 244, and the numerous authorities cited thereunder. See, also, Taylor on Landlord and Tenant (8th ed.), sec. 345 (28 Am. & Eng. Ency. Law (1st ed.), 870); *Clarke* v. *Holden,* 66 Am. Dec., 450; *Clemens* v. *Steer* (R. I.), 53 Am. Dec., 621; *Jones, Lee & Co.* v. *Britton* (N. C.), 4 L. R. A., 178; *Brashear* v. *Macy,* 3 Marsh. (Ky.), 89; *Buckley* v. *Dolbeare,* 7 Conn., 232; *Johnson* v. *Johnson,* 18 N. H., 594; *Davis* v. *Gilliam,* 5 Ird. (N. C.), 309; *Davis* v. *Clarke,* 40 Mo. App., 515; *Owens* v. *Hyde,* 6 Yerger (Ky.), 334; *Mooers* v. *Wait,* 3 Wend, 104 (20 Am. Rec., 667).

We thus see from the overwhelming weight of authority of the American statutes that *the tenant for years has no right to the growing timber on lands other than the right to use the same for reasonable purposes of estovers;* that is to say, for the building of houses and fences and for firewood, and *that he has no right to clear the land except for purposes of cultivation in such a manner as a prudent owner in fee would clear for that purpose,* and that he must leave enough timber and wood as would be necessary for the permanent use and enjoyment of the inheritance. That in clearing wild and uncultivated land, *due regard must be had for the amelioration of the inheritance. That when land is cleared it must be cleared for immediate cultivation,* in which event the tenant can appropriate the proceeds to his own behalf, but *he cannot cut the timber for sale without being liable for waste.*

In the case at bar it was alleged in the bill of complaint that appellant had cut timber from the land, and was threatening to cut all of it therefrom, not for the purpose of cultivation, but for commercial purposes, for its own mere profit. The allegation of the bill put the case at bar squarely within the decision of the *Gans case,* and within all of the vast array of authorities in support of the *Gans case* which we have above cited.

In the North Carolina case of *Ward* v. *Sheppard,* above

referred to, the court said: "Cutting timber for clearing is not waste, but if done for the purpose of sale it is waste."

Let us proceed now to a discussion of the general policy of the law on the subject of sixteenth sections as indicated by the various statutes enacted on the subject of school lands, and see if we can find in the history of the legislation on this subject any reason why the *Gans case* should be overruled.

It will be remembered that the act of congress, 1815, regarding the subject of school lands while Mississippi was a territory, and the act of the Mississippi legislature, 1824, on the same subject, made the tenant liable for cutting trees or timber.

Counsel for appellant says the conditions contained in these laws were unsuited to the leasing of lands in their then wild conditions, and the then existent conditions in the state made a change imperative, and that therefore the legislature, by the act of 1833, changed the whole system and repealed all former acts, and that the provisions of the law of 1824 with reference to the commission of waste were repealed, thereby indicating an intention on the part of the legislature that these lands should be held, as it were, in fee simple by the tenants, unimpeachable for waste.

We deny the correctness of this proposition, and submit that *the act of* 1833 *did not repeal the act of* 1824, and the argument of counsel that a sweeping change was effected in the whole system of leasing the school lands by the act of 1833 falls to the ground.

Section 1 of the act of January 9, 1824, provides for five trustees in each township shall be elected by heads of families for one year. Section 2 provides for the treasurer, his duty and liability. Section 3 for schoolhouses and teachers. Section 4 provides as follows: "The trustees aforesaid shall carefully and faithfully preserve the school lands and timber thereon from all improper waste; and shall institute suits in

any court having competent jurisdiction against any person, tenants as well as others, who may be found damaging, in any manner, the lands, timber or improvements, reserving to tenants the full liberty of their several leases; and any money thence arising shall be appropriated to the same uses as other moneys in the township treasurer's hands; and the trustees shall from time to time, on the expiration of the leases already granted, as well as any land not heretofore so let out, rent the whole or any part to the highest bidder, for any term not exceeding five years, public notice having been first given for the space of six weeks before the said lands are to be leased out or rented."

The act of February 27, 1833, is entitled "An act to authorize the trustees of the school lands within each township in this state to lease the sixteenth sections within the same for ninety-nine years, and for other purposes." Sections 1 and 2 provided that "whenever a majority of the resident heads of families (minors not excepted), in each township or fractional township containing section number sixteen, or such section as may be reserved for the use of schools in lieu thereof, within this state, shall request the same, it shall be the duty of the trustees now in office, or who may hereafter be in office, to lease the said section of their respective townships to the highest bidder for the term of ninety-nine years," etc. Sections 3, 4 and 5 provided for the application of the funds, reservation of certain lands for schoolhouses, and for application of funds arising from funds invested in bank stock. Sections 6 and 7 provided for the loaning of the amount of lease, if under $100, and for the giving of bond by trustees.

Nothing is said in the entire act of 1833 about the election of trustees. It presupposes that the trustees are in existence. Indeed, the act of 1824 provided for the election of trustees, and the act of 1833 is simply an act amendatory to the act of 1824, and did not repeal that act; otherwise there would

have been no trustees in office and no mode prescribed for their election. In Hutchinson's Code, at the end of the act of 1833, it is expressly stated that this act is amendatory to the act of 1824.

"It is a cardinal rule of the construction of statutes that the law does not favor a repeal by implication, and even when two statutes are seemingly repugnant they must be so construed, if possible, that the latter shall not be a repeal of the former by implication." *McAffee* v. *Southern Railroad Co.,* 36 Miss., 669.

"Where an act contains no explicit repeal of a previous act, it does not operate as a repeal except in so far as it may be inconsistent with the previous act." *Hearn, et al.,* v. *Brogam,* 64 Miss., 335.

"Repeal of statutes by implication is not favored by courts." *Swan* v. *Buck,* 40 Miss., 268 (s.c., 1 South. Rep., 246). See, also, *House* v. *State,* 41 Miss., 737; *Commercial Bank* v. *Chambers,* 8 Smed. & M., 1.

There is nothing in the act of 1833 inconsistent with, or repugnant to, the act of 1824. The two statutes constitute one harmonious whole. The act of 1833 simply added to the act of 1824, but did not repeal either section 1, which provides for election of trustees, or section 4, which provides for the preservation of school lands and timber from all improper waste, and directing that the trustees should institute suits in any court having competent jurisdiction against any person or persons, tenants as well as others, who may be found damaging in any manner the lands, timber or improvements, reserving to tenants the full liberty of their several leases. The act of 1833 did not, therefore, as contended for by counsel for appellant, change the whole system and repeal all former acts, and did not provide a scheme by which was to be conveyed to the lessee of the sixteenth section lands more than a mere ordinary leasehold interest.

This was the construction placed upon these two statutes by the attorney-general, John D. Freeman, in 1847.

Counsel for appellant have in their possession a curious document of antiquity which they propose to use on the oral argument of this case. This is a form of lease prepared by the attorney-general, John D. Freeman, to be used in making leases of the sixteenth section lands. On this form the court will notice printed instructions from the attorney-general directing how this lease shall be made and citing the statutes on which they are based. He first cites the act of 1824, showing how the trustees shall be elected. He then cites the act of 1833, showing how, and for how long, this lease shall be made, thus showing conclusively that it was his opinion that these acts were not in conflict with each other, and that the act of 1833 did not repeal the act of 1824, but that they were parts of one harmonious whole, each entirely dependent upon the other.

Counsel for appellant seems to get some comfort out of the fact that the act of 1833, authorizing the lease, provided that it should be the duty of the trustees, on the final payment of the money, to convey the "right, title, use, interest and occupation" of said section to the lessee or lessees for, and during, and until the end of the full term of ninety-nine years. They claim that this was therefore not an ordinary lease upon a rent reserved, but the sale for a term in gross for a specific sum; that it was the manifest intention of the legislature that the sale should pass more than an ordinary leasehold interest. We submit that the words "right, title, use, interest and occupation" contained in the act of 1833, and in the lease, were not intended to give, and did not give, any greater right in regard to the use and occupation of the land than the ordinary common law lease for a term of years, and the only rights that the tenant acquired to the use and occupation of the land,

under and by virtue of said lease, were such rights as pertained to an ordinary lease for a term of years.

It is a cardinal rule of construction that "one part of a statute is called in to help in the construction of another part, and they are to be so expounded as to support and give effect to the whole." *Swan* v. *Buck,* 40 Miss., 270.

The whole act and the whole lease must be construed together. The words "right, title and interest" are defined and limited by the words "use and occupation of said section to the lessee or lessees for, during, and until the full end of the term of ninety-nine years." How could the legislature's intent to provide for an ordinary lease of ninety-nine years be expressed more plainly? What matters it whether the rent be paid in a gross sum or whether it be paid in annual installments? It was not the legislature's intent that the purchaser of a term of ninety-nine years should be more than a mere lessee, and that for that period he should enjoy the estate as if he were the owner of it. While apt words of a lease are not used, that makes no difference, as was said in the case of *Cunningham* v. *Davis,* 62 Miss., 366, the name by which an instrument is called makes no difference. The character of the instrument is to be determined by its legal effect.

"No particular form of expression or technical words are necessary to constitute a lease, but whatever expressions explain the intention of the parties to be, that one shall divest himself of the possession of his property, and the other shall take it for a certain space of time, are sufficient, and will amount to a lease for years, as effectually as if the most proper and permanent form of words had been made use of for that purpose. 12 Am. & Eng. Ency. Law (1st ed.), 977.

The grant of the right, title and interest, and the use and occupation of land for ninety-nine years, simply passes to the lessee the title of the grantor to the land with all the incidents, not of ownership, during that period, but of a leasehold interest for that period of time.

The word "title" in real property, according to the classic authorities, is "the means whereby a man holdeth land." This is the definition given by Coke and Blackstone, and all the old authorities. The word "title" in the act of 1833 and in the old leases meant simply the means whereby the lessee held an unexpired lease of ninety-nine years to the land described in the lease. Simply this, and nothing more!

It is true as stated by counsel for appellant that the word "title" denotes a collection of all the facts of ownership. In the lease above referred to it simply meant a collection of all the facts of ownership of a lease for ninety-nine years, with all the incidents pertaining thereto.

"The intention of the party is to be ascertained from the entire instrument, not from particular words or phrases without reference to the context, and the instrument shall operate according to the intention, unless it be contrary to law." *Berridge* v. *Glassy,* 112 Penn. S. T., 442.

Measured by this standard construing all the words of the lease, it can mean nothing else but an ordinary lease for ninety-nine years.

It was held in the case above referred to that "an instrument, purporting to be a lease for a term of years at a specified yearly rental is not converted to a deed in fee by the fact that it runs "to the second party, her heirs and assigns." The words of the lease in question were as follows: "Leonard Frailey doth lease unto the said Jane Glassy, her heirs and assigns for the term of five years from the first day of December next, for the yearly rent of three dollars, which yearly rent the said Jane Glassy doth for herself, her heirs and assigns, covenant and agree to pay to the said Leonard, his heirs and assigns, the said rent." Considering only the first part of the lease above referred to, it would clearly convey an estate in fee simple, because the words "heirs and assigns" are words of inheritance and are construed to pass an estate in fee. This,

however, was held to be qualified and limited by the words "for the term of five years," etc., "for the yearly rental," etc.

Counsel quote in support of their contention the case of *Bramlett* v. *Roberts,* 68 Miss., 325 (s.c., 10 South. Rep., 56). This case is authority to the position taken by us. The court held: "We recognize the doctrine that the estoppel of conveyance of land is only 'co-extensive with the estate, right or interest, which the conveyance purports to pass,' as held in *McInnis* v. *Pickett,* 65 Miss., 354 (s.c., 3 South. Rep., 660)." The estate which the lease in question purported to pass was a leasehold interest for a term of years.

Counsel contend that the language used to define the estate granted in the lease is the same used by the Georgia cession, Hutch. Code, 55, which contains the words "right," "title," "claim," "interest." This is not an analogous case. The Georgia cession to the United States did not limit the *use and occupation for a term of ninety-nine years,* as in the case of leases. There is a world-wide difference in the language used in the act of cession and in the leases.

Counsel contend in their brief that there is nothing in any of the codes, nor since the act of 1824, giving the right to sue for cutting timber or for waste, or creating any liability therefor. We answer this by saying that we have demonstrated that the act of 1824 was not repealed by the act of 1833, and that even if the act of 1824 is not now in force, there are ample provisions in the common law, as modified by our decisions, for creating liability for cutting timber by tenant for years, and giving the right to sue therefor, either at law or in equity. We think we have already demonstrated this proposition by the authorities cited by us in discussion of the question of waste by life tenants.

Counsel for appellant contend that to maintain trespass the plaintiff must have title and possession, and that a disseizee cannot maintain trespass until re-entry.

We answer that by saying that "by common law an action of waste may be maintained by remaindermen, or reversioners for waste committed by tenant during occupation of the tenant." 30 Am. & Eng. Ency. Law (2d ed.), 275.

"It is not necessary to the maintenance of a bill for injunction that either complainant or respondent be in possession." 30 Am. & Eng. Ency. (Law 2d. ed.), 287.

Counsel for appellant cited *Davany* v. *Koon,* 45 Miss., 71; *Bond* v. *Griffin,* 74 Miss., 599 (s.c., 22 South. Rep., 187); *State* v. *Fitzgerald,* 76 Miss., 502 (s.c., 24 South Rep., 872), in support of the contention that the fact that the lessee was allowed to recover for cutting of trees, is inconsistent with any right with the lessor to recover therefor. With all due deference, we maintain that these authorities do not bear out the contention of counsel. Let us examine for a moment these authorities. In the case of *Devaney* v. *Koon,* 45 Miss., 71, the decision was based upon the act of January 20, 1841, Hutch. Code, 221, which gave the lessee of school lands the same rights of action, and remedies against strangers as if they were the fee simple owners. In that case the lessee claimed under a bond for title made to him by the judge of probate of the county, and it was held that he had color of title, which, coupled with his possession, entitled him to maintain his action unless the defendant could show title in himself or some third person.

In *Bond* v. *Griffin,* 74 Miss., 599 (s.c., 22 South. Rep., 187), it was expressly held that the plaintiff, who was the lessee of the school lands, had only a limited interest in the property, and that he could only recover to the value of such interest. It has been held always that a person with a special or limited interest can recover as against a stranger, though he might not be able to prevail in a suit with a party holding the general title. So this authority does not support the contention of counsel.

*State* v. *Fitzgerald,* 76 Miss., 502 (s.c., 24 South. Rep., 872), simply held that the land commissioner has authority to maintain, in the name of the state, replevin for crossties cut by a trespasser from a sixteenth section of land which had been sold to the state for non-payment of taxes. The lessee did not recover by replevin, but the recovery was made by the land commissioner. This question, however, has been set at rest forever by the case of *Jones* v. *Madison County,* 72 Miss., 777 (s.c., 18 South. Rep., 87), which held that the title to these lands is in the state of Mississippi in trust for the inhabitants of the several townships, which opinion was based upon the decision of the United States supreme court in the case of *Gaines* v. *Nicholson,* 9th How. (U. S.), 358, and upon the case of *Long* v. *Brown,* 4 Ala., 622.

Counsel for appellant endeavor to draw a distinction between the Alabama case and the Madison county case, because the act of congress admitting Alabama as a state declared that sixteenth sections should be granted to the inhabitants of each township for the use of schools, while the act of congress admitting Mississippi contained no such provision. In view of the fact that the supreme court of the United States expressly held in the case of *Gaines* v. *Nicholson, supra,* that the title to this land is in the state of Mississippi by virtue of the cession from the state of Georgia, we fail to see how the provisions of the act of congress admitting Mississippi could affect this title.

The United States, having no title to these lands, could neither confer title to the state of Mississippi by said act, nor could it deny the title which the state of Mississippi had already acquired from Georgia.

Counsel argues that the legislature intended that by the leases of the sixteenth section land there should be conveyed to the lessee an estate greater in extent than a lease, because of the fact that under the act of 1833, and under the revenue act, 1841, Hutch. Code, 188, the lessees were subject to taxation

separate from the reversioner in the land.  Let us quote this section: "The school lands known as the sixteenth sections of land in this state, which shall have been leased subsequent to the passage of the revenue act, approved February 24, 1844, shall be subject to taxation during the continuance of the lease, in the same manner and proportion as other lands; provided, in case of the sale of such leased lands, or any part or parcel thereof, for taxes, the title of the lessee, or his assignee, only shall be conveyed."  Hutch. Code, 188.

This act expressly provides that in the case of sale of such leased lands for taxes, the title of the lessee, or his assignee, only shall be conveyed, thus clearly showing that the lessee held simply an ordinary leasehold, and not some imaginary estate greater than a lease.

The title of the lessee only was to be conveyed!  Title to what?  The title to this unexpired lease for ninety-nine years.

Counsel also seems to get some comfort out of the act of 1841, Hutch. Code, 221.  "The lessees of sixteenth sections, and all other school lands, shall be authorized to, and may maintain and carry on, all such suits at law or equity, immediately after leasing, as they could or might maintain or carry on were they the fee simple owners of the leased premises, except as against the lessors."

They argue that if all the rights of action of fee simple owners were vested in them against the world, except the lessor, that it was conclusive evidence that their estate was more than a lease.  We submit that this is conclusive evidence of no such thing!  It was conclusive evidence that the fee simple title was in some one other than the lessee, and the lessee possessing simply a term of years, an ordinary leasehold interest, had no right to institute suit with reference to the school lands, as that right was vested solely in the owner of the fee.  This act was passed simply to protect the lessee, and enable him to maintain such actions as but for this act could only have been

brought by the owners of the fee, and even then it is provided that they can maintain and carry on such actions as they might maintain if they were the fee simple owners, *except against the lessor.* This shows conclusively that the legislature recognized that the title was in the lessor and that the lessee had simply a leasehold interest. It may be remarked in passing that this act has been repealed, and is only interesting now by way of illustration.

Let us discuss now briefly the provisions of the code of 1880, under which the lease was made in the instant case.

Section 732 provides that "whenever a majority of the resident heads of families shall petition therefor, the board of supervisors shall appoint three intelligent citizens of the township to appraise said land, who shall do so, and make oath to such board of the value of the land, and thereupon said board of supervisors shall direct that said lands *be leased to the highest bidder for a term of ninety-nine years."* It will be noticed that this section provides not for a sale of land, but for the *lease* of the land to the highest bidder for the term of ninety-nine years. This clearly shows that the legislature contemplated the conveyance of a leasehold interest, and not of a qualified fee for ninety-nine years, as contended for by counsel for appellant.

It is true that this section provided that three intelligent citizens should appraise said lands, and make report to the board of supervisors of the value of such land, and section 735 provided that in no case should lands be leased for less than the appraised value. The clear meaning of these two sections is that the three intelligent citizens should appraise the value of the land for a term of ninety-nine years, and not its value in fee simple, and that the said lands should be leased for not less than their appraised value; that is, for the appraised value of the leasehold for the term of ninety-nine years, or less term. All through the various sections pertaining to six-

teenth section lands mention is constantly made of the *leasing* of said lands, and no provision is made for any *sale* of sixteenth section lands, and no sale was contemplated. The scheme was that the lands should be leased for ninety-nine years, and leased for not less than the appraised value of the leasehold interest for ninety-nine years. This interpretation is perfectly manifest when we look at the code of 1892, sec. 4155 of which said code provides that three disinterested freeholders of the county shall be appointed by the board of supervisors to appraise and report to the board the actual rental value of each lot or parcel thereof, with improvements, if any, for a term of twenty-five years. The only difference between this section and the code of 1880 is that by section 4155 the appraisers are directed to ascertain and report the actual annual rental value, while by section 732 of the code of 1880 they are directed to appraise the value of the land for a term of ninety-nine years in gross. By the act of 1880 the lands were to be leased on a credit of one, two, three and four years, in equal annual installments, for which the lessee executed promissory notes, and it was provided that the notes should operate as a lien and special mortgage on said lands until the payment thereof. The clear meaning of this provision is that the notes should operate as a lien and special mortgage on said lease for ninety-nine years, and in case it should become necessary to foreclose the lien the decree of the court would have been for a sale not of the fee simple title, but for the sale of the unexpired leasehold interest for ninety-nine years.

Section 733 provided that the president of the board of supervisors should execute and deliver to the lessee of lands a written lease thereof for ninety-nine years, the said lessee paying the expense of the execution and delivery of said instrument.

Section 734, code of 1880, provided that if a majority of the resident heads of families should petition therefor, the

board of supervisors, instead of directing the said lands to be leased for ninety-nine years, might cause them to be leased in such manner as they might deem best, for a single year or any number of years less than ninety-nine, but in no case, as provided in section 734, should the land be leased for less than its appraised value.

The act of 1898, ch. 41, and the act of 1904, ch. 124, authorizing a sale of the merchantable timber and wood therefrom, and also the leasing for turpentine purposes, shed no light on this controversy. These acts certainly do not aid the contention of counsel for appellant. If any inference is to be drawn from them, it should be drawn in our favor. It shows that the lessee for a term of ninety-nine years has no right to the timber except for reasonable purposes of estovers, otherwise why authorize a sale of merchantable timber outright, and why authorize a lease for turpentine purposes? The passage of these acts show clearly that neither the board of supervisors nor the county had any right to sell the timber outright until the passage of the act of 1898, otherwise why the necessity of the act of 1898, if during all these years the board of supervisors or the county had the right to *sell the timber?*

The title of the appellant is based upon the assignment of a lease for ninety-nine years executed by the board of supervisors of Harrison county, in accordance with the provisions of the code of 1880. The lease differs from the form of lease provided by the act of 1833, and it is written in the regular form of a lease. See exhibit "A" to the bill of complaint, transcript, p. 7.

We submit that under and by virtue of this lease appellant acquired a leasehold interest for a term of ninety-nine years, and that it had no right to commit waste upon the leased premises; that it had no right to cut and remove valuable timber therefrom, and convert the same to its own use for commercial purposes and its own mere profit. That such action on its part .

justified the issuance of the injunction in this case, and the learned chancellor ruled correctly when he overruled the demurrer of appellant to the bill of complaint.

*R. V. Fletcher,* attorney-general, on the same side.

*Warren County* v. *Gans,* 80 Miss., 67 (s.c., 31 South. Rep., 539), was a sixteenth section case, and involved precisely the principle now under investigation. The argument was made there, as here, that the lease was really a sale of the land for a limited term, and vested in the lessee all the rights of fee simple owner, and that the common law doctrine of waste did not apply. But the court held that while the lessee might clear the land for purposes of cultivation, and might dispose of the timber on such cleared land as he saw proper, yet that he cannot cut the timber for sale without making himself amenable for waste. The decision is a clear-cut adjudication of the question, and we rest confidently upon its soundness and authority.

The eminent counsel for appellant earnestly insists that the case should not be followed. It is contended that it was not fully and adequately represented on behalf of the contention pressed in the instant case, and six reasons were given why the doctrine of the *Gans case* is unsound.

1. The statute of 1824, prohibiting waste on sixteenth section lands, was repealed by the statute of 1833, thus by implication committing the state to the policy that waste could not be committed on these lands.

2. The words used in the lease in question and in the various acts authorizing leases are not the opposite words of a common law lease.

3. The character of the lands and the conditions of the country when the leasing system was established render it improbable that the legislature ever contemplated that timber could not be cut at will by the lessee.

4.   At early common law waste could not be committed by a tenant for years, and the statute of Marlbridge has never been a part of our jurisprudence.

5.   The appraisers in the instant case in valuing the term took into consideration the actual worth of the timber, and the purchase price given by the lessee represented the value of the timber.

6.   The legislature in recent years by certain statutes relating to the sale of timber has recognized the correctness of appellant's contention.

I purpose briefly to consider these points in order named.

1.   The act of 1824, approved January 9th, provided for the election of five trustees in each township, and defined the duties of such trustees as to control and management of moneys derived from the sale of sixteenth section lands. It further provided, by section 4, "that the trustees aforesaid shall carefully and faithfully preserve the school lands and timber thereon from all improper waste and shall institute suits . . . against any persons, tenants as well as others, who may be found damaging in any manner the lands, timber or improvements," etc. This section does not define the incidents of the lease. It assumed that such leases as had been made under previous acts were the ordinary leases, with the common law incidents, and the act, enacted primarily for the purpose of defining the duties of trustees, recognizing that under these leases there was an implied prohibition against waste, placed upon the trustees to protect the property. Such being the purpose of the statute, it cannot be said that the act of 1833, approved February 27th, in any way repealed this section. This act changed the term of the leases and provided for leasing by the trustees for a term of ninety-nine years, and enlarged the powers of the trustees as to the disposition of the funds, but it left undisturbed the other duties imposed upon the trustees by the act of 1824. Of course, it is a fundamental

rule of construction that one statute will not be held to have repealed a previous one unless the terms are clearly inconsistent. Repeals by implication are never favored. This statute of 1824 is of value in the discussion only this far: that it shows unmistakably that at the time of its enactment it is the recognized doctrine in this state that these leases did not permit waste. Now this doctrine, thus early implanted in our legislative enactments, has never been gainsaid or overruled by either the general assembly or the courts. Certainly the act of 1833 does not intimate that this theory had been abandoned. Nor is there anything in the act of 1836 which tends to show any change of policy on the part of the law-making power. All of these acts are compiled and reduced to order in Hutchinson's Code, and it does not appear in this compilation that the act of 1833 repeals the act of 1824. Indeed, by the act of February 24, 1844, waste is penalized when committed on seminary lands, and this tends to show that at this time it was settled policy of the state to prohibit waste upon any of these leased school lands. In the absence of any legislative declaration from 1824 to the present time on this question of waste, no presumption can arise that there has been any change in our policy as to the doctrine of waste.

2. The argument that the words of the statute of 1833 are not the apt words of a lease, but that they convey more than an ordinary household estate, may have merit, but it is sufficient to say that the lease under review was made under the code of 1880, and the words of the statute of 1833 are not used in the code of 1880. The only expression there employed is "lease." This term is used repeatedly. It is not accompanied by any qualifying or explanatory words. It uses this simple term as being one with well understood and well settled meaning. It must mean, and can only mean, such a disposition of lands as is commonly referred to as a "lease." The proper words to be employed to create a "lease," according

to the view of the code makers, is found in section 1238 of the code of 1880. There it is held sufficient to say that the lessor leases the land to the lessee. When the word "lease" is used in the statute, it only remains to refer to the settled principles of law to ascertain what is a lease and what are its recognized incidents. I contend, therefore, that it is not important to inquire what were the exact terms of the statute of 1833, since this act was not in effect at the time the lease was made.

3. The argument drawn from the character of the land and the condition of the country is the precise argument that was made and disallowed by this court in the *Gans case, supra.* If it is argued that the case was not adequately presented upon other grounds, it cannot be said that the learned counsel for appellant did not press this point with skill and force. See his brief as reported. I take it that the court will not reverse upon this contention.

4. The ingenious argument that our courts do not recognize the statute of Marlebridge as part of the common law is based exclusively upon the early case of *Jordan* v. *Roach,* 32 Miss., 481, which seems to hold that certain English statutory additions to the common law are not in force in Mississippi. However we may regard this decision as authority in regard to the particular question there under review, it is well settled that a modified form of the common law doctrine of waste, as it prevailed after the incorporation of the statute of Marlebridge, has always been recognized by our court. The common law doctrine of waste, either with or without the statute of Marlebridge, has not been incorporated into our jurisprudence in its entirety. The rule has been modified to suit the changed conditions of a new and largely undeveloped country, so that when we come to seek for the law of waste in Mississippi, the common law is not an absolutely safe guide. Like many others of our rules of law, the courts of this state have, on broad

lines, and of necessity, by a species of judicial legislation built up and established a rule of waste based on the common law but adapted to our peculiar needs and conditions. Thus in *Eskridge* v. *Eskridge,* 51 Miss., 522, it is said that the reversioner may against the life tenant maintain an injunction to prevent a permanent injury to the freehold.

In *Cannon* v. *Barry,* 59 Miss., 289, a controversy between the remainderman and the life tenant, the court held that the remainderman might enjoin the owner of the life estate from committing voluntary waste to the permanent injury of the estate. The question is thoroughly examined and put to rest in *Learned* v. *Ogden,* 80 Miss., 769 (s.c., 32 South. Rep., 278), where it is said that "while the law of waste, as established in England, is modified by its transmission to this country to suit the conditions of a new and uncleared country, and to allow a tenant for life to open wild land for necessary cultivation or to change the course of agriculture, without being liable for waste, yet the cutting down of trees for his mere profit is here, as there, considered waste."

It is true that by the ancient common law before the enactment of the statute of Marlebridge tenants by the courtesy were liable for waste, but that the doctrine is also applicable to limited estates by deed is expressly held in *Warren County* v. *Gans, supra,* where the language of the court shows that the statute of Marlebridge and Gloucester are considered as part of our law, for it is there said: "By the common law of England waste is defined with great accuracy, and ancient statutes there have made tenants for years liable for waste," etc.

It is hardly to be conceived that this court will hold, now, that every landlord or lessor for a year or more must especially provide against waste by his tenant in order to protect the estate from permanent injury. It is contrary to the whole course and spirit of our law. There is probably not a single

state in the union where the statute of Marlebridge is not recognized as a component part of the common law. 30 Am. & Eng. Ency. Law, 259. Nor is there any dissent as to the doctrine of waste by cutting timber and selling the same for gain. 30 Am. & Eng. Ency. Law, 244; *Jackson* v. *Brownson,* 5 Am. Dec., 258; *Thurston* v. *Mustin,* 3 Cranch. C. C., 335; *Fleming* v. *Collins,* 2 Del. Ch., 230; *Bond* v. *Lockwood,* 33 Ill., 212; *Padelford* v. *Padelford,* 24 Mass., 152; *Butman* v. *Jones,* 27 N. W., 66; *Moorehouse* v. *Cotheal,* 22 N. J. Law, 521; *Kidd* v. *Dennison,* 6 Barb., 9; *Woodman* v. *Gates,* 38 Ga., 205; *Drawn* v. *Smith,* 52 Me., 141.

5. It is contended that weight should be given to the fact that the appraisers in valuing the land took into consideration the value of the timber, but this action on the part of the appraisers can bind nobody if the appraisers proceeded upon a theory not warranted by law. Certainly the state suffers because the appraisers mistook the meaning of the law. And, further, the appraisement was proper, since the grantees might sell the timber on land cleared for purposes of husbandry, and in putting a valuation upon the land, it would be a correct method of valuation to take the timber into consideration.

It is not the contention of appellee that the timber may not be cut in clearing the land and improving the freehold. It is the cutting of the timber for purely commercial purposes that is objectionable under the authorities citied.

6. No comfort can be derived by appellant from recent legislation on this subject. The acts of 1902, ch. 78, throws no light on the subject as affecting the character of the lease. Chapter 41 of the acts of 1898, and chapter 124 of the acts of 1904, dealing with the sale of merchantable timber and the exemption of turpentine leases, indicates rather to my mind that the legislature did not consider that ordinary leases already provided for by statute carried with them the right to cut this timber.

Argued orally by *J. I. Ford, Walter White,* and *Marcellus Green,* for appellant; and by *A. H. Longino,* and *R. P. Willing,* for appellee.

Calhoon, J., delivered the opinion of the court on the first decision of the cause.

This is a bill to enjoin the appellant from further cutting or removing timber from a sixteenth section, which it held under a lease of ninety-nine years, and for an accounting of that already cut, on the ground that such cutting was waste. The bill charges that the cutting was purely for sale, and that the avowed purpose is to cut and remove the entire timber growth, and solely for commercial uses. It charges that the lease was made in 1882, for the sum of $835, and, as will be particularly noted, states as follows: "That said land, by reason of the character of the soil, is unfit for cultivation, and that the *only value it possesses* is given it by the merchantable pine timber growing thereon." The lease is under Code 1880, § 732, pursuant to appraisement under that section, of "the value of the land." A demurrer to this bill was filed on the grounds, first, that the right to cut was contemplated by the parties to the lease; second, that the title to the trees was vested by the lease; third, that the bill showed that the lease was of no value, except for the trees; and, fourth, that there is no equity on the face of the bill. This demurrer was overruled, and the timber company appeals to settle the principles of the case.

It is apparent that the scope and meaning of the lease, and the intent and understanding of the parties to it, must be determined by the act of 1833 in reference to such leases of school lands, construed in the light of the common law, and the condition of the country at that time, and the usage of the country since. It must be noted that no question was ever made of the right of such lessees to do what they pleased with the growing timber until about six years ago. We will first

invite the attention of the profession to a careful consideration of the common law, and then examine the statutes read in the light of the then situation in the state. There is no decision as to waste on ninety-nine year leases of public lands in any other state that we can find.

In 28 Am. & Eng. Ency. Law (1st ed.), p. 891, the text is as follows (see, also, 30 Am. & Eng. Ency. Law [2d ed.], p. 258 *et seq.*): "At the common law a tenant for life or years was not liable for waste, because it was presumed that the demise or lease creating his estate would have provided against waste if it were to be prohibited; but the common law was changed by the statutes of Marlebridge (52 Henry III.), and Gloucester (6 Edw. I., c. 5), and tenants for life or years were made liable for waste. These statutes have been modified, and some of their provisions re-enacted, in some of the states of the union, or are considered a part of their common law." The statute of Marlebridge referred to in the text was ordained A.D. 1269, and that of Gloucester A.D. 1278, before when we may assume that England, in the particular of forest growth, bore some resemblance to Mississippi in 1833. Note 2 to the text of the encyclopædia cites *Moore* v. *Ellsworth,* 3 Conn., 483, and *Poe* v. *Hardie,* 65 N. C., 447, and reproduces the language of Lord Coke, 2 Inst., 300, as follows: "For that the law created their [tenants in dower and by the curtesy] interests, therefore the law gave against them a remedy; but a tenant for life or years came in by demise and lease of the owner of the land, etc., and therefore he might in his demise have provided against the doing of waste by his lessee, and, if he did not, it was his negligence and default." It may be noted here that Lord Coke (Inst. by. 2, \*634, \*635) repeats this doctrine in these words: "In this particular case the statute of Gloucester, which giveth the action of waste against the lessee for life or years (*which lay not against them at common law*)," etc. So, in the note to top page 266, vol. 3 of Thomas' edition of Coke upon Lyttleton, it is stated that

a person holding for life or years, by grant, was not liable to an action for waste unless restrained from it by the terms of the lease, "because it was in the power of the person who created the estate to impose such terms on the tenant as he thought proper." The annotation then says: "*Sed vide* Bracton, lib. 4, c. 18; 2 Reeves' Hist., 73, 74, 148"—thus indicating that these authors differed with Lord Coke, as they in fact do, as to the scope of the common law in the remedy for waste. See Finlason's edition of Reeves' Hist. of English Law, vol. 1, p. 386, and vol. 2, pp. 58, 59, and notes. In Thomas' edition of Coke upon Lyttleton, vol. 3, top page 272, we find it for the third time stated by this high authority that "a prohibition of waste did lie against tenant by curtesy, tenant in dower, and a guardian in chivalry, by the common law, *but not against tenant* for life or years, because they came in by their own act, and he might have provided that no waste should be done." See, also, 2 Saunders (by Williams), 47*e*, and 3 Saunders (by Williams), 252, and note 7, and *Pryne* v. *Dor,* 1 Durnford & East, 55, keeping in mind that there is no question whatever of equitable waste in the case we now have before us. It is either legal waste or nothing. The English work of Woodfall on Landlord and Tenant (1 Am. Ed., by Webster), vol. 2, p. 609, says: "At common law an action for waste lay only against tenants by the curtesy, tenants in dower, and guardian, whose estates were created by act of law. But tenants for life or years had an interest in the land by the act of the lessor, who might and ought to have provided against waste by some express covenant or condition; and such tenants were not liable at common law either for voluntary or permissive waste." See, also, citations in note "d." This author then proceeds to consider the statutes of Marlbridge and Gloucester, changing the common law, and on page 611 he says: "A tenant at will is not within the statute, and therefore not liable upon the statute for either kind of waste, although, if he commit waste, he thereby in effect determines his tenancy," etc. In Smith on

Landlord and Tenant, another English work of high reputation, we find on top page 240 the following: "At common law there was a distinction between the tenants of estates created *by the act of the law* and tenants of estates created *by the contract of the parties;* the former having always been punishable for committing waste, and the latter not so. Thus tenant by the curtesy or in dower was at all periods of the law restrained from waste; tenant for term of years was not so. And the reason of this distinction was that it was thought it would be a hardship if the law were to give the estate without restraining the person to whom it was given from doing injury to the inheritance, while it was thought to be a hardship on a person who had let a tenant in by express contract, and who had the power of inserting in the contract stipulations against the commission of waste, it was thought to be no hardship upon him to leave the tenant in the same situation in which he had himself placed him by the contract." This author then shows the change in the law worked by the statutes of Marlebridge and Gloucester.

In all discussions of waste in the text-writers and the reports it will be seen that they have reference to leases, since those statutes in nearly every instance, and that there is no difference about what the common law was before those statutes. In 3 Washburn on Real Property, sec. 270, the common law rule is stated as in Smith and Woodfall, *supra.* In the opinion in the case of *Moore* v. *Ellsworth,* 3 Conn., 487, 488, is this language: "It is said by Sir Edward Coke (2 Inst., p. 145) that waste was punishable at common law in tenant in dower, tenant by the curtesy, and a guardian, but not in tenant for life or for years; and for the distinction he assigns this reason: That the law, which created the former of these estates and interests, provided a remedy itself against waste, but left the owners of land, who created the others, to provide a remedy in their demise. This reason, Reeves, in his History of the English Law, considers as only plausible, and the diversity as

ideal. But, visionary as he supposes it to be, it has been embraced as sound by the most eminent English jurists; and the common law, as stated by Lord Coke, has been recognized by all the respectable law writers in England to the present time. And it must not be forgotten that Sir Edward Coke appeals to 'the rule of the register' for the doctrine which he affirms. Chief Baron Comyns, whose opinion alone was said by Lord Kenyon to be an authority, declares in his Digest that 'by the common law waste did not lie against lessee for life or years; for it was laches in the lessor that he did not provide against waste.' Title 'Waste,' A, 2. In the second volume of his Commentaries, 282, 283, it is said by Sir William Blackstone that 'waste was not punishable in any tenant save only in three persons, guardian in chivalry, tenant in dower, and tenant by the curtesy, and not in tenant for life or years. And the reason of the diversity was that the estate of the three former was created by act of the law itself, which, therefore, gave a remedy against them; but tenant for life or for years came in by the demise and lease of the owner of the fee, and therefore he might have provided against the committing of waste by his lessee; and, if he did not, it was his own fault.' It is laid down by Cruise, in the first volume of his Digest (p. 68, sec. 35), that 'by the common law, where lands were granted to a person for life, he was not liable to an action for waste, unless he was restrained by particular words in his conveyance from committing waste, because it was in the power of the person who created the estate to impose such terms as he thought proper.' If it be said that the persons whose works are cited found themselves on the doctrine and reasons of Sir Edward Coke, it will not be denied. It only proves that the authority of Bracton (on whom Reeves stands) cannot stand in competition with the transcendent authority of the great law luminary in the opinion of celebrated jurists perfectly capable of appreciating their respective merits. The law, as applicable to the situation of this, as of the mother country, accompanied our

ancestors in their migration hither; and, having never been abrogated or altered, it is the law of the state at the present time." Accordingly the Connecticut·court sustained the right of a tenant for life to cut down and sell the timber. In 2 Minor's Inst., 546, the author states the common law rule as we have stated it—that tenants for life or years, by contract, are not liable for waste. In *Poe* v. *Hardie,* 65 N. C., 449, the court declined to follow the common law, and held that the occupant of a homestead, although an estate created by law, and not by contract, was not liable for waste. In *Hastings* v. *Crunckleton,* 3 Yeates (Pa.), 261, the court, in a case against a widow for waste in dower lands, said there was "a material difference between the local circumstances of this state and Great Britain. It would be an outrage on common *sense* to suppose that what would be deemed waste in England could receive that appellation here. Lands *in general* with us are enhanced by being cleared, provided a proper proportion of woodland is preserved for the maintenance of the place. If the tenant in dower clears part of the land assigned to her, and does not exceed the relative proportion of cleared land considered as to the whole tract, she cannot be said to have committed waste thereby." The court had in view here the case of an improved and inhabited tract of land, and not the case before us, but still would not be bound by the universal rule of the English common law that tenant *in dower* was liable for waste, because of the different conditions here. In *Findlay* v. *Smith,* 6 Munf. (Va.), 142 (8 Am. Dec., 733), Judge CABELL said: "The law of waste in England varies, and accommodates itself to the varying wants and situations of the *different counties* in that country. Thus what is waste in one *county* is not waste in another. On the same principle, the law of waste, in its application *here,* varies and accommodates itself to the situation of our new and unsettled country." Further on in his opinion he says, on page 145 of Munf. (8 Am. Dec., 733): "A tenant

for life of a mine of coal may use it till he exhausts it, even although the interest of the remainderman may be thereby entirely destroyed. If this be the case when the thing itself is consumed by the use, never to be reproduced, *a fortiori* the right exists in the case of *wood, which will reproduce itself in a series of years.*" In this case Judge COALTER and Judge BROOK held to the same views with Judge CABELL. Judge ROANE dissented in so far as it was held that all the wood might be cut, but is in full accord as to the law of waste varying with varying conditions. See, also, *Sherrill* v. *Conner,* 107 N. C., 630 (12 S. E., 588); *Ward* v. *Sheppard,* 2 Hayw. (N. C.), 283 (2 Am. Dec., 625), was a case against a widow for waste of dower lands, inhabited and partly cleared, and the court says: "Waste in this country is not to be defined by the rules of the English law in all respects; for cutting timber trees for the purpose of clearing the lands was not waste here, though it was so in England. If lands were leased to a lessee in an uncultivated state, he must of necessity have the power to clear; otherwise the lease would be of no profit or advantage to him. The same is the case of dower lands." The opinion, however, proceeds to hold the particular case that, if the widow had cut the trees, not merely for clearing, but for *sale,* she would be liable. On the same line is *Jackson* v. *Brownson,* 7 Johns. (N. Y.) 227 (5 Am. Dec., 258).

As before indicated, all the decisions in this country on the subject of waste have reference to waste on farms in cultivation. Many of the states have re-enacted the statute of Marlebridge and Gloucester in one shape or another, and some courts have simply followed the English decisions on these statutes as if they announced the common law. But these statutes have not, and never did have, any force in Mississippi. English statutes have no force in this state since the act of 1807. *Jordan* v. *Roach,* 32 Miss., 482; *Sessions* v. *Reynolds,* 7 Smed. & M., 130; *Boarman* v. *Catlett,* 13 Smed. & M., 149; *Ingraham*

v. *Regan,* 23 Miss., 213. Even the common law has no force
where not adapted to "our institutions and circumstances."
*Railroad Co.* v. *Patton,* 31 Miss., 156 (s.c., 66 Am. Dec., 552);
*Green* v. *Weller,* 32 Miss., 650; *Crane* v. *French,* 38 Miss. 503.
So, in determining adaptitudes to our condition our courts are
continually building up a common law of our own. However,
the courts of no state have gone further than those of our own
in holding that the common law, where not repugnant to our
institutions, conditions and circumstances, must always pre-
vail unless displaced by plain statute. So, if seen fit, this case
might go off on the reasoning that it required English statutes,
of no force in our state, to make a tenant for years liable for
waste. The sages of the common law held a tenant for years
not so liable on the assumption that, if he was to be, it would
have been so expressed in the lease. We have no statute of
waste, and our common law is what this court may declare it,
and why shall not our judgment be with the early judges of
England, that a tenant for ninety-nine years shall not be liable
for waste, because, if it were intended he should be, it would
have been so declared in the statute providing for such a lease.
In England the common law varies with different counties
as to the subjects of which waste is predicable, and the judges
here, in declaring the law, should have regard to the conditions.
Waste is an injury to the remainder or reversion (the fee),
something that lessens the value of the estate. Who can say
that removing the pine trees will injure the estate to the taker
of it ninety-nine years hence? To hold the removal waste
when, manifestly, that was the very purpose of it, seems quite
harsh. Judge Strong, in *Heil* v. *Strong,* 44 Pa., 264, said
the statute of Pennsylvania was not applicable when the very
purpose of the lease was to get the timber. At common law,
when a mine is leased, the lessee may exhaust it, for he is simply
pursuing his right. See 6 Munf. (Va.), 134 (8 Am. Dec., 733);
44 Pa., 264; *Owen* v. *Hyde,* 6 Yerg. (Tenn.), 334 (27 Am.
Dec., 467); 107 N. C., 630 (12 S. E., 588).

By universal understanding the lessee for ninety-nine years of sixteenth section lands acquired all of the rights of an owner in fee for the time. The long time, the public necessity for clearing, the fact that practically the whole state was forest in 1833, the uncertainty of the future, the fact that the soil of a great majority of these sections in the pine regions was regarded as absolutely worthless for agriculture, the absence of any provision for liability of the tenant of any sort, the carelessness of our people about anything so long off, all argue persuasively for the immunity of the lessee. Twenty years' growth is held to constitute timber. In case of a lease for ninety-nine years, or other long periods, the trees being cut away, the land will reproduce the trees several times over before the right of the reversioner accrues. David said: "There is hope of a tree, if it be cut down, that it will grow again," and we know that land denuded of its growth will reproduce. Who can say, in this case, that the interest of those who come after will be harmed by removing the timber? Aside from all else, the fact that the lands were authorized to be sold for ninety-nine years, in the then condition of the state, without any limitations, restrictions, or conditions, would no doubt cause the sages of the common law to hold that the lessee was vested with the rights of an owner, and not answerable for the destruction of timber. It seems, then, that at the common law a tenant for life, by lease, was not liable for waste. But it is not necessary, in the case at bar, to determine whether the common law did, or whether existing law does, make such tenant for life, or tenant for years or at will, so liable. That must, when it may be necessary to settle it, be decided on the condition of our country, the *practice and custom* of our people, and the circumstances of the particular contract.

After the foregoing necessary review of the decisions on the common law, it is necessary to examine the legislation of Mississippi, in order to ascertain the *intention of the parties* in a contract for a ninety-nine-year lease of sixteenth section

school lands made in the year 1833. The first settlement of this state was along water courses, and the lands and timber had practically no value, unless near little towns and villages. Even in the 50's, except on the strips of alluvion along streams, timbered land was not regarded, and, within thirty years past, public lands were sold in fee at five, ten, fifteen and twenty-five cents per acre. As late as 1877 public lands, of equal value with sixteenth sections, were authorized to be sold outright at a minimum value of twenty-five cents per acre. Pamph. Acts 1877, p. 34. Taking the history of the legislation about these sections, we find that in 1818 the justices of the county court were authorized to make leases for not more than *three* years, and that, "in all cases, the lands shall be protected against improper waste of soil and timber." This act is silent as to the terms of the conveyance by the lease. In 1824 an act provided that five trustees be elected by the resident heads of families, and it authorized these trustees to lease for not longer than *five years,* and provided that they "faithfully preserve the school lands and timber thereon from all improper waste, and shall institute suits against any person or persons, *tenants* as well as others, who may be found damaging, in any manner, the lands, timber or *improvements,* reserving to tenants the full liberty of their several leases." It is fair to presume that in these two acts the legislature had in mind that without these provisions there would be no liability, because of the common law, for waste without express provision for it. But it turned out to be utterly impracticable to make these leases with prohibition of waste, except in scattered instances, where the lands were in or near towns. Nobody wanted them. The act of 1833 reviews the whole subject and authorizes the leases for ninety-nine years, which leases shall "convey the *right, title, use, interest and occupation* of said sections," and by an act of 1841 (Laws 1841, p. 127, c. 25) the lessees can sue as if they were "the *fee simple owners* of the leased premises, except as against the lessors."

The precise question is, what was the understanding of the parties to the leases of sixteenth sections under the law of 1833? In that year there were less than five inhabitants to the square mile in a state with 46,000 square miles of territory, capable of supporting 20,000,000 of population, and then be considerably less densely settled than several of the kingdoms of Europe. The vote in a heated election for governor in 1833 was less than 13,000. Timber was not considered at all. It cumbered the earth. It had no value, except along streams capable of floating logs, or of easy haul to occasional small sawmills. The lands themselves were, except in the instance hereinbefore adverted to, of small, if any, value, and in the pine regions, where those in controversy lie, generally regarded as worthless, "barren wastes," infertile and unproductive, unfit for agriculture. There was, perhaps, the idea, with some of the far-sighted, that the timber at some remote period might be of some worth. Certain it appears to be that there could not have been any sale or lease of such wild lands, except for the timber on them. A lease for life, by fiction of the law, is regarded as of greater dignity than for any period of years; but, in fact, we know that a lease for ninety-nine years is far more desirable and of much greater market value than one for life. It is incredible, then, that in 1833 any sane man would have leased a pine barren for ninety-nine years, except for the timber on it. It is equally incredible that the state (the lessor) could have had any other idea in demising for a period so long that forests reproduce themselves, in the same, or often more desirable, growth, several times over. Such cases cannot be assimilated to ordinary leases of improved lands in the then condition of the country. In this view the terms of the lease, unheard of in such instruments, conveying, as required by law, "the *right, title, use, interest* and occupation," become of great significance, the more especially since there was no market for leases with any reservation as to waste.

The criterion of damage is the injury to the reversion. Who can say there will be any here? Who can say that it will not be restored in a much more valuable condition? Can waste be predicated of the removal and sale of all the timber, where fine brick buildings have been erected on the plot of their growth? Such is the case in several instances in towns and cities of the state. There could have been no intent or expectation of either party to restrict the cutting of trees, and such was the public and universal construction of these leases by the unquestioning usage of about seventy years. The case of *Warren County* v. *Gans,* 80 Miss., 76 (s.c., 31 South. Rep., 539), cites in its support *Jackson* v. *Brownson,* (N. Y.) (5 Am. Dec., 258); but it must be noted that in that case there was an express covenant, to which the court said it was tied down, against waste, and the lease was of a farm, and the court said the covenant prevented consideration of intention. It also cites *Mooers* v. *Wait,* (N. Y.) (20 Am. Dec., 667); but there the lease was for four years, with condition that the lessee should have full title only on compliance with conditions named. We approve both these cases. Note that both are New York cases. However, they throw no light on the question here as to the intention of the parties to the contract before us, viewed in reference to its terms and the conditions in Mississippi. . It follows that we were in error in the *Gans case,* as it should be overruled. In New York the statute of Gloucester was in force. Before the *Gans case* we are not directed to any decision, and we find none, on the ninety-nine year leases of public school lands, and so must decide on our own statutes and the history of our own conditions, and are *not bound* to the same view in reference to the *usual leases* of farm lands. As to these, the courts will consider whether a common law has not grown up here from custom and usage, and from these will ascertain the intent of the parties. *Thruston* v. *Mustin,* 3 Cranch. C..C. (U. S.) 335, Fed. Cas. No. 14013, is conclusive,

so far as it goes, in favor of this opinion. Judge CRANCH plainly shows that except for the statute of Gloucester being in force and adopted in the constitution and bill of rights of Maryland, the decision would have been the reverse of what it is. Besides, in that case, the lease was of a cultivated farm and a personal private lease, and the waste confined to the cutting of "young and green wood," and the terms of the lease the usual terms.

This case falls distinctly in the class referred to above, where the statute of Gloucester is put in force by enactment. There is, as before stated, another class of cases, which assume that statute to be in force as common law without discussion. If it can be said of any principle that it is immovably fixed in the law of Mississippi, it is that no statute ever enacted in Great Britain has any force here unless re-enacted by our own legislature. *Jordan* v. *Roach,* 32 Miss., 481; *Boarman* v. *Catlett,* 13 Smed. & M., 149; *Sessions* v. *Reynolds,* 7 Smed. & M., 130; *Ingraham* v. *Regan,* 23 Miss., 213. Surely any assault on this proposition need not be noticed. It follows, therefore, that the statutes of Marlbridge and Gloucester are nullities so far as this state is concerned, and it is the law of this state, as applicable to a ninety-nine-year school land lease of this state, which we are considering. On this we are driven to the common law existing before those statutes, and which, by all the decisions, is the law here, so far as suitable to our conditions at the date of the contract. To learn what this common law is, we have quoted three distinct utterances of Lord Coke. If these are "idle talk," and so to be considered by the profession, though sustained by nearly all of the learned law writers and judges who have treated the subject, of course there is an end to argument on that line; but this would not affect our conclusion from a proper interpretation of the statutes of Mississippi and of this particular lease. Our view is that this lease, in view of

the conditions existing in 1833, the course of legislation, the terms of the act authorizing it, and the understanding of the people for seventy years, was intended to convey, and did convey, absolute ownership for the ninety-nine years. The statute orders the trustees "to *convey* the right, *title,* use and occupation" for ninety-nine years.

It is contended that the act of 1833 is not a repeal as to waste, but an amendment of the act of 1824, and that Hutchinson says so. We deny both propositions. The last act reviews the whole subject and is silent as to waste. Hutch. Code, pp. 205, 210, 213, c. 9, arts. 2, 5, 12. The machinery for leasing is unaffected. The terms of the law show the intent. It is idle to cite cases, in which the books abound, that waste is predicable of all leases. These are all, in all instances, from states where the statutes of Marlbridge and Gloucester are in force, and from nowhere else. Everywhere else the question of waste can or cannot be implied in reference to the common law as applied to local conditions. In Smith's Manual, an English hornbook for boys, the two statutes are, in general terms, taken as common law; but in his elaborate and extended work of Landlord and Tenant, as before shown, he states the rule as Lord Coke does and as we do. It is idle, also, to confuse legal with equitable waste, and produce authorities on this. Here the question is one of the intent of the parties to the contract. Here the timber is the only thing of value in the present lease, and was of no value at all in 1833. The idea that the universal demand is to sustain suits for waste is without a place in courts. And so of the idea of the benefits to unborn children. The only question is what the law is. The people want to be honest. But it is not true in fact. The children will be benefited throughout the state by our view.

*Reversed, demurrer to bill sustained, and remanded.*

TRULY, J., delievered the following concurring opinion on the first decision of the case.

I concur specially in the conclusion reached in this case. I deem it unnecessary to enter upon any discussion of the general principle whether an action of waste is predicable of a tenancy for years, whether for one or ninety-nine. I base my conclusion upon the language of the statutes germane to this matter, upon the uniform construction placed thereon, and the unbroken practice heretofore existing. In my opinion it was clearly the intention of the legislature, in enacting the act of 1833 and all subsequent statutes dealing with this matter, to vest in the purchaser of the sixteenth section school lands as full and complete ownership as if the title was in fee, subject, only, to the condition that the holding was to terminate at a specific date. In plain words, while the letting was termed a lease, it was in truth intended to operate as a fee determinable at the end of ninety-nine years. To this extent I agree with the opinion of the court, and for this reason concur in the conclusion.

WHITFIELD, C. J., dissented.

After the delivery of the foregoing opinion a suggestion of error was filed by *Longino, Willing & Wilson,* solicitors for the appellee, and after consideration thereof, the case was decided a second time and the following opinions read.

MAYES, J., delivered the opinion of the court on the second decision of the cause.

This cause was decided at the last term of court by a majority court; WHITFIELD, C. J., dissenting. Subsequently a suggestion of error was filed, and the case is now before the court on this suggestion of error.

The board of supervisors of Harrison county filed a bill in the chancery court against the Moss Point Lumber Company, seeking to enjoin it from cutting down and using the timber on a sixteenth section of school land. The substantial allegations

of the bill are that on the 7th day of August, 1882, the board of supervisors of Harrison county, acting on a petition of a majority of the inhabitants of township 2, range 12, of said county, wherein is located the particular section in controversy, leased the sixteenth section, for a period of ninety-nine years, to one Margaret C. Thomas. The bill further alleges that appraisers were appointed, as was provided by law, to appraise and value the leasehold of the sixteenth section for the term. The appraisers, pursuant to their appointment as aforesaid, viewed and appraised the value of the term for said section, and fixed same at $835, which said sum was paid or secured by the said Margaret C. Thomas in the manner required by law. The bill further alleges that the valuation made by the appraisers was based and calculated on the quantity and quality of the merchantable timber standing and growing on the section, and that the land leased, by reason of the character of its soil, is unfit for cultivation, and the only value it possesses is given it by the merchantable pine timber growing thereon. The bill further alleges that Mrs. Margaret C. Thomas has conveyed to some other person or persons, who have conveyed same to defendant company, so that, on and since the 1st day of April, 1905, the defendant has become, and is now, the owner of the unexpired term of whatever estate or interest was created thereby and vested in the original lessee. The bill then alleges that the Moss Point Lumber Company has, since the 1st day of April, 1905, entered on the said sixteenth section by virtue of this lease, and has cut down and carried away a large number of pine trees growing thereon, and is now engaged in illegally and wrongfully cutting and removing the merchantable pine timber therefrom, and, though notified by the complainant to desist, has declared it to be its purpose to cut and remove and manufacture into lumber all the merchantable pine timber on said section; that defendant is not cutting and removing the timber with

the intent and purpose *of clearing* the land for cultiva-
tion, but the timber is being cut *for commercial purposes solely*
and to be used in its lumber business, and that said cutting is
waste and injurious to the reversionary estate of the public
therein; that, if the defendant company is allowed to continue,
the estate or interest of the trustees in the township, at the
end of the term, will be of no value, and the injury and damage
which will be done to the land by the removal of the timber
is irreparable and impossible of ascertainment; that defendant
company is of doubtful solvency, and a judgment at law would
be valueless to the trustees as custodians of said land. The bill
concludes with a prayer for an injunction to restrain the de-
fendant company, or its agents or servants, from cutting and
removing any of the pine timber from said section for commer-
cial purposes, and for an accounting, under the direction of the
court, of the timber and value of trees cut from the section,
and for a decree in favor of the complainants against defendant
for said sum and for perpetual injunction. As an exhibit to
the bill, plaintiffs filed the lease, which we here set out in full:
"The State of Mississippi, Harrison county. I, F. B. Hiern,
president of the board of supervisors of Harrison count, Miss-
issippi, by authority of said board and in pursuance of the
statute, *hereby lease* to Mrs. Margaret C. Thomas and her rep-
resentatives and assignees, the sixteenth (16th) section, in
township two (2 south, of range twelve (12) west, containing
640 acres (being the section of land in said township two south,
of range twelve west, reserved for the use of the public schools
in said township) for and during the term of ninety-nine years
from the date hereof; the said Mrs. Margaret C. Thomas having
been the highest bidder at a public sale of said lease of said
section of land made at the door of the courthouse of said
county, within legal hours, on the 7th day of August, A. D.
1882, by direction of said board of supervisors, on petition of
a majority of the resident heads of families of said township,

report of appraisers on oath, and due and legal publication of notice of sale, on said day. This lease is made for and in consideration of the sum of eight hundred and thirty-five dollars, payable in equal installments, on one, two, three and four years, with interest at the rate of ten per cent per annum, on said sum, for which said Margaret C. Thomas, aforesaid, has executed and delivered her four certain promissory notes, payable to F. B. Hiern, president of the board of supervisors, and his successor in office, all dated this seventh (7th) day of August, A.D. 1882, and each for the sum of $208.75, bearing interest at the rate of ten per cent per annum from date, until paid, and payable, respectively, in one, two, three and four years after date; it being distinctly understood that said promissory notes, with interest which may accrue thereon, shall operate as a lien and special mortgage on said land herein described and leased, until the final and complete payment of said sum of $835 and all interest. Witness my signature this 7th day of August, 1882. F. B. Hiern, president board of supervisors Harrison county."

A demurrer was filed to the bill, stating the following grounds of demurrer: First, under the facts alleged, the right to cut and remove the timber from the land was contemplated by the lessors and lessee, and defendant, as lessee, was entitled to cut and remove the same; second, that the title to said timber was, under the lease, vested in the original lessee, and in the defendant as holder and owner thereof; third, it appears from the bill that the unexpired term was of no value other than the timber thereon, and the appraisal of said leasehold interest was based upon the timber alone, and, therefore, the complainants were estopped to deny said lessee the right to cut and remove the same; fourth, there is no equity in the face of the bill as against the defendant.

In the consideration of this case, the first question to be settled is the classification of the estate conveyed to appellants;

that is to say, is it a freehold, a leasehold, or a life estate?
It would seem that the mere examination of the conveyance
under which appellants claim would conclusively show that the
class of their estate is a leasehold for the term of ninety-nine
years.    The statute under which the conveyance is made pro-
vides *only for a lease;* the instrument making the conveyance
recites in the face of it *that it is a lease;* the only power granted
under the law to the trustees of the school lands is the power
*to lease;* and it would seem that any discussion as to the kind
and character of estate which appellants obtained by this con-
veyance would be idle waste of time.    Laws Miss., 1818, p.
201; Laws Miss. 1824, p. 17; Laws Miss. 1833, p. 452; Code
1880, § 732.    The determination of the rights of appellants
must necessarily be governed by the kind and character of
conveyance under which they hold.    When an estate is an estate
for years, pure and simple, does it differ in its characteristics,
when it is for a long term, from an estate for years, which
is of short duration?

The original opinion in this case says: "By universal under-
standing, the lessee for ninety-nine years of sixteenth section
lands acquired all the rights of an owner in fee for the time.
The long time, the public necessity for clearing, the fact that
practically the whole state was forest, the uncertainty of the
future, the absence of any provision for liability of the appel-
lants of any sort, . . . gives to these lessees the rights
of an owner in fee for the time."    Again, the original opinion
states that: "The statutes of Marlbridge and Gloucester are
nullified so far as our state is concerned, and are not the law
of this state as applicable to a ninety-nine-year lease of school
lands, which we are considering.    On this we are driven to the
common law existing before those statutes, and which, by all the
decisions, is the law here, so far as is suitable to our conditions at
the date of the contract."    Again, the court in its original opinion
says: "Our view is that the lease, in view of the conditions

existing in 1833, the course of legislation, *the terms* of the act authorizing it, and the understanding of the people for seventy years, was intended to convey and did convey absolute ownership for ninety-nine years."

We desire to call attention to the fact that the statutes of Marlbridge and Gloucester were passed nearly 600 years ago, for the purpose of relieving what was *then* considered a hardship on the lessors of land. It will also be observed that the statute of Marlbridge provided that a tenant should forfeit single damages for waste, and the statute of Gloucester, passed afterwards, provided that the tenant should forfeit treble damages and forfeit the estate. We call attention to the characteristics of these statutes, which we will treat of in this opinion later on.

It will be notice that the court in its original opinion makes its conclusion of law applicable only to a ninety-nine year lease. We are unable to see how this distinction can be drawn, or to agree with this view, or concede that any different law is applicable to one estate for years than applies to all estates of the same kind. Let us examine the law on this subject. The length of time for which a lease is to run never can change the principle which governs the kind and character of the estate conveyed. If an estate can be made to endure for 1,000 years, it is none the less an estate for years, and none the less controlled by the principles which govern the class of estate to which it belongs. For the above-announced principles we cite: 1 Tiffany, secs. 36, 84; *Goodwin* v. *Goodwin,* 33 Conn., 314; *Ware* v. *Washington,* 6 Smed. & M., 737; *Dillingham* v. *Jenkins,* 7 Smed. & M., 479; *Gay, Administrator,* 5 Mass., 419 Cooley's Blackstone, vol. 1, book 2, p. 142; *Spengler* v. *Stanler,* 1 Md. Ch. Dec., 36; *Faler* v. *McRea,* 56 Miss., 227; *Webster* v. *Parker,* 42 Miss. 471; Washburn's Real Property; *Whitmire* v. *Wright* 53 Am. Rep., 724. In commenting on the authorities cited above for the purpose of showing that a lessee

of land for ninety-nine years is in the same class in all respects under the law with any other tenant for years, and that the lease for ninety-nine years is controlled and governed by the same principles, and that in no instance, however long may be the lease, can any right in the fee pass by *a mere lease,* I desire to call special attention to some of the cases cited above.

In the case of *Goodwin* v. *Goodwin,* 33 Conn., 314, a widow claimed her right of dower in a nine hundred and ninety-nine-year lease, and the court said: "If an estate for so long a term of years can be regarded as real estate, then dower should be allowed; otherwise not. The general principle is that an estate for years is less than a freehold, and is nothing more than a chattel real, and is classed as personal property. Does a long term of years stand upon different ground in this respect from a short one? Of course, the value of the reversionary interest depends upon the length of time the estate is to continue, and such value in the present case is exceedingly small, too small for any substantial benefit; but does the difference in the value or reversionary interests make any difference in the principle? If this estate had been created nine hundred and ninety-nine years ago, it would be conceded that Horace Goodwin would have had only a chattel interest. If, then, at the commencement it is to be regarded as a fee simple, at what time will it change to chattel real? The claim of the plaintiff involves the necessity of fixing time, and the absurdity of holding that immediately before the time shall arrive the estate will be a fee simple, and immediately after a chattel interest merely. We are unable to discover any difference in principle in this class of estates, whether they are to endure for a short or a long period of time, and we are satisfied that no distinction can be found in the common law." The case quoted above is strikingly applicable to the case under consideration, when it is sought to give a lessee for ninety-nine years the rights of a fee simple owner, by calling his lease a fee

determinable at the end of ninety-nine years, as is stated in the concurring opinion. This authority clearly shows that in no lease can there enter any of the rights of ownership in fee. The case of *Gay, Administrator*, 5 Mass., 419, was also in regard to a lease for nine hundred and ninety-nine years. In this case an administrator filed a petition in the probate court, alleging that the personal estate of the decedent was insufficient for the payment of debts, and prayed for license to sell real estate belonging to the decedent for that purpose. The real estate consisted of land belonging to the deceased under a lease for nine hundred and ninety-nine years, and the court held that the lease was not land, but personal property.

But we have more direct authority than the authorities above quoted, and we merely use them for the purpose of showing that, where the period of lease was for nine hundred years longer than the lease in the case under consideration, it was nevertheless held to be governed by the same characteristics as governed all estates for years, and an estate of no higher right or dignity was created by the nine hundred and ninety-nine-year lease than was created in a lease for a shorter period of years. The thing, after all, is that it is a lease for years. In the case of *Ware* v. *Washington*, 6 Smed. & M., 741, in speaking of a lease of the sixteenth section lands in this state, the court says: "The lease for ninety-nine years was but a chattel title. The dower is a freehold estate, which never can be carved out of an estate for years. A lease for any definite period is a lease for years. A lease for one year and a lease for ninety-nine years create an estate of the same dignity." The case above quoted was decided in 1846. The same principle is repeated in the case of *Dillingham* v. *Jenkins*, 7 Smed. & M., 479, and deals with the sixteenth section lands in the state of Mississippi. The case last above cited was before the court twice; first in *Montgomery* v. *Dillingham*, 3 Smed. & M., 647, and again in the report cited above. Justice Sharkey, delivering

the opinion of the court in both cases, said: "A lease of ninety-nine years is of no higher dignity than a lease for a term of one year." To the same effect will be found the decisions and text in all the cases cited above. We might go on and multiply authorities without limit, holding that, when a lease is the thing granted, it matters not whether it be for one year or for ninety-nine years, it belongs to the same class and is controlled by the same principle as the law governing all other estates for years, however long or short they may be, conclusively showing that any idea that a lease for a long period of years carries with it any part of the fee, is in opposition to all authorities on the subject.

We now turn our attention to the question as to whether or not a tenant for years is liable for waste. Independently of the statutes of Marlbridge and Gloucester, and independently of whether or not they form a part of our common law, we think this question is as firmly settled and buried in our juris-prudence as any principle of natural right can sink itself in the jurisprudence of any state. Whenever this question has arisen in this state it has been decided in the affirmative. It was so decided in the *Gans case,* 80 Miss., 76 (s.c., 31 South. Rep., 539); *Walton* v. *Lowrey,* 74 Miss., 487 (s.c., 21 South. Rep., 243); *Learned* v. *Ogden,* 80 Miss., 769 (s.c., 32 South. Rep., 278; 92 Am. St. Rep., 621); *Cannon* v. *Barry,* 59 Miss., 289. The *Gans case* is the most recent and accurate announcement of this principle. The question cannot be considered an open one in this state. Any tenant for years, it matters not how many years his tenancy may run, is liable for waste when he does those acts which are defined as waste, determined by the conditions and circumstances which exist at the time when the acts are committed. Any contrary holding would shock common understanding of the law. It may be stated that it is a universal rule in this country that, unless exempted by the terms of the lease from responsibility for waste, a tenant is

responsible for voluntary waste, whenever committed. This statement of the law is laid down in Encyc. of Law, vol. 30 (2d ed.), p. 259, and it is there stated that such is the law in Georgia, Illinois, Indiana, Maryland, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Rhode Island, Virginia; and we might add that the result of our investigation shows many other states not named in the Encyclopædia of Law. *United States* v. *Bostwick,* 94 U. S., 53 (24 L. ed., 65); *Bullitt* v. *Musgrave,* (Md.), 3 Gill, 31; *Belt* v. *Simkins,* 113 Ga., 894 (39 S. E., 430). We do not hold that the statutes of Marlbridge and Gloucester have any intrinsic force as statutes in this state, but we do hold that the principle announced by them over 600 years ago, making a tenant for years liable for waste, is a part of our law at this time. These statutes have been enacted, in a modified form, in nearly every state in the union, and in those states which have not passed statutes upon this subject the principle announced, making the tenant liable for waste, nevertheless enters into their jurisprudence. Over six hundred years ago the rule exempting the tenant from waste was considered harsh and unjust towards the lessor, and the very purpose of these statutes was to relieve the law from this species of wrong. To say that this principle has not been adopted as a part of our jurisprudence would be to say that our courts and laws have not kept pace with the development of the law in extracting from it just rules of right. This principle of holding the tenant liable is not only one of natural right and justice, but it is thoroughly in keeping with our institutions, enlightenment, and circumstances, and has been held to be the law every time the courts have been called upon to pass on the subject.

It is held in many of our decisions that the common law is the law of this state, as far as it is adapted to our institutions and circumstances, when not repealed by statute, or varied by usage which long custom has superseded. *Vicksburg & Jack-*

*son R. R. Co.* v. *Patton,* 31 Miss., 156 (s.c., 66 Am. Dec., 552); *Green* v. *Weller,* 32 Miss., 650. It is stated in the original opinion that "it is immovably fixed in the law of Mississippi that no statute ever enacted in Great Britain has any force here, unless re-enacted by our legislature." In support of this proposition the court cites *Jordan* v. *Roach,* 32 Miss., 481; *Boarman* v. *Catlett,* 13 Smed. & M., 149; *Ingram et al.* v. *Regan,* 23 Miss., 213. We do not take issue with this announcement of the law as an abstract proposition, but we do say that a principle of law, passed by an English statute over 600 years ago, announcing a wise and just rule of conduct, is not to be renounced simply because it made its appearance first in an English statute, when it is suited to our circumstances and conditions, and adjustable to the policy of our law, and when it has been recognized as the common law by such universality of authority. As a matter of fact this lease was made in 1882 under the code of 1880, and it is governed by the law as it existed under the code of 1880, and the statutes cited by counsel have no bearing on the construction of this lease. The lease was made in conformity to sec. 732 of the code of 1880. By section 3 of the code of 1880 it is expressly provided that all "acts and parts of acts, the subjects whereof are revised, consolidated and re-enacted in our revised code, . . . shall be, and the same are, hereby repealed." The subject of the school lands had been revised and remodeled by the code of 1880, and for that reason this lease is governed by the law contained in the code.

The acts of 1818 and 1824 contained a special injunction against the tenant committing waste. The act of 1833, amendatory of the acts just quoted, and all succeeding laws, are silent on this subject. In the argument of counsel much time is devoted in an effort to show that, because the statute succeeding the acts of 1824 was silent as to waste, the tenant could therefore deal with the property as an owner, and was not liable

for waste. We think we have shown by the authorities already cited that a lessee of land, it matters not for how many years, is liable for waste as an incident of the character of the estate which he gets. No statute was needed to create this liability, and the insertion in the act of a clause making the tenant liable for waste is surplusage and unnecessary, and might be omitted from any succeeding statute without affecting his liability therefor. It was doubtless intended by the legislature to impose upon the trustees the duty of actively seeing to it that the tenant committed no waste. In all leases a tenant was liable for waste, but the lessor was under no duty to bring an action against him. He might do so or not, as suited him. In the case of the public school lands it was the purpose of the legislature to convert *this right,* which every lessor had against his tenant, into a *duty* which the trustees of the school lands owed to the public in seeing to it that no acts of waste were committed. When the legislature used the language that the lessees should be vested with "the right, title, use, interest, and occupation of said, section," it used the language in connection with the character of the estate which was authorized to be conveyed, which was a tenancy for years, a leasehold estate. It meant to convey, and did convey, only such right, title, use, interest, and occupation as went with the kind of estate conveyed. The whole act must be construed together. The parts of it cannot be separated and make the act mean a different thing from that which the whole act shows was intended. There is no authority given in the statute to do anything but lease this land. No person reading this statute could possible be misled into the supposition that he was getting a fee, when the statute said that it should be a lease, and when the conveyance made by the trustees only purported to be *a lease. The very purpose* of the legislature in saying that the land should be leased was to measure certainly the rights which every party taking the lease should get by the kind and character of conveyance which

they authorized to be made to him.  A lease has an accurate, definite, certain legal meaning, and by this legal meaning the rights of the lessees under this statute must be measured.  Because this is public land, and because the lease is for ninety-nine years, and because the parties authorized by law to make the lease are public officers, no greater or different rights were conveyed by the lease than if it had been made by private parties for any number of years.

In the former opinion it is stated that the act of 1833 repealed the act of 1824 in reference to its provisions against waste; that it was found utterly impracticable to make the lease with the prohibition against waste in the law, except in scattered instances where the lands were near the towns.  As we have stated above, this prohibition against waste, placed in the acts referred to, was unnecessary in so far as it created any right to proceed against the tenant for waste.  This act but declared the law upon that subject which was then in existence.  Without it the lessor had the right to proceed, and with it no new right was given him.  But we do not agree with the former opinion of the court in this regard for another reason.  It will be noticed that in the act of 1818 a lease could only be made for three years.  The act of 1824 changed this, and increased the period of the lease to five years.  The act of 1833 changed both acts in this particular, and authorized a leasing for ninety-nine years.  We conclude that if leases could not be made under the acts of 1818 and 1824, as stated in the former opinion, it was not because of the prohibition against waste, but because of the short term the leases were to run, and it was for the purpose of increasing the time that the act of 1833 was passed.

It is alleged in the bill that the appraisal of the leasehold value was based upon the quality and quantity of merchantable timber.  This allegation of the bill is not sustained by the lease, which is filed as an exhibit to the bill; nor did the statute

authorize any lease based upon the quality and quantity of merchantable timber. Where the exhibit-filed contradicts the bill, this court has repeatedly held that the exhibit alone could be looked to.

The next question which we will consider is the question of what constitutes waste. Waste is defined to be any substantial injury done to the inheritance, by one having a limited estate, during the continuance of his estate. By universality of authority the cutting of timber for commercial purposes by a tenant for years is waste. We may safely say that there are hardly any authorities to be found in conflict with this statement. 1 Tiffany, sec. 249, p. 564; *Warren County* v. *Gans,* 80 Miss., 76 (s.c., 31 South. Rep., 539); Taylor on Landlord and Tenant, sec. 353, p. 271; Tiedeman on Real Property, sec. 69; *Lester* v. *Young,* 14 R. I., 579; *Davis* v. *Clark,* 40 Mo. App., 515; *Smith* v. *Smith,* 105 Ga., 106 (31 S. E., 135); *Davis* v. *Gilliam,* 40 N. C., 308; 1 Washburn on Real Property, secs. 275, 276; *Proffitt* v. *Henderson,* 29 Mo., 325. When the authorities cited above are examined, there will be found many references to authorities not cited in this opinion.

What rights have tenants for years? The answer to this question can be placed in no better language, or more accurate expression, than the rule laid down in the *Gans case*: "The rigid rule of the common law that a tenant of a particular state could not cut timber, except for estovers only, is in many jurisdictions modified, so as to allow him to cut off timber for clearing so much of the estate as the needs of his family may require for their support, though the timber be destroyed thereby. And he may clear for cultivation such portions of it as a prudent owner in fee would clear for that purpose, provided he leaves enough timber and wood as may be necessary for the permanent use and enjoyment of the inheritance. His right to open and clear for cultivation wild and uncultivated land is that of a prudent owner, having regard to its amelioration

as an inheritance. When the particular tenant cuts timber in the process of clearing the land for immediate cultivation, he can appropriate it or its proceeds to his own benefit; but he cannot cut the timber for sale without making himself amenable for waste. When the timber is cut by the tenant or others unnecessarily or unlawfully, the right of the reversioner or remainderman at once attaches, and he may bring an action on the case in the nature of waste for his damages, or he may bring trover or replevin for the timber severed from the inheritance." The rule announced in the *Gans case* is but an affirmation of settled authority. What constitutes waste is determined by the consideration as to whether or not the act done results in injury to the inheritance. 1 Tiffany, sec. 247. In the original opinion it is held that "twenty years' growth is held to constitute timber. Who can say, therefore, in this case, that the interests of those who will come after will be harmed by removing the timber?" Courts do not undertake to deal with speculations of this kind, or reckon with possibilities. They are confined to legal rights, which exist at the time they are called to act on them. Whether or not an act on the part of the tenant is waste is determined by the facts and conditions which exist at the time the act is committed.

It must not be forgotten that the only title these lessees hold is that of a tenant for years. Their estate is stamped with this character at the instant of its creation, and it lasts throughout the entire period of tenancy, in whomsoever the tenancy may exist. Every instant of time, during the continuance of the tenancy, the tenant must conduct himself as a prudent owner of the fee in the exercise of good husbandry. If at the beginning of this lease the timber had been valueless and the tenant had destroyed it, he would not have been guilty of waste. If the timber had stood upon the land, and the tenancy had been in existence for forty years, and the timber, from being valueless, had become valuable for commercial purposes, and the

tenant should undertake to destroy it, or cut it for purposes of sale, or use it beyond such measure as a tenant for years might lawfully use it, he would be guilty of waste. He must conduct himself as the prudent owner of the fee, in the exercise of good husbandry from the beginning of the tenancy to the end, and in the light of facts which may develop a value in that which had no value at the beginning of this term. The exercise of good husbandry to-day cannot be measured by what would have been good husbandry twenty-five years ago. But the conduct of the tenant towards the estate, as to whether or not his acts constitute waste, is determinable by the facts, circumstances and conditions which exist at the time the alleged act of waste was committed.

It is argued in this case that because of the allegation in the bill that the nature and character of the soil makes the land unfit for cultivation, and that its only value consists in the merchantable timber standing on it, it was intended for the lessee to use it for that purpose. In answer to this we state that the usual purposes for which lands are leased are agricultural purposes, and, unless the contrary be stipulated in the lease, the lease of the land carries with it only such rights as go with ordinary leases. The original lessees of the land were the best judges of what use the land could be subjected to, and in taking the lease they are conclusively presumed to have taken it with such rights as go with a lease of land, and the right to cut and sell the timber is not such a right as goes with the lease. In this connection we quote from the opinion of Chief Justice RUFFIN, in the case of *Davis* v. *Gilliam,* 40 N. C., 310, which was a bill filed to restrain waste. The court said: "It is certainly proper, in cases of this kind, to have a view to the spirit and reason of the common law; and therefore many things that constitute waste in England, and may hereafter do so here, because prejudicial to the inheritance, ought not to be so held here at present, because they do not prejudice, but rather improve, the

inheritance.    Hence, turning woodland into arable, though
the timber felled be sold, is not absolutely waste in our law;
for cutting timber on land fit for cultivation, or that may be
made so, and reducing it to that state, may, in the condition of
our country, be a benefit, rather than an injury, to the rever-
sioner.    If this swamp be of the fertile quality, it might add
greatly to the value of the inheritance to take off the whole of.
the timber, if the tenant would go on by embankments and
ditches to prepare the land for crops.    The rules, therefore, of
the common law, determining what is or is not waste, are not
entirely applicable to the condition of things here.    But the
principle on which these rules were formed applies here, as, in-
deed, it does everywhere; for it is founded in the nature of
justice itself.    It is that a tenant for a limited period, or a
particular estate, *cannot rightfully* so treat the estate *as to de-
stroy the value* of the reversioner, or materially reduce it below
what it should be; *regard being had merely to the postponement*
of the enjoyment.    The tenant may use the estate, *but not so
as to take from it its intrinsic worth.  .  .  .*    We should
hold, as the state of the country now is, that a tenant for life
of land, entirely wild, might clear as much of it for cultivation
as a prudent owner of the fee would, and might sell the timber
that grew on the part of the land.    Clearing for cultivation
has, according to the decisions, peculiar claims for protection;
and a sale of the timber from the field cleared may be justly
made, in compensation for clearing and bringing it into culti-
vation.    *But it seems altogether unjust* that a particular tenant
should take off timber *without adequate compensation to the
estate for the loss of it.*    For he takes in that case, not the
product of the estate arising in his own time, but he takes that
which nature has been elaborating in all ages, *being a part of
the inheritance* itself, and that, too, which imparts to it its
chief value.    .  .    It is said, however, that, unless he be
allowed to take some of the timber, his estate will be of no

89 Miss.—34

value, when the land is swamp, not fit for cultivation, or that cannot .be made so without great expense in drains and dikes. *This could not alter the principle.*" This same reasoning is repeated in 29 Mo., 325, and in *Thurston* v. *Mustin,* Fed. Cas. No. 14,013. In *Davis* v. *Clark,* 40 Mo. App., 515, it is held that a tenant cutting and destroying timber, not for firewood, repairs to premises, or cultivation, but for converting it into ties for market, was committing waste; and to the same effect are the other cases and authorities cited. The cutting of timber on this land by the lessee, under the conditions alleged in the bill, *is a substantial injury to the inheritance, and therefore waste.* We cannot improve upon the rule laid down in the *Gans case.*

We have approached the consideration of the suggestion of error with the greatest deference and respect for the former opinion rendered herein. But we have no hesitancy in announcing our conclusion that the opinion of the court was wrong. We feel strengthened in this opinion by the fact that the *Gans case* was decided in 1902, after the fullest argument, by a unanimous court, our distinguished associate Justice Calhoon, now dissenting, being a member of the court at that time, and then holding the view .we now reannounce. A decision contrary to our holding would involve the necessity of overruling this decision decided a little over four years ago. When a question has been settled by this court, it should be treated as no longer open for review and investigation, unless the evil resulting from the principle established by it is manifest and mischievous. We cannot say this of the *Gans case,* but, on the contrary, declare it to be sound in logic, sound in law, and sound in natural justice. We are announcing no new principles of law in this case, but are simply reaffirming that which has been well settled and thoroughly accepted for a long .while. The doctrine of waste is almost as old as the law itself. Even where there is an express stipulation in the lease that the tenant should not

be held liable for waste, the equity courts have always intervened to protect the reversioner, where the tenant exercises his power in an unconscionable manner.

To ascertain the rights which went with the lease to the lessee, we turn to the law to seek the definition of what is meant by lease.    Upon this subject the law is plain.    We cannot turn from this definition to seek aid by recalling the conditions of the country which existed at the time the lease was made.    We might do this, if there was a doubtful meaning in the lease; but since its terms are perfectly plain, and since the rights which go with it are accurately measured by the law, since its meaning is defined and certain, we can have no recourse to extraneous matters as the contract is free from doubt.    When the legislature authorized this lease, they had the right to stipulate the terms and conditions upon which they would lease the land.    Those provisions in the law which require the lessee to pay taxes and give him the right to bring suit were placed there for purposes which the legislature deemed good, and are perfectly consistent with the lease.    No person was bound to lease the land; but, if he did, he was bound to take it with such burdens and such rights as was granted by the legislature. Let it be remembered in passing, that the Moss Point Lumber Company bought this timber in April, 1905, and that the *Gans case,* in 80 Miss., 76 (s.c., 31 South. Rep., 539), was decided in 1902, so that at the time appellant purchased it had full knowledge of the law, and bought this timber, knowing at the time that the court has held such sales to be unlawful.

*All objection having been withdrawn as to the manner in which this suit was brought, at the request of counsel we consider the merits of the case.    Let the suggestion of error be sustained, and the former judgment of this court vacated, and the decree of the chancellor affirmed, and the cause remanded, with leave to answer in sixty days after mandate filed.*

WHITFIELD, C. J., on the second decision delivered the following concurring opinion.

The opinion of the court, read by my Brother MAYES, is so thoroughly able and so completely exhaustive that I, desiring not to go over any of the ground he has so fully covered, shall confine myself, in this concurring opinion, to as brief a statement of my views as the great public importance of the question will permit.

At the very outset I wish to concentrate attention upon that which constitutes the crux of this case—the most serious contention of learned counsel for appellant. That precise contention may be thus summarized: The insistence is that the bill avers that the only value that this sixteenth section had was the value of the timber upon it; that the demurrer admits this to be true; that the lessee must have gotten something of value by the instrument, and if the lessee of a section of land, valuable only for its merchantable timber, cannot cut down, and sell for his own private profit, all the merchantable timber which may be grown on the land, during the term of the lease, he gets nothing at all practically, and that *that,* assuredly, could not have been the intention of the parties; that the opposite construction presents a case of such great hardship that the court ought to hold—presumably, because of this hardship—that the lessee may so cut and sell, for private profit, *all* the merchantable timber on the section; that is to say, he may absolutely destroy the sole and only value that the section of land has. This presents fairly and clearly the strongest contention, to my mind, counsel for appellant urge.

Before answering this, let it be specially noted that the lease—the exhibit—controls the averment of the bill, and it is a lease of the land, not the timber merely, and there is no pretense in the lease of a lease of merchantable timber only, or of the land as valuable for the timber only, and, under our decision, the exhibit controls and limits the averment of the bill. But,

suppose the exhibit had contained that allegation; what then? In the first place, let it be noted that not a single authority is cited in support of the proposition that a lessee for ninety-nine years may sell for profit all the merchantable timber, thus destroying the value of the reversion; destroying, in other words, the whole value of the inheritance. I think I may confidently say that not an authority can be produced to sustain this contention, in England or America. Once let it be granted that the instrument is a lease of the sixteenth section for ninety-nine years, and no more, and not an authority can be produced to show that *that* sort of legal instrument authorizes the sale for profit of the merchantable timber, even if the merchantable timber constitutes the whole value of the section. It will be observed that the advisory views of Judge CAMPBELL, incorporated in the very learned and able opinion of my Brother CALHOON, take the same view of what is waste, and of the particular character of this instrument as being a lease, which the majority of the court take. Judge CAMPBELL deems any discussion of the legislation prior to the code of 1880 out of place, because this lease was made under the code of 1880. He insists fully on the American modified doctrine of waste, which makes tenants for years and tenants for life liable to appropriate remedies for waste; these remedies residing, as he puts it, "in the breasts of the judges." He repudiates the idea of any "determinable fee" being created by this instrument. He treats it, not as a fee of any kind, but, as it is, a plain, simple lease for the term of ninety-nine years. And the only point of difference between him and the majority, and of concurrence between him and my Brother CALHOON, plainly is, as seen from his views set out as above, that, whilst the doctrine of the *Gans case* is sound, whilst all our statutes provide for leases, and not sales, yet that in this particular, precise case, the lease being, not of arable land, but of land valuable alone for the merchantable pine timber upon it, the court ought, be-

cause of the hardship of the case, in order to give some benefit to the lessee, to hold that a different rule should be applied to a lease of a section valuable only for its timber from the rule which ought to be applied to a lease valuable for the soil, and therefore ought to work out of this instrument a construction allowing the lessee to cut and sell for profit all the merchantable timber on this section, from time to time, as it may grow and become merchantable, else, says he, the lessee gets nothing. I have tried to state Judge Campbell's views, and particularly this—his point of concurrence with my Brother Calhoon—fairly and fully.

I think it can be shown, on principle and authority, that this view is unsound. First, as stated above, no authority is produced to sustain this precise contention; second, how is it on principle and reason? The trouble with this view is that it is all founded in the notion of the supposed great hardship which will be imposed upon a lessee in a case of this kind if he be not allowed to cut and sell the timber for profit. The question is not one of hardship. The solitary inquiry is, what is the nature of the instrument under which the lessee claims? It has been demonstrated beyond cavil, as it seems to me, by my Brother Mayes, that it is nothing in the world but an ordinary lease of a sixteenth section for ninety-nine years. A lease has its own peculiar and established incidents and characteristics, crystallized in it and stamped upon it by the law. This instrument leases the land for a fixed and determinate time—ninety-nine years. It calls itself a lease. Its terms show it to be a lease. Nobody ever heard of its being anything but a lease, until the argument in this case by the appellant. It is made under the provisions of Code 1880, § § 732, 735, which provide for nothing but a lease. The value of the land is appraised for the term of ninety-nine years—*the leasehold value*—and that is simply to ascertain a minimum amount for the lease, for less than which it shall not be leased, as provided in

section 735, but the thing leased is the land. Section 732. The statute says: "Thereupon said board of supervisors shall direct that said land be leased," and in section 734 what the lessee paid is called "annual rent." Being, then, a mere lease for the term of ninety-nine years, of course all the incidents and characteristics of a lease at once attach to and inhere in the instrument; and it is certainly elementary learning that no lessee can ever commit lasting damage to the inheritance—can ever cut and sell all the timber, when the only value the leased land has is the value of the timber. If he could, he would by such cutting absolutely destroy the whole value of the inheritance—a thing utterly at war with any legal conception of the incidents and characteristics of a lease, and the duties and liabilities of a lessee under a lease.

But it is said, both in the view expressed by Judge Campbell and that of my Brother Calhoon, that this doctrine may be and is true of tenants for years of "arable lands," but that it is not true of lands the whole value of which consists in the value of timber growing on the lands. How is it possible, let me ask, to draw any such distinction? If the instrument be a lease, undoubtedly the principle that the lessee cannot destroy the value of the inheritance must apply, whatever may be the subject-matter of the lease. The widest possible range of dealing may be allowed the lessee, the widest usage and freest treatment of the subject matter of the lease, provided, always, that the value of the inheritance in the thing leased shall not receive lasting damage. The lessee knew that this was the law when he took the land. He was charged with a knowledge of that law. He doubtless advised with counsel, or ought to have done so, as to his rights under such lease.

This is demonstrated beyond cavil by the fact that appellant took this lease in April, 1905, three years after the decision in the *Gans case,* 80 Miss., 76 (s.c., 31 South. Rep., 539), which was decided in March, 1902. The appellant took the lease

as interpreted in that case, and now seeks to repudiate that case. There had been more than seventy years of usage under leases of sixteenth sections in this state. If one takes a broad view, such as ought to be taken in the discussion of this case, the reason why there never has been, until recently, any legislation authorizing the sale of a sixteenth section, is perfectly obvious. Law is a growth, an evolution; not a thing, like Jonah's gourd, grown overnight. It is born with the needs of the people, as those needs develop themselves. It may be crude at the outset; but as civilization advances, and wider range of needs for citizenship is disclosed, the law applying to these varying, diverse, differing, needs, under constantly shifting conditions, itself is changed, unfolded, and adapted to these varying wants and needs of an advancing civilization. The law in respect to sixteenth sections has undergone this very evolution; this very unfolding. When these leases of sixteenth sections were provided for in early legislation, they were first made for very short terms. They are now made for ninety-nine years, since no one would have a short term. Moreover—and let this specially be noted as a historical fact, in connection with the legislation about our sixteenth sections—when this legislation first appeared upon our statute books, and all along from that time until within the last ten years, these leases were almost altogether executed in those parts of the state in which the soil (the ground) of the sixteenth sections constituted its chief value for crops of various kinds. The legislature was dealing with lands valuable as crop producers, rather than as valuable for timber.

The former opinion of the majority of the court expressly stresses the point that, in that early time, timber was so little valued that in many instances it very largely improved the value of a sixteenth section to cut it down and to open the land to cultivation; and for that very reason the legislature, until within the last ten years, had, as a matter of fact, been

dealing with sixteenth sections nineteen-twentieths of which were valuable chiefly for the soil. There never had arisen the need for any law authorizing the sale of the timber on a sixteenth section. The soil of all of north Mississippi, of all of west Mississippi, and of central Mississippi, was soil valuable for crops, rather than for timber, speaking by and large; and because *that* was the fact, the law, which is a growth, finding that more of value to the beneficiaries of these sixteenth sections could be had by lease of the land than by sale of the timber, provided for such leases, rather than for such sales, because the soil was valuable chiefly as a crop-producing soil. This is a fact in respect to the nature of the lands in nineteen-twentieths or more of the sixteenth sections of the state. The law, which is an evolution, a growth, an unfolding suited to the needs of the people, as population increases and the lands of the state are occupied and brought into use, grew up slowly along with this situation, and provided, hence, for such leases, and not for such sales. But within the last ten years southeast Mississippi has become an empire within itself—an empire, one of the chief sources of whose wealth is its merchantable pine timber. In some of the sixteenth sections—a very small proportion, doubtless, of the sixteenth sections—in southeast Mississippi, the timber and not the soil is the principal element of value. I do no say that, as a matter of public policy, as a matter of good judgment for the interest of the beneficiaries of such sixteenth sections, valuable solely for the timber on them, there should not be legislation authorizing, not leases only, but sales outright, of the timber of such sixteenth sections. But it is to the *legislature* that this argument should be addressed, not to this court. Let the intending purchaser of a sixteenth section, the sole value of which consists in the merchantable timber thereon, apply to the next session of the legislature of this state, and have the law changed, if it be thought wise so to do—as to which I express no opinion—so as to authorize sales in fee simple of the timber

on such sixteenth sections, within the discretion and best judgment of the authorities charged with the disposition of such sections valuable only for timber. Then there will be no difficulty. There will be no difficulty, in the first place, about such purchasers getting the fee simple, if they desire the fee simple; and there will be no difficulty, in the second place, about their being required, when they do get the fee simple, to pay a fee simple consideration.

Can any one believe that $835, paid for this leasehold interest for ninety-nine years of this sixteenth section and all the merchantable pine timber on it—640 acres of land—was ever dreamed of by either lessor or lessee of this land as being the *purchase price* of a fee simple of this timber? Why, certainly not. There certainly would be a hardship, as it seems to me, in holding that the lessee got the right, under this mere lease, to sell, for profit, all the timber, for the obvious reason that he would be selling as fee simple owner what he paid only a small leasehold consideration for. That, indeed, would be a hardship on the beneficiaries of the sixteenth section. It seems to me to be curious, to be hard, to be unjust to the last degree, that a lessee who paid $835—a pure leasehold consideration—for leasehold rights for ninety-nine years, in this sixteenth section and the 640 acres in merchantable pine timber thereon, should be allowed to get, not what his instrument calls for, a leasehold interest only, but what his instrument does not call for, the absolute fee simple. Why, why can he possibly get any more right, any larger measure of right, than the actual nature of the instrument he holds under confers? Whenever it is known, ascertained and settled that this instrument is a lease for ninety-nine years, then this case is settled. He is a lessee for years, charged with the duty of not committing waste to the lasting damage of the inheritance, strictly forbidden by the legislation and the decision under which he holds—the *Gans case,* decided three years before this lease—to cut and sell for profit

all the merchantable timber of such sixteenth section, even though that merchantable timber should constitute the sole value of the land. If he chose to take a lease, he must stand by the lease. It is not his to talk about hardship. He knew the law. He took under the *Gans case,* and, if he wishes to purchase a fee simple title to the timber, let him go to the legislature and get the authority to buy a fee simple title. This court construes the law *as it is;* this lease *as it was written.* It has no power to wrench the law to suit alleged, but really non-existing hardships. "Hard cases make bad precedents."

Something has been overlooked in the discussion of this case, in the former opinion of the majority of this court, which to my mind is conclusive of the correctness of the views which I have just been elaborating, as the reason why there has been no legislative authority for the sale of these sixteenth sections until very recently. When our pine timber in south Mississippi and other wood became, within the last ten years, of such fabulous value, intending purchasers, knowing that they could only lease under the law as it then stood, actually applied to the legislature and secured the passage of an act (Act, February 11, 1898; Laws 1898, p. 62, c. 41), section 1 of which is as follows:

"Section 1. Be it enacted by the legislature of the state of Mississippi, that the board of supervisors in counties having control of any sixteenth section of land, or a part of such section or of another section or a part of a section taken in lieu of any sixteenth section, or a part thereof, reserved for the support of township schools, be, and they are hereby authorized and empowered to sell the *merchantable pine timber* and wood on such lands or to lease said lands for turpentine purposes for a term not exceeding one year."

Here, then, we have for the first time direct legislative authority for the sale of the identical character of timber involved in this litigation, towit, "merchantable pine timber." Such

merchantable pine timber, found almost exclusively in south Mississippi, had only within the last ten years become of such immense value. The evolution and growth of the value of that sort of timber reached within the last decade a point at which legislative authority to sell the timber was thought needed; and the law, growing and adjusting itself to the needs of the situation, immediately in this act of February 11, 1898 (amended in 1904) authorized such sale. If sales of the timber are best in some cases, let the legislature authorize the sale, as it did by this act; but so long as the instrument a court is called upon to construe is by its terms a lease, not a sale, the court is bound by the highest obligation to construe the instrument as what it is, a lease, attaching to it the legal characteristics and incidents of a lease, and hold the lessee strictly to account for any lasting damage inflicted upon the inheritance. Such I submit is the view, conclusive on principle, on reason, and on a review of the history of the growth of the state, and of the legislation and decisions of the state on this subject.

But now, lastly, is there no *authority* on this *identical* question putting at rest, definitely and forever, the contention, unsupported by authority, of learned counsel for appellant? My Brother MAYES has referred to eleven distinct authorities to show that the length of time for which leases are to run never changes the principles which cover the kind of estate conveyed. I shall now add two authorities, with which his diligent research has furnished me, on the precise, identical proposition, which I call the crux of this case, towit, that, although the price of the timber may be the sole value of the sixteenth section, the lessee nevertheless is subject to the universal principle, governing estates for years—that he cannot commit waste, and is answerable for the value of trees so cut and so sold for profit, even in that sort of case. The first case is the case of *Proffitt* v. *Henderson,* 29 Mo., 325. In that case the precise point which I call the crux of this case was decided. The court said: "There may be

waste where there is such profitable enjoyment, and there may be profitable enjoyment without waste.  The cutting of the timber may have been necessary to the profitable enjoyment of the land according to the tenant's standard of profit, and yet have been a great outrage upon the rights of the reversioner.  . . . The other objection, that there is no allegation that the land was not valuable for any other purpose except timber, is not well taken; for, if the land is *valuable for timber only, it would surely be waste* for a tenant to cut and carry away all the timber of value.  If useful for the timber alone, the tenant must in that case, *as in all others,* respect the rights of the owner of the inheritance, and his enjoyment of it must be regulated accordingly."

The second case is that of *Thurston* v. *Mustin,* Fed. Cas. No. 14,013, where it was very distinctly held by CRANCH, C. J., that a tenant of a lease for ninety-nine years, renewable forever, with leave to purchase the reversion at a stipulated price, is liable to be restrained by injunction from cutting and selling young and green wood, where the wood constitutes the principal value of the land."  The court added: "But it is said that in such a lease, renewable forever, and with a right to purchase the reversion, the relation of landlord and tenant does not exist, inasmuch as it is in the power of the defendant to prevent the plaintiff and his heirs from ever enjoying the reversion. But, until the defendant has *actually purchased* the reversion, it remains in the plaintiff, and the *relation of landlord and tenant still subsists* in full force."

These two authorities are directly and squarely decisive of the affirmative of the proposition that a lessee for ninety-nine years of a sixteenth section of school land is liable for waste, although the sole value of the sixteenth section consists in the value of the timber upon it, and for the very obvious reason that the principle applies—the universal principle—that such

liability cannot be varied by the nature of the subject-matter of the lease.

It is quite true, as stated by my Brother CALHOON, in his very learned and careful examination of the common law as to waste, that this opinion of Judge CRANCH holds the statute of Gloucester, inflicting treble damages, applicable in that case, because that statute had been held to be of force in the state of Maryland. That is true; but I do not cite the case for anything it holds with respect to the statute of Gloucester. I cite it solely for the purpose stated above. It holds, as to that, precisely with the Missouri case, and both are direct and conclusive authority on the precise point which I have been thus far discussing, and these two are the only authorities referred to *in the whole discussion* touching upon this identical proposition, except one other, the authority referred to by my Brother MAYES, towit, *Davis* v. *Gilliam,* 40 N. C., 308, which holds the same doctrine precisely. That case decides much more than is supposed by Judge CAMPBELL. Its exact holding is clearly pointed out and approved in the Missouri case above referred to, at page 328. The court says "that, as the state of the country now is, a tenant for life of land, entirely wild, might clear as much of it for cultivation as a prudent owner of the fee would, and might sell the timber that grew on that part of the land. Clearing for cultivation, he [Ruffin] says, has, according to the decisions, peculiar claims for protection, and a sale of the timber from the fields cleared may be justly made in compensation for clearing and bringing it into cultivation. But it seems *altogether unjust* that a *particular tenant* should take off the timber without any adequate compensation to the estate for the loss of it; for he takes, in that case, not the *product of the estate arising in his own time,* but he takes that *which nature has been elaborating through ages, being a part of the inheritance itself, and that, too, which imparts to it its chief value.*"

I call special and emphatic attention to the last clause of Judge RUFFIN's opinion as quoted above: "For he takes, in that case, not the product of the estate arising in his own time, but he takes that which nature has been elaborating through ages, being a part of the inheritance itself, and that, too, which imparts to it its chief value"—a statement too luminous on the precise point, and too beautiful in its style, to have been made by any other than the great and classic RUFFIN.

I confidently submit, therefore, that this, the strongest contention made by the learned counsel for the appellant, is clearly and incontrovertably resolved against them, first, by a review of the growth of the country, and of the legislation of the state and of its decisions, the *Gans case* especially, as both have regard to these sixteenth sections; second, on reason and principle; and, third, by these authorities, express adjudications on the precise, identical proposition.

I turn, now, to the opinion of the court on the former hearing. The former opinion of this court reached the conclusion it did upon two independent lines of reasoning—one based upon an investigation of the principles of the common law applicable to waste, and the other based upon an investigation of legislation in England, and especially in Mississippi, upon that subject. Let us treat these views separately; and, first, as to the common law. The view of the majority opinion may thus be summarized on this head: It was held that at the *ancient* common law tenants of those estates which were created by the act of the law were liable to impeachment for waste, but tenants of those estates created by contract of the parties, were not so liable. It was said that a tenant by the curtesy, for example, or in dower, belonged to the former class, and was liable, whereas tenants for life or for years belonged to the latter class, and were not so liable. This all rested upon the solitary dictum of Lord Coke, and the fanciful notion for this distinction which he gave was this: That the law, having created the

former estates, ought to protect them from waste, but that, the latter estates having been created by contract, the common law would not provide protection for him who might have protected himself, and did not, by a stipulation in the contract. It is not to be doubted that very many decisions and text-books can be found reiterating this doctrine; but it can confidently be said that every single decision or text-book so holding traces back to this unsupported dictum of Lord Coke. I shall look at this just a moment on authority, and then on principle. Directly the contrary of Lord Coke's statement was expressly held to be the law, towit, that tenants for years and for life *were* liable for waste at the common law, by Bracton, quite as high authority as Coke (Bracton, lib. 4, c. 18), and by Reeves in his History of English Law (vol. 2, p. 438), where he says, speaking of the statutes of Gloucester and Marlbridge: "Not that the common law had already provided *no remedies in all such cases of waste;* for we have before shown, upon the authority of Bracton, that a proceeding might be had for waste against a tenant in dower, and tenant for life, and a guardian." And in note 1 it is said: "Lord Coke holds the contrary, but gives *no authority* for his opinion." And Chancellor KENT— as great a name as Coke—the highest authority upon American common law, criticises Coke's view and approves the contrary in the following language in volume 4 of his commentaries, at star page 80:

"It is frequently said by Lord Coke, in his commentaries, and it was so declared by the King's Bench, in the *Countess of Shrewsbury's case,* that waste would not lie at common law against the lessee for life or years; for the lessor might have restrained him by covenant or condition. But Mr. Reeves, who was thoroughly read in the ancient English law, insists that the common law provided a remedy against waste by *all* tenants for life and for years, and that the *statute of Gloucester only made the remedy more specific and certain.* The provision

in the statute of Gloucester, giving by way of penalty, the forfeiture of the place wasted and treble damages, was re-enacted in New York, New Jersey and Virginia, and it is the acknowledged rule of recovery in some of the other states in the action of waste.  It may be considered as imported by our ancestors, with the whole body of the common and statute law then existing, and applicable to our local circumstances.   As far as the provisions of that statute are received as law in this country, the recovery in the action of waste, for waste done or permitted, is the place wasted and treble damages; but the writ of waste has gone out of use, and a special action on the case, in the nature of waste, is the substitute, and this latter action, which has superseded the common law remedy, relieves the tenant from the penal consequences of waste under the statute of Gloucester. The plaintiff, in this action upon the case, recovers no more than the actual damages which the premises have sustained."

. Another of the highest authorities on English common law (Smith, in his Landlord and Tenant), after stating Coke's view, pronounces it "plausible in theory, but very detrimental in practice," and adds, at page 249, in regard to voluntary waste:  "Indeed, it is obvious to common sense that what the owner of a freehold interest (life estate) is prohibited from doing, a holder of a chattel interest (a lessee for years) must be clearly prohibited from."   So far as authorities go, therefore, we have Bracton and Reeves and Kent squarely against Coke, and Smith criticising his notion.   See, also, Butler's note to 3 Coke on Lyttleton, p. 266, and the authorities there collected.

The true view stated by these authorities, as shown in the quotation from Kent, was that the common law provided a remedy against waste for all tenants for life and for years, and that the statute of Gloucester only made the *"remedy* more specific and certain."   Kent says again, at star page 78:  "It is a general principle that the tenant, without some special

agreement to the contrary, is responsible to the reversioner for all injuries amounting to waste done to the premises during this term, by whomsoever the injuries may have been committed, with the exception of the acts of God and public enemies, and the acts of the reversioner himself." In other words, the true view of the *ancient* common law was that the general principle of the common law made *all* tenants for life and tenants for years liable for waste, and that the statutes of Marlbridge and Gloucester, so far as the *general principle* was concerned, were merely *declaratory* of the *ancient* common law, as it existed when those statutes were passed, and only provided more specific remedies against waste, so far as they contained any new matter.

Second. How does Coke's notion stand the test of principle and reason?

Take an illustration: A becomes a tenant by the curtesy on the death of his wife—issue capable of inheriting being born-alive—of the manor of Dale. On the very *same day* he becomes the tenant for life of Blackacre by virtue of a deed or will. Dale and Blackacre lie side by side, and in respect of the soil, and all upon the soil, are identically alike in all respects. According to Coke, the *ancient* common law made A liable for waste committed on Dale, but not liable for exactly the same sort of waste committed at the same time on Blackacre! Is it possible that the *ancient* common law—"the perfection of reason"—ever tolerated any such absurd distinction? The distinction is so plainly abhorrent both to reason and principle as to need no discussion, and as to furnish the strongest possible ground for showing Coke's notion to be unsound. So much for Coke's curious and fanciful notion, on principle and reason.

I therefore maintain that at the *ancient* common law, on the authority of Bracton and Reeves and Kent and Smith, a tenant for years was liable for waste, and, further, that he was so liable on principle and reason, and, if he was so liable, even

.my Brother CALHOON will concede that he would be liable today in Mississippi, *because* he *was* so liable by the *ancient* common law, so far as that law is suited to our conditions at this time. But there are other considerations which show this to be undoubtedly the true view. The remedies provided by the statutes of Marlbridge and Gloucester were the writ of estrepement and the writ of waste, one of which provided for the infliction of single damages, having been passed in the year 1267, and the other for the infliction of treble damages and forfeiture of the estate wasted, having been passed eleven years later, in the year 1278. Now, by all the authorities, these ancient writs have long since become obsolete, and were at first succeeded by an action on the case for waste, in which only the actual damages were recoverable—a far more rational rule—and in modern practice, more recently, by the writ of injunction sued out in chancery, which gives indemnity for the past, by an account for damages already sustained, and security for the future, by an injunction preventing future waste. See 4 Kent's Comm., p. 78, note 3, and Cooley's Blackstone (3d ed.), vol. 2, p. 225, and especially Pomeroy's Eq. Jurisprudence (3d ed.), vol. 4, sec. 1348, where that great master of equity jurisprudence says:

"The remedy by injunction is fully established, and has not only virtually superseded the old common law 'action of waste,' but has to a great extent taken the place of the 'action on the case' for damages. An injunction will be granted in all cases where a legal action would lie to recover possession of the land wasted or to recover damages. It will also be granted in many instances where no legal action can be maintained, although the interest of the injured party is legal, and where the estate of the injured party is wholly equitable, and where the waste itself is entirely 'equitable'; that is, where by the terms of the will, deed, settlement, or lease the tenant holds the land 'without impeachment of waste.'"

It is hardly to be doubted that the writ of estrepement and. the writ of waste are practically obsolete, in England even, as announced in Am. & Eng. Ency. Law, and are at this time succeeded by the modern writ of injunction; and it follows as a clear corollary that the forfeiture and the treble damages provided by the statute of Gloucester would only be enforced where the action was *strictly* on *that statute;* and *this* is the complete answer to the suggestion, in the majority opinion on the former hearing, that, if the statutes of Marlbridge and Gloucester are part of the common law of Mississippi, then treble damages and forfeiture could be enforced here today. This is clearly incorrect for the obvious reason, supported by authorities, now to be subjoined. When the great *principle* of the *ancient* common law of liability on the part of tenants for life and for years was made a part of our common law, as being suited to our conditions, leaving the mere *remedies* by writ of estrepement and writ of waste entirely out, we incorporated the great *principle* of the common law into our common law; but there was no occasion for the incorporation of these harsh remedies, since they were wholly *unsuited* to our conditions, and this is directly held in many authorities, and notably in the case of *Parker* v. *Chambliss,* 12 Ga., 235. I say notably, because Georgia is the state from whose territory what is now Mississippi was in part carved.

But it is clearly incorrect for the further reason that, after the ancient writs of estrepement and of waste had become obsolete, even in England, and, of course, in the United States, and had been succeeded, first, by the action on the case, and, in more modern practice still, by the writ of injunction, these last two remedies were applied against tenants for life and for years, getting their estates by *contract,* just as completely as against all other tenants, who get their estates by law! This is expressly declared to be the law in note 3 to page 225 in Cooley's Blackstone, vol. 2, *supra,* and in many other authori-

ties unnecessary to cite.   In other words, the law on this sub-
ject was a growth, an evolution, so completely so that in Eng-
land today, where the statutes of Gloucester and Marlbridge
have been regarded for *hundreds of years* as a part of the com-
mon law, the *principle* holding tenants for years liable for
waste, existing at the *ancient* common law and merely *re-
declared* in those statutes, holds such tenants to liability,· but
the liability *enforced* is that which *equity* now enforces, and
not treble damages and forfeiture.   The law, in short, in the
march of its unfolding on· this subject of waste, both as to the
right and the remedy, has kept pace with the needs of the people
in the development of advancing civilization.   And there has be-
come crystallized, fixed, in the jurisprudence of every state in
the union, not the ancient English law of waste, suited to Eng-
land seven hundred years ago, but what is universally known
as the American modified law of waste, which is simply the
great *principle* of liability for waste of tenants for life and for
years, and all other tenants holding estates by law or by con-
tract, enforced in modern jurisprudence so as to make the
owner of the inheritance whole, but denying him the harsh
remedies unsuited to conditions in the United States.   And it
may be said that in every state in the union the American
modified law of waste holds tenants for years liable for waste—
that is, for any lasting damage inflicted on the inheritance—
just as Mississippi holds them so liable in *Learned* v. *Ogden,
Cannon* v. *Barry,* and *Warren County* v. *Gans.*   From all
which it most manifestly results that, whether Coke was right
or wrong in his fanciful notion about the distinction suggested
above, liability of tenants for years for waste stands upon and
grows out of the American modified law of waste, quite apart
from and entirely independent of any English law of waste
whatsoever, except the universal, immutable principle, squaring
with reason and common sense, that such tenants have always
been liable for lasting damage inflicted upon the inheritance,

however that liability may have been differently enforced, ·at different times, by varying remedies, existing in the common law or provided by statute. As is beautifully and accurately said in *Jacob* v. *State,* 3 Humph. (Tenn.), 493, quoted and approved in 6 Am. & Eng. Ency. Law, p. 272:

"The common law has been aptly called the *'lex non scripta,'* because it is a rule prescribed by the common consent and agreement of the community as one applicable to its different relations, and capable of preserving the peace, good order, and harmony of society, and rendering unto every one that which of right belongs to him. Its sources are to be found ·in the usages, habits, manners and customs of a people; its seat in the breast of the judges who are its expositors and expounders. Every nation must of necessity have its common law, let it be called by what name it may; and it will be simple or complicated in its details, as society is simple or complicated in its relations. A few plain and practical rules will do for a wandering horde of savages; but they must and will be much more extensively ramified when civilization has polished, and commerce and arts and agriculture enriched a nation. The common law of a country will, therefore, never be entirely stationary, but will be modified and extended by analogy, construction and custom, so as to embrace new relations springing up, from time to time, from an amelioration or change of society. The present common law of England is as dissimilar from that of Edward III as is the present state of society. And we apprehend that no one could be found to contend that hundreds of principles, which have in more modern times been examined, argued and determined by the judges, are not principles of the common law, because not found in the books of that period. They are held to be great and immutable principles, which have slumbered in their repositories because the occasion which called for their exposition had not arisen."

Surely there can be no reasonable doubt of the liability under

this, the American modified doctrine of waste—our common law of waste in Mississippi—of this tenant for ninety-nine years of this land.

Third.    What do we mean by the common law in the United States, including Mississippi?

Under this head I propose to show that the great principle of the *ancient* common law, merely redeclared by the statutes of Marlbridge and Gloucester, that tenants for years and for life were liable for waste, as common sense and reason demanded, is a part of the common law of Mississippi. And this is settled by the highest authority. In *Parrott* v. *Barney et al.*, Fed Cas. No. 10,773*a*, DEADY, United States District Judge, said:

"It seems that by the ancient common law tenants were not liable to an action for waste, except those who were in by operation of law—as tenant in dower or guardian in chivalry.    To protect the inheritance against the waste of tenants in by act of the parties, whether for life or for years, the statute of Marlbridge was passed.    52 Henry III, c. 23 (year 1267). This statute provided: 'Also fermors during their terms shall not make waste, sale or exile of house, woods and men, nor of anything belonging to the tenements, that they have to ferm, without special license had by writing of covenant making mention that they may do it; which thing if they do and thereof be convict, they shall yield full damages and shall be punished by americiament.'    1 Chit. St., pt. 1, 3.    This statute proving insufficient, the statute of Gloucester was passed.    6 Edw. I, c. 5 (year 1278).    This statute provided: 'That a man from henceforth shall have a writ of waste in the chancery against him that holdeth by the law of England, or otherwise, for term of life or for term of years or a woman in dower; and he which shall be attained of waste shall loose the thing that he hath wasted, and moreover shall recompence thrice so much as the waste shall be taxed at,' etc.    1 Chit. St., pt. 2, 1106.    These

ancient statutes are a part of the common law, brought to this country by the colonists from England. When the migration to America began, they had been in force in the *mother country for four centuries,* and were *then* practically as much a part of the English *common law* as the *oldest traditions of the courts. Com.* v. *Knowlton,* 2 Mass., 534; *Sackett* v. *Sackett,* 8 Pick. (Mass.), 314; 4 Kent. Comm., 81."

I especially ask the profession to read carefully *Sackett* v. *Sackett, supra,* as an absolutely unanswerable demonstration of the correctness of Judge Deady's view. This opinion of the district judge was reaffirmed by Sawyer, federal circuit judge, in the same case, styled "Case 10,773," on appeal to the United States circuit court, and the doctrine of Deady, district judge, and Sawyer, circuit judge, was affirmed on appeal to the United States supreme court, in *Parrott* v. *Wells,* 15 Wall. (U. S.), 524, 21 L. Ed., 206. This principle, therefore, that the statutes of Marlbridge and Gloucester, so far as the general *principle* of liability of tenants for life and for years for waste is concerned, became crystallized as a part of the common law in all of the *United States,* is expressly declared to be the true and sound view by the *United States supreme court.* And the identical doctrine is expressly declared in the 6 Am. & Eng. Ency. of Law, at page 277, in the following words:

"It may be stated as a general rule that *English statutes* passed before the emigration of our ancestors, *in aid or amendment of the common law,* applicable to our condition, and not repugnant to our institutions and form of government, constitute a part of *our common law"*—and again at pages 271 and 272. The array of authority on this subject is simply overwhelming. At page 259 of Am. & Eng. Ency. of Law it is again said, after a review of the whole subject: "In the United States these statutes are either considered a part of the common law, so far as applicable to the different conditions, or they have been expressly enacted in a modified form"—citing a multitude of authorities.

They are attempted to be met, however, by four cases from our court, in which the court has said, at different times, referring to Toulmin's Digest, as set out at page 65, c. 2, art. 1, of Hutch. Code, that no English statutes are in force in Mississippi unless re-enacted here. A careful and critical examination of these cases will show that reference is, *in all of them,* had to English *statutes,* specifically therein dealt with, as *statutes* standing apart from the common law—statutes covering completely the subject treated in them, *not* as statutes merely *in aid of,* or *amendatory of,* or *declaratory of,* some mere principle of the ancient common law. All that could have been meant, on any judicious and reasonable construction of the passage in Toulmin's Digest, is that English statutes of the former class are not law in Mississippi unless they shall have been re-enacted here. It surely never could have been meant that English statutes, like those of Marlbridge and Gloucester, merely *in aid of* and *declaratory of* a great principle of the common law, and containing in themselves *nothing new,* except the *remedies* therein provided for, statutes which had become, in the lapse of more than 500 years, ingrafted into and crystallized in the body of the *English common law,* and which were, as to that great *general principle of liability* of tenants for years and for life, also brought to the United States by our ancestors as a part and parcel of that *same common law,* becoming thus in the United States a part of the great body of *our common law,* were not also part of the common law of Mississippi. Such statutes were not thought of in England, for several hundred years before our emigration, as *statutes,* so far as the great *principle* of which they were merely declaratory was concerned.

A *fortiori,* is it not in the extremest degree unreasonable to hold that Toulmin's Digest could have meant to say that those statutes were not a part, as to that great principle, of the common law of Mississippi? The section quoted from that Digest

meant to exclude, undoubtedly, *only* those English statutes not ancient enough to have become, and to have been regarded for centuries in England itself, as a part of the common law, being, too, statutes merely *amendatory of* and *in aid of* a great common law principle, but to exclude *such* English *statutes* as stood *apart to themselves* as *statutes* covering the whole law on the subject dealt with in them, and which were not, therefore, any part of the *ancient common law*. It must be said that my Brother CALHOON has plausible ground for citing these four Mississippi cases; but it is clear, on close examination, that the expressions of the court touching this subject in these cases were merely casual, and it must be said for the court that it was not, in any one of these cases, directing its attention to the precise question what was the common law in Mississippi, as brought to the United States by our ancestors.

I desire to add to this, the third, section of my discussion of this subject, what is extremely important to be noted, that, whether the view which I have here advanced, and which I have the utmost confidence in asserting, is the true doctrine on this subject, be the true doctrine or not, is utterly immaterial to the liability of *this* tenant for ninety-nine years in *this* case, because *that* liability is absolutely established by the American modified law of waste, which has been declared to be the Mississippi law of waste in *Learned* v. *Ogden, Barry* v. *Cannon,* and *Warren County* v. *Gans.* What I here advance in paragraph 3 adds to and strengthens that view merely; but that view stands incontrovertibly established by what I have said, in this opinion, without reference to the discussion in this paragraph 3. In other words, to phrase it shortly, and to dismiss the subject, if the great *principle* of liability, merely redeclared in the statutes of Marlbridge and Gloucester as having been the ancient English common law, became a part of the common law of Mississippi, then clearly *that* consideration alone ends the discussion; but, if Coke's curious notion

is right as to what the *ancient* common law *was* on this subject, and if the statutes of Marlbridge and Gloucester, so far as declaring this great principle of liability, never became a part of Mississippi's common law, *still* the law of waste in Mississippi is the American modified law of waste, and *that* law makes tenants for years liable for waste.

In the fourth place I will consider the practical results from the opposite view.

The reasoning of the majority opinion on the former hearing is this:

(1) At the *ancient* common law tenants for years were not liable for waste unless a clause making them liable was put in the lease.

(2) The statutes of Marlbridge and Gloucester, for the first time in England, made such tenants liable for waste.

(3) We never adopted the statutes of Marlbridge and Gloucester, even as to the great principle of liability which they announce.

(4) Therefore the only common law of waste that we have is the *ancient* common law, under which tenants for years are never liable for mere voluntary waste, unless a clause to that effect has been inserted in the lease.

Now, if that be the law in the twentieth century in Mississippi, what follows as the inevitable, direct result? Take an illustration put by counsel:

"A leases to B 640 acres of land, of which 140 are in cultivation, on which have been erected valuable improvements. The balance of the land, we will say, is covered with a fine growth of yellow pine timber. For a small annual rental the possession of the estate is delivered to the tenant for years. No restrictions are placed in the lease as to the commission of waste, either voluntary or permissive, because to do so would be an idle performance; the law implying that the tenant will do no lasting damage to the inheritance, and that he will farm

the estate according to the dictates of good husbandry. B, the tenant, learning that the statute of Marlbridge has not been re-enacted in Mississippi, and, on the authority of *Jordan* v. *Roach,* that he is unimpeachable for waste, proceeds, in flagrant disregard of the rights of his landlord, to cut and convert into lumber the timber standing on the 500 acres of land, worth at present prices about $15,000. He tears down the buildings erected on the premises, destroys orchards, ornamental shrubs and shade trees of one hundred years' growth, thus bringing utter destruction and ruin upon the estate of the reversioner; and yet we are told by counsel for appellant that the tenant for years is unimpeachable for waste in Mississippi, and the landlord is utterly without remedy to redress the flagrant violation of his rights by the tenant! To such curious and illogical conclusion does the argument of counsel for appellant lead." Is it possible that the law can be "the author of such confusion"? And if, as is inescapably true, the opposite view leads to this conclusion, does it not show conclusively that *that* view cannot be the law? The common law is said to be "the perfection of reason." There is no sound reason in the opposite view, as it seems to me.

I now turn to the second ground on which the conclusion of the majority of the court on the former hearing rested, towit:

That on the legislation of Mississippi this tenant got what is called a fee simple for the term, and is not liable; that he has, during his term, "the absolute rights of a fee simple owner for the term of ninety-nine years." With all deference to the majority opinion, I must frankly confess my utter inability to apprehend, or comprehend, how there can be an estate conveyed by a plain lease for the term of ninety-nine years, which estate, at the same time, vests in such lessee the absolute rights of a fee simple owner for the period of the term! It is said that the case of *Davany* v. *Koon,* 45 Miss., 71, gives this sort of lease "and sale for a limited time." But, when that case is critically examined, it is seen, at once, that this language was

used with strict reference to the lease in that case made, which was a lease executed in pursuance of the law found in Hutch. Code, pp. 213, 222, c. 9, arts. 12, 26 (the act of January 20, 1841), which gave to lessees thereunder "the same rights of action and remedies against strangers as if they were the fee simple owners." Judge SIMRALL, therefore, in too loose language, writing *currente culamo*—said this in reference strictly to the lease under which, according to the terms of the statute, "the lessees were vested with the rights of a fee simple owner as to actions against strangers." And that, let it be especially noted, was an action against a *stranger by said lessees.* The case is, therefore, of no authority whatever here, since this lease was made under the code of 1880, which conferred no such right on the lessees of suit, "as if they were fee simple owners."

Again, almost the whole argument in the majority opinion on the former hearing, seeking to show that this tenant had, as said, the absolute rights of a fee simple owner for the term of ninety-nine years, is built up on a too narrow and technical construction of the words in the act of 1833—"right, title, use, and occupation." The argument is that *that* language, in that act of 1833, conferred this character of estate on the lessee under that act. Suppose that is true, as we shall later show it could not possibly have been; how does that at all affect the estate *this tenant* got under the lease made under the *code of* 1880, which, concededly, does not contain the words "right, title, use, and occupation"? If a tenant under a lease for ninety-nine years, made under the act of 1833, did have—as most erroneously argued—the absolute rights of a fee simple owner for the term of ninety-nine years, what has *that* to do in determining the character of the estate held by *this* tenant under a totally different statute, to wit, Code 1880, § 732, which does not contain these words, "right, title, use, and occupation?" Can anything be clearer than, as said by Judge CAMPBELL, that the whole measure of the estate of *this* tenant must be de-

termined exclusively by the provisions of the code of 1880, under which this particular lease was made? Assuredly not; and so the whole superstructure of the argument of the majority opinion on the former hearing, based on statutes anterior to the code of 1880, falls to the ground.

But, so great is the deference which I feel for my Brother Calhoon's very ingenious and very able opinion on the former hearing, marked as it is by careful and profound research into the sources of the common law and by a critical historical examination of the legislation both in England and Mississippi on this subject, that I feel bound to make answer, if I can, to that former opinion touching this review of legislation.

Both the act of congress of 1815 regarding the subject of school lands while Mississippi was a territory, and the act of the Mississippi legislature of 1824, made the tenant expressly liable for cutting trees or timber. This appellant is bound to admit. But learned counsel for appellant seek to avoid the force of this by saying that the act of 1833 repealed the provisions of the act of 1824 with respect to the commission of waste; and they give as a reason that conditions as to what ought to be waste had so greatly changed in the nine years from 1824 to 1833 that the legislature changed the whole system of our laws as to waste. In respect to this it may be said that the historical fact is just the converse. No such tremendous change in the condition of Mississippi occurred in the very short interim of nine years between 1824 and 1833. In the very nature of the case no such marvelous change could have been wrought in so very short a time. But, as a matter of fact, the act of 1833 manifestly did not repeal the act of 1824, but was simply amendatory thereof, as is shown at the end of the act of 1833, as set out in Hutch. Code, sec. 1, act of January 9, 1824, provided that five trustees in each township should be elected by heads of families for one year; section 2 provided for a treasurer, and section 3 for schoolhouses and teachers. Section 4 provided as follows:

"The trustees aforesaid shall carefully and faithfully pre-serve the school lands and timber thereon, from all improper waste; and shall institute suits in any court having competent jurisdiction against any person, tenants, as well as others, who may be found damaging, in any manner, the lands, timber or improvements, reserving to tenants the full liberty of their several leases; and any money thence arising shall be appropriated to the same uses as other moneys in the township treasurer's hands; and the trustees shall, from time to time, on the expiration of the leases already granted, as well as any land not heretofore so let out, rent the whole or any part to the highest bidder, for any term not exceeding five years, public notice having been first given for the space of six weeks before the said lands are to be leased or rented."

Act February 27, 1833, is entitled "An act to authorize the trustees of the school lands within each township in this state to lease the sixteenth sections within the same for ninety-nine years, and for other purposes." Sections 1 and 2 provided that "whenever a majority of the resident heads of families, minors not excepted, in each township or fractional township, containing section number sixteen, or such section as may be reserved for the use of schools in lieu thereof, within this state, shall request the same, it shall be the duty of the trustees *now in office,* or who may hereafter be in office, to lease the said section of their respective townships to the highest bidder for the term of ninety-nine years," etc. Sections 3, 4, 5, 6, and 7 provide other details in the administration of the sixteenth sections, not important to set out. Not one single word is said in the entire act of 1833 about the election of trustees. That had been provided for in section 1 of the act of 1824, as shown above. The act of 1833 proceeded, therefore, very naturally upon the idea that the trustees were already in existence, and did nothing more than amend the act of 1824 in the respects indicated.

It must be too clear for comment that, if the act of 1833 repealed the act of 1824, there would have been no law providing for the trustees necessary to administer this trust, and there would have been actually no trustees in office; and, as the act of 1833 did not provide itself for the selection of trustees, the law on this subject would have been, on this theory, in the chaotic and absurd condition of leaving the fund without any machinery for its administration. Of course, no such folly as this should be imputed to the legislature. Besides, the history of that time shows that sixteenth sections were leased, and by trustees elected under the act of 1824, as a careful study will show. It is too elementary a principle for citation of authority· that repeals by implication are odious, and, where two statutes even seem to be repugnant, they must still be so construed, if possible, as to exclude any repeal by implication. But there is nothing in the act of 1833 inconsistent with or repugnant to the provisions of the act of 1824. They are perfectly harmonious parts of one consistent whole. The act of 1833 simply adds to the act of 1824, but did not repeal section 1 of that act, which provided for the election of trustees, or section 4, which provides for the preservation of school lands and timber from all improper waste, and directs the trustees to institute suits against any person, tenants as well as others, who might be found damaging in any manner the lands, timber or improvements.

The very ancient document offered by learned counsel for appellant—an alleged form of lease prepared by John D. Freeman, then attorney-general of the state, to be used in making leases of sixteenth section lands—cites the act of 1824 as still in force, showing how the trustees should be elected, and then cites, in the same breath, the act of 1833 as showing for how long, etc., a lease should be made; thus indicating clearly that the learned attorney-general of the state, at that time, held both of these acts to be in force, consistent parts of a harmonious whole. It is very clear, therefore, that the statute

law of this state after it became a state, as well as the act of congress while it was a territory, both expressly made tenants of sixteenth sections liable for waste. There can be no escape, as it seems to me, from the conclusion that such tenants were made so liable expressly by the statute law. But it is insisted, apart from this view by learned counsel for appellant, that the act of 1833 by its terms actually vests a fee simple interest —or what is curiously called a fee simple interest for the term—in the person who has always heretofore been considered as having acquired a leasehold interest for ninety-nine years. There has been much litigation about these sixteenth section lands; the decisions respecting these leases are scattered all the way back through our decisions, and yet it may be affirmed, without the slightest fear of contradiction, that no sale was ever anywhere in any statute ever passed by this state provided for, nor was any decision ever rendered by this court construing these leases as sales. The word "lease" is used in every statute and in every decision ever rendered touching this subject. The word "lease" has actually become crystallized in the statute law and in the decisions of the court touching this subject-matter. The provisions in this state have, from the beginning until this hour, uniformly regarded the instrument executed as a "lease." The instrument calls itself a lease. It uses accepted and technical terms indicating a lease. The exact statement of learned counsel for appellant is that this lease under the act of 1833 conveyed what they strangely call "a determinable fee." It is said that the words in the act of 1833, "the right, title, use, interest, and occupation," are inconsistent with anything else than a fee; but counsel, seeing that they were immediately followed by the limitation that all this right, title, etc., were to last only until the end of the full term of ninety-nine years, do not hazard the contention that the instrument conveyed a fee simple absolute, but say that it conveyed "a determinable fee." It is settled law that

all terms used in any instrument, deed, will, lease, or what not, are to be construed together, not in isolated fragments, so as to arrive at the real intent of the maker of the instrument. We reaffirm the correct view on this subject as to the ascertainment of the intent of the maker of any instrument, clearly set forth in *Hart* v. *Gardner,* 74 Miss., 153 (s.c., 20 South. Rep., 877).

The same doctrine had been previously announced in *Swan* v. *Buck,* 40 Miss., 270; *Cunningham* v. *Davis,* 62 Miss., 366, and as set forth in 12 Am. & Eng. Ency. Law (1st ed.), 977. See, especially, *Berridge* v. *Glassy,* 112 Pa., 442 (3 Alt., 583; 56 Am. Rep., 322), directly in point.

All that is meant by the words "right, title," etc., in this lease, is simply the "right," etc., for the term of ninety-nine years. One loses one's self in a metaphysical fog by straining over the separate, artificial significance of each technical word —"right, title, use, interest, occupation," etc.—and shutting out all the other terms of the instrument plainly showing it to be nothing but a lease. The reference of learned counsel for the appellant to the use of the words "right, title, claim, and interest" in the act of cession by Georgia to the United States, to be found in Hutch Code, art. 4, p. 55, c. 1, is most unfortunate. Georgia did not limit the term in these sixteenth sections to ninety-nine years. It gives them in perpetuity. These instruments specifically limited the term in each instance to ninety-nine years. There is absolutely no merit in the contention that the act of 1833 conveyed "a determinable fee."

Counsel for appellant is equally unfortunate in citing the act of 1841 (Hutch. Code, art. 24, p. 221, c. 9). That act provides:

"The lessees of sixteenth sections, and all other school lands, shall be authorized to, and may maintain and carry on, all such suits at law or equity, immediately after the leasing, as they could or might maintain or carry on were they the fee simple owners of the leased premises, except as against the lessors."

The very use of the phrase *"were* they the fee simple owners," is conclusive that the statute treated them as *not* being the fee simple owners.   If they had been the fee simple owners, no statute would have been necessary to authorize the maintenance of such suits.   It was precisely because they were not the fee simple owners that they had to be invested by statute with the right to maintain these suits as *if they were.*   But, again, the statute, in its concluding clause, expressly says that they may maintain these suits "as if they were the fee simple owners to the leased premises, *except as against the lessor."* This clause, "except as against the lessor," shows, to demonstration, that the tenant had no estate in fee, determinable or otherwise; that he was a mere tenant, subject to the superior title of his lessor.

Counsel are also unfortunate in appealing to the act of 1841, known as the revenue act (Hutch. Code, art. 17, p. 188, c. 8). That act provides as follows:

"The school lands known as the sixteenth sections of land in this state, which shall have been leased subsequent to the passage of the revenue act, approved February 24, 1844, shall be subject to taxation during the continuance of the lease, in the same manner and proportion as other lands; provided, in case of the sale of such leased lands, or any part or parcel thereof, for taxes, *the title of the lessee or his assignee, only* shall be conveyed."

This provision expressly stipulates that, when a sixteenth section should be sold for taxes, the purchaser should not get the paramount or foundation title, which was still in the lessor, but merely the title—that is to say, the interest—of the lessee or his assignee.   The loose use of the word "title" will not fail to be noted in this connection.   It is used in the same loose sense in which it was used in the act of 1833.   So that, summing up on this branch of the inquiry, it is clear that the lessee of the sixteenth sections, under the act of 1833, got precisely what he has always been understood to have gotten, pre-

cisely what his instrument said he had got, a leasehold interest for the term of ninety-nine years, and no fee of any character.

Pray, what is a determinable fee? In Anderson's Law Dictionary it is thus defined: A "base, qualified, or determinable fee, has a qualification subjoined thereto, and terminates whenever the qualification is at an end"—as a grant "to A and his heirs, tenants of the manor of Dale"; that is, as long as they continue tenants. This estate is a fee, because it *may* endure forever; yet the duration depends upon a *circumstance,* and this debases the purity of the donation. 2 Bl. Com., 109.

It is said that this is "a determinable fee, terminating upon the expiration of ninety-nine years." Was ever such a determinable fee heard of? Where is the qualification, or contingency, or uncertainty, upon the happening of which uncertainty or contingency the alleged fee terminates? Is it *possible* that the mere expiration of the ninety-nine years can, by any perversion of logic, be tortured into the faintest resemblance to the qualifications subsisting in a determinable fee, or the uncertainty or contingency upon the happening of which such fee would terminate? The very essential characteristic of a lease for years is that its term shall be *fixed* and *definite,* and the fixed term of ninety-nine years is precisely what makes it an *estate for years* and discriminates it sharply from a determinable fee. Let this claim of a determinable fee be passed without further comment.

Finally, under this head, let it be noted that this particular lease was executed under Code 1880, § 732, which is as follows:

"Whenever a majority of the resident heads of families shall petition therefor, the board of supervisors shall appoint three intelligent citizens of the township, to appraise said land, who shall do so, and make oath to such board of the value of the land, and thereupon said board of supervisors shall direct that said lands be *leased* to the highest bidder for a term of ninety-nine years."

Here expressly is given the right to lease, not to sell. The code of 1880 did not authorize sales. Many sales had been made without authority prior to 1880, and that code does contain provisions for the management of the proceeds of *these* sales; but it did not authorize any sales to be made in the future. It provided for nothing but a "lease." As I have before pointed out, there never was, from the beginning, any policy authorizing sales. This state is an agricultural state. It is not a mineral state, nor a timber state. It is primarily an agricultural state, rich in fine soils for crops. There never was any market of any sort for timber in this state until some ten years ago, when the pine timber of southeast Mississippi became valuable because of the ruthless destruction of such timber and other timber elsewhere, actually making the enactment of reforestry laws necessary in the United States. Then, for the first time, this pine timber, becoming of pronounced value, a market for timber was created. A market being created, those desiring to purchase the timber encountered difficulty in purchasing it, when the timber stood upon sixteenth sections, dedicated to the education of the children of the townships. They sought, therefore, a change of the law, authorizing a sale of the timber on these sixteenth sections; and so, as pointed out in the act of 1898, for the first time, power was given to sell, not the land, but the timber—"the merchantable pine timber"—on the sixteenth sections, and this act above referred to was amended in 1904 (Laws 1904, p. 173, c. 124) so as to provide as follows:

"Be it enacted by the legislature of the state of Mississippi, that Laws of 1898, ch. 41, sec. 1, be, and the same is hereby, amended so as to read: That the board of supervisors in counties having control of any sixteenth sections of land, or a part of such sections, or of another section or part of a section taken in lieu of any sixteenth section, or a part thereof, reserved for the support of township schools, be, and they are hereby, authorized and empower to sell the merchantable

timber, of any and all varieties, and wood on such land, or to lease for a term not exceeding three years said lands for turpentine, or pasturage purposes for a term not exceeding one year."

The original, passed in 1898, authorized the sale of merchantable pine timber and other wood. The amendment of 1904 authorized the sale of the "merchantable timber of *any and all varieties,* and wood on such land," and also authorized the leasing for a term not exceeding three years for turpentine purposes, or for pasturage purposes. The original authorized the sale of merchantable pine timber; the amendment, the sale of merchantable timber of any kind whatever, and then created a new lease, known for the first time in the history of the state—a lease for turpentine purposes.

All this vindicates beyond question the view I hereinbefore expressed—that these leases, until within the last ten years, when southeast Mississippi's pine timber first came into the market, universally dealt with our state as an *agricultural* state, and not as a mineral or a timber state, and therefore leases, until within the last ten years, were of the soil as being the chief element of value; leases of agricultural lands, as to which both Judge CALHOON and Judge CAMPBELL admit, as I understand them, that waste could be committed by tenants for life and for years in Mississippi. No provision had ever been made, until within the last ten years, for sales of timber, or for leases for turpentine purposes, for the simple reason that the legislature had been dealing with the situation as it existed all along—a situation as pointed out, in which the sixteenth sections were leased because of the value of the lands for agricultural purposes alone. If within the last ten years a new situation has come about, in which, in southeast Mississippi at least, some sixteenth sections are chiefly valuable for the merchantable pine timber standing thereon, the remedy is not to have the *court* wrench the statutes authorizing *leases* into statutes authorizing wholly different things, *sales,* but to apply

to the legislature to authorize the sale of the merchantable. timber on these sixteenth sections, as was done in these two acts (1898 and 1904).    The very fact that such acts were asked for and passed is *conclusive* of the general understanding among the profession and the people that without such legislation no sale of the merchantable timber on these sixteenth sections could be made.    Of course, after the adoption of section 211 of the constitution of 1890, the legislature has been without power to sell the land embraced within these sixteenth sections.    I will show later the public policy intended to be conserved by this section 211.    This trust is intended, as I believe, to endure always as a perpetual trust, for the recurring generations of children in this commonwealth, and not as the source of a fund intended to benefit the children of any particular decades.    Decades count for little, so far as time even is concerned, in the earthly immortality of a state.

I add just one concluding thought under this head, as to the legislation on this subject, and that is this:  That in view of the fact that this lease was made under Code 1880, § 732, I am wholly unable to see why the majority opinion on the former hearing should have gone into any discussion or review either of legislation in England or of legislation in Mississippi prior to said code of 1880.    But because I felt it important, since the majority opinion had gone into that matter, to point out what I deemed to be the clearly erroneous construction of said former legislation in Mississippi, and of the legislation in England, therefore I have written on this subject.

One more inquiry:  What has been the course of judicial decision in this state touching this subject of waste?

First, the whole matter has been definitely and conclusively put at rest in this state by the decision of this court in *Warren County* v. *Gans,* 80 Miss., 76 (s.c., 31 South. Rep., 539), decided in March, 1902.    That case was carefully and thoroughly considered by this court.    The arguments addressed to this court at this time are. the same as those used in the

· arguments of the case referred to. The views urged now were presented then with great earnestness and with great ability. All that could be said for that view was then said, and well said. The very ingenious and able arguments now made add substantially nothing to the argument then made for the appellant's view. We are merely called on, therefore, to rethresh old straw, and to overrule a former well-considered case, decided by a unanimous, and not a divided, court, and accepted now for some years past as the settled law of this state. The doctrine of *stare decisis* should not be lightly disregarded. And a former deliberate, and especially a former unanimous, opinion of any court should be firmly adhered to, unless it be manifestly wrong, and public policy imperatively requires it to be overruled. So far from there being any doubt as to the soundness of the decision in the *Gans case, supra,* Ballard, in his recent most elaborate work on real estate, not only cites the *Gans case* as stating the law correctly, but, recognizing the careful consideration and ability with which it was decided by the late learned Justice TERRAL, actually inserts the opinion entire in his work (vol. 10, p. 828, sec. 824). The law of waste, as stated in that case, beyond all controversy is sound and just. It is sustained by decisions in every state in the union, an array of authority absolutely overwhelming. The very same doctrine as to what is waste had theretofore been announced by this court in *Cannon* v. *Barry,* 59 Miss., 289, and *Larned* v. *Ogden,* 80 Miss., 769 (s.c., 32 South. Rep., 278). In the last case the court said:

"While the law of waste, as established in England, is modified in its transportation to this country to suit the conditions of a new and uncleared country, and to allow a tenant for life to open wild lands for necessary cultivation, or to change the course of agriculture, without being liable for waste, yet the cutting down of trees for his mere profit is here, as there, considered waste. A tenant by the curtesy, as an incident to his estate, may take reasonable estovers of all kinds, and he may

cut timber to pay taxes or to improve the land, and, when so cut it belongs to the tenant and not to the reversioner. But the cutting down by the tenants of trees for sale is waste, and the felling of trees by the tenant or others for a sale of them is an injury to the inheritance, for which the reversioners have their appropriate action."

In one word, whatever inflicts lasting damage upon the inheritance is waste in all jurisdictions, here and in England. Of course, where all the timber is cut off and a town built on a sixteenth section, as in the case of the city of Columbus, the inheritance is benefited, and not damaged, and there is no waste in such case. That which benefits the inheritance can never be waste. Such instances present cases of "meliorating waste." In the very nature of things this must be the only correct rule, and it will be kept in mind, in this connection, that the demurrer admits in this case, that the whole value of the inheritance was being destroyed by the lessee for years. When the demurrer admitted *that,* it was logically impossible for the appellant to argue here that there was no waste shown in this case. The admission cut from under the appellant the only ground it had to stand on, if it chooses to make that argument. Nor, indeed, do learned counsel for appellant chiefly plant their case on any contention that what was here done was not waste; but they argue alone on the technical proposition that a tenant for years in Mississippi, in the twentieth century, is not liable for waste unless the lease expressly makes him so! There is, indeed, in counsel's brief, something said about Mississippi having been a wilderness in 1833, her soil covered with an unbroken forest, her population scant, and about timber being at that time, as stated, a burden which it would be a benefit to remove by destroying it in any way, etc.; and it is further stated, in this same loose strain, that consequently the act of 1833, provided for leases of these sixteenth sections, without liability for waste, as being better suited to the condition of the country at the time, overburdened with timber, etc.; that

the condition of Mississippi in 1833 was not like that in England; there was no timber there, and too much timber here, and what was waste there would be actually a benefit here, resulting in clearing up the land for cultivation, etc. So far forth as the contention is that what is waste changes in the history and development of a country from time to time, and that, according to the changing conditions of a country from time to time, what would not be waste in the earlier settlement of a timbered country, would be waste in the same country when the timber became scarce. The contention may be conceded to be perfectly sound; but what is the effect of the contention, when conceded?. Why, obviously that *that* which would not have been waste in 1833 not only may be, but certainly is, waste in 1906 in Mississippi! Learned counsel will hardly insist that Mississippi is a wilderness in the year 1906! If it ever had been the law, as it clearly never was, that timber could be destroyed in 1833 without reference to the damage to the inheritance, when virgin forests stood unbroken all over the state, no one will have the hardihood to contend that the timber, *now* becoming rapidly scarce, can be all taken from a sixteenth section, to the lasting damage of the inheritance, without the act being characterized as waste! So far, then, as our decisions are concerned, we have had the modern doctrine of waste thoroughly imbedded in our jurisprudence by *Cannon* v. *Barry, Learned* v. *Ogden,* and *Warren County* v. *Gans, supra;* and we have had the precise question now before this court squarely decided against the appellant's contention by a unanimous court in the last-named case. It need only be added that the views announced in these cases, as to what is waste and as to the liability of a lessee for years for waste, have been settled the same way in all the states of this union by an array of authority absolutely overwhelming, many of which authorities have been selected with great care by the learned counsel for appellee in their brief.

*The Trust View of This Subject.*—No adequate view of the importance of this case can be taken, unless regard be had to the great, paramount purpose had by the *federal government* and by the *state of Georgia* in dedicating the sixteenth sections as a trust fund, to be perpetually maintained, for the education of the children of the townships in which sixteenth sections are located, not only in Mississippi, but largely throughout the union. As well said by counsel: "About one thirty-sixth of all the land in the United States has been set apart for township school purposes. Much of this vast territory is in the same category with the section to which this controversy relates. All the people in the United States, outside the present limits of the original thirteen states, are to some extent interested in the result of this litigation. The people of Mississippi are interested, because a binding precedent is about to be established; the people elsewhere in the United States, because a high authority will, in this decision, add its weight to the support of a definite rule of sixteenth-section property."

A suggestion of great importance is to be made here: That whilst the decision in *Jones* v. *Madison County,* as applied to sixteenth sections, embraced in territory acquired by Mississippi from Georgia, announces correctly state policy as to such sixteenth sections embraced in such territory, yet, in that part of Mississippi *not* acquired from Georgia (and this particular sixteenth section is of that sort, since it lies south of the thirty-first parallel, which marked the southern limit of the Georgia cession), the policy of the *federal government* in dealing with these sixteenth sections is a matter of vital importance. Congress, in the Ordinance of 1787 (article 3), provided: "Religion, morality and knowledge being necessary to good government, and the happiness of mankind, schools and the means of education shall forever be encouraged." It was in pursuance of the purpose thus declared, this enlightened public policy, that sixteenth sections, all over most of the United States, have been set apart as a sacred trust fund to be perpetually maintained

for the education of the children in the various townships. The thought, the paramount controlling purpose, was that this fund should not be wasted, and not even consumed for any one decade of children, but preserved "forever" for the education of every succeeding generation of children in these townships all over most of the United States. This state, acting in its governmental capacity, has accepted this sacred trust according to its terms and in harmony with the spirit which created it. It may appoint whatever administrative machinery it sees proper to carry the trust into effect; but it may not wholly and absolutely destroy these sixteenth sections by a sale, either of the land or of all the timber, unless, possibly, where the sole value the section may have is the timber thereon, and certainly *never then* under a *mere lease,* because timber, elaborated through ages, as Judge RUFFIN says, is not an annual product of the land, as Coke himself also states in 3 Coke on Lyttleton, p. 262, note 1; and ordinarily it is this "annual product" only, "the temporary profits," which a tenant for years may take. It is, in my judgment, a high and solemn trust, which the state in its governmental capacity has accepted, the most sacred imaginable; and the state should see to it that this trust fund shall not be seized upon by arrogant timber trusts, demanding, for the first time in the history of this state, that they can, under the guise of a *lease,* having paid only a *leasehold consideration,* take an absolute fee simple property in these sixteenth sections, and destroy the whole value of the inheritance. No greater trust can be committed to any state than that of the education of the children within its borders; and, if one such trust can be more sacred than another, it is that trust designed to bring home to the doors of the poorer children of the commonwealth the means of acquiring a reasonably good education. It is these helpless children the state's faith is pledged to protect. There are thirty-five other sections in every township, the timber on which is open to absolute sale. There is but one section in every township, the sixteenth section, consecrated to the education

of these children. Let it be sacredly preserved for every genration of Mississippians to come in the great future.

And finally, on this point, let the principle be given all the emphasis the high character of the provision carries with it, written—as it is—above legislative reach, in the organic law of the land, towit, the principle declared in section 211 of the constitution of 1890, which provides that there shall never be a sale of the sixteenth section lands, in the following language:

"The legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state, or land granted in lieu thereof, in the Choctaw purpose, and shall provide that the sixteenth section lands reserved for the support of township schools *shall not be sold,* nor shall they be leased for a longer term then ten years for a gross sum; but the legislature may provide for the *lease* of any of said lands for a term not exceeding twenty-five years for a ground rental, payable annually; and, in case of uncleared lands, may *lease* them for such short term as may be deemed proper in consideration of the improvement thereof, with right thereafter to *lease* for a term or to hold on payment of ground rent."

*Concluding Observations.*—Very great emphasis is put repeatedly, in the opinion of the majority of the court on the former hearing, upon the fact that Lord Coke, the great common law judge, announces the view of the ancient common law contended for by the majority. Names count for little with me. Mansfield was as great as Coke, if not greater; and yet who, that has ever read the magnificent argument of Raymond in the case of *White* v. *Wagner,* 4 Har. & J. (Md.), at pp. 375–379 (7 Am. Dec., 674), ever had any doubt left of the woeful errors into which that great judge, Lord Mansfield, fell in dealing with this same subject of waste at the common law? All judges are fallible, all live under the possible applicability to themselves, however great they may be, of the line, *"Bonus Homerus aliquando dormitat."* If Jove nods, so does Coke.

The truth is that the very greatness of a judge, or commentator, furnishes readier shelter for error. The very greatness of the name induces readier belief in the error. *"Stat magni nominus umbra"* is no maxim for my guidance, and the test is with me, and has always been, and always shall be, does the proposition, announced as law, square with sound principle and true reason? If so, I accept it, because it so squares; if not, no name, however great, shall be permitted to lead me into false paths. Coke's name is, indeed a great name, especially great when the common law is under consideration; and it is not strange that he has, as I believe, caused not only my Brother CALHOON, in this splendid opinion of his, to miss his way, but many other great judges as well. If they have been led astray by the dictum of the great Coke, it can almost be said, in extenuation of the error, that "the light that led astray" at least was "light from heaven!"

DISSENT ON SECOND DECISION.

CALHOON, J., on the second decision of the case, delivered the following dissenting opinion.

It would be pleasant to concur with the majority, but not possible, since the people, whom each of the court represents, is entitled, in great public questions, to the judgment of the minority member of the court. The reasons for my position are stated in the views of the then majority of this court in the opinion heretofore rendered in this same cause, to be published. It remains now, on this suggestion of error, only to group them and leave conclusions to an able and upright profession.

I have now nothing left, except as mourner at what I conceive to be the funeral of the honor of a great state. I am profoundly impressed with this view, notwithstanding I was a member of the court which decided *Warren County* v. *Gans,* 80 Miss., 80 (s.c., 31 South. Rep., 539). Observe, however, for what it is worth, that in that case the opinion said: "The

two places for which the timber in controversy was cut *were used as farms.*" But for this, it is my belief that the exceptionally wise judge who was the mouthpiece of the court would not have led us to the camp we are now to sleep in, with what dreams may come. That case may well comport with the special view I have of the particular case in hand, though not generally. He who relies on the great multitude of decisions on equitable waste is utterly in the dark as to the concrete question now before us. There is no inquiry here of the renting of a cultivated farm, and cutting down shade trees or ornamental shrubbery, or tearing down houses. These constitute equitable waste, and these only, and these are not here. He is in no degree advised of the question involved in this record who depends on the many, and very correct, decisions holding the general doctrine that impeachment of waste is predicable of leases for terms of years of cultivated lands. It cannot be easily seen how this can apply to the case here, either at common law in England, or the common law changed so as to suit conditions and become the common law of the states. What is wanted, and what *cannot* be found anywhere, is a·case so holding as to ninety-nine-year leases of public lands, or, as between individuals, where the appraised value of the lands is paid, and where the lands are confessedly of no sort of value whatever, except for the timber. This is absolutely the situation. confessed in this case, and was the situation in the public view of these lands in 1833. We have seen in the former opinion that Judge CRANCH, in *May* v. *Bayne,* 3 Cranch. C. C., 335 (Fed. Cas. No. 9,331), applied the doctrine, even as to cultivated land, only because the statutes of Marlbridge and Gloucester were expressly re-enacted in the state of jurisdiction. In truth, in 1818, 1824 and 1833, when the first three statutes in point were passed, Coke upon Lyttleton may be said to have been the common law, with the people, the bar, the courts, and the legislature of Mississippi. The acts were passed with reference to that. Hence the two first acts referred to waste,

and the last did not. The act of 1833 revises the subject, omits waste, and conveys "title" for the term. *Clay Co.* v. *Chickasaw Co.*, 64 Miss., 534 (s.c., 1 South. Rep., 753). So, on the common law branch of this case, the three utterances of Lord Coke, the American decisions, and every one, without exception, of the standard authorities, English and American, on Landlord and Tenant and Real Estate, cited in the first opinion, seem conclusive. On the statutory branch the acts are themselves conclusive.

When does impeachment for waste begin? When does it end? How often may it spring up in the meantime? What is the standard of damages? If the timber reproduces itself, is there a new right of action? If the timber be destroyed, and the whole of the section be put in cultivation, and worth, therefore, ten times more, as is often the case in Mississippi, how then? If built up in fine brick structures, as is here and there the case in this state, how then? Shall the uniform action of seventy years, based on the universal popular construction, go for naught? In view of long usage and public understanding, and of the fact that the whole country was forest, as here, and that there are six hundred and fifty sixteenth sections in the state, generally subdivided into small parcels, I cannot think that the subtenant is liable in damages for every load of wood he hauls to town for sale. When it is seen that the act of 1818 prescribes no form of lease, but specifies that the *justices of the county court may lease for not* more that three years and shall protect the lands "against improper waste of soil *and timber*"; when it is seen that no tenants could be had, in this then wilderness of timber under that statute; when it is seen that the act of 1824 prescribes no form of lease, but specifies that the *trustees* may lease for not longer than five years and "shall carefully and faithfully preserve the school *lands* and *timber* thereon from all improper waste," and provided for suits for waste; when it is seen that no tenant could be had under that, in this then wilder-

ness of timber; when it is seen that the act of February 27, 1833, empowers the *heads of families to compel* the *trustees* to lease for ninety-nine years, and prescribes the very terms of the lease to be "to *convey the right, title, use, interest and occupation* of said sections," when it is seen that this act is *silent as to waste,* and that its title, "An act to authorize the trustees of school lands within each township in this state to lease the sixeenth sections within the same for ninety-nine years and for other purposes," shows it to be an independent act, and that it concludes, "and that all acts and parts of acts contravening the provisions of this act be, and the same are hereby, repealed;" when all this appears, and the code of 1880 is considered—it will be seen what the lessee had the *right to expect* under solemn enactment. What *Cannon* v. *Barry* or *Learned* v. *Ogden* have to do with ninety-nine-year leases of school lands, under express statute, cannot be seen with a microscope. That is true of all the cases, every one, referred to in support of the contention of appellee, except the *Gans case,* a small part of which I was, as is shown in the first opinion on the former hearing of this record. Here there is no concern whatever with leases of farms of cultivated lands. We have to do only with leases of virgin wildernesses under legislative act, and our business is to ascertain the *intent of the parties* in the light of the statutes, the construction put upon them by the whole people for seventy years, and the condition of the country when they were authorized by law.

There is no occasion, really, to resort at all to the common law. If there was, three distinct utterances of Lord Coke, the opinions of the greatest of the judges, and the views of the most eminent of the writers on Landlord and Tenant and Real Estate law, cited in the former opinion of this court, ought to be reasonably satisfactory in support of common honesty. Inasmuch as the act of 1833 distinctly directs the trustees to "*convey* the *right,* title, use, and occupation of sixteenth sections

for and during the full term of ninety-nine years," it is plain that they had to "convey," and to "convey the title" for that term. So the title, as of fee, itself, is conveyed for the term. No other construction is rational, especially in view of the previous legislation and the surroundings. There was "a sale for a limited time of the school lands." *Davany* v. *Koon*, 45 Miss., on page 75. This idea, and this idea only, is expressed in the sound concurring opinion of Judge TRULY on the first trial in this court of this cause. It is inescapably correct. *Fee simple right* for ninety-nine years passed in the lands, and they are *so taxed against the lessees* by express law. Reference to the Georgia decisions is curious indeed, even if they had any bearing on this case. The act of our legislature of 1807, still the law here, excluding all acts of parliament from any force, was passed fifty years before the Georgia decisions. That the statutes of Marlbridge and Gloucester are of no force in Mississippi is distinctly shown in *Jordan* v. *Roach*, 32 Miss., 482; *Sessions* v. *Reynolds*, 7 Smed. & M., 136; *Boarman* v. *Catlett*, 13 Smed. & M., 149; and *Ingraham* v. *Regan*, 23 Miss., 213, all cited in the original opinion, and reannounced as late as 1904, in *Bank* v. *Field*, 84 Miss., 664, 665 (s.c., 37 South. Rep., pp. 139, 146), in which it is said: "All the statutes of England not re-enacted in Mississippi, were, in the year 1807, excluded from operation within the territory of Mississippi." This language precisely conforms to the act of 1807, which ends in these words: "And all statutes of England and Great Britain, not contained in the said volume of statutes (Toulmin's Digest), shall cease to have any force or validity in this territory." So it is idle to talk of the statutes of Marlbridge and Gloucester having any sort of force in Mississippi. It is equally idle to deny that these two English statutes were to change the common law, thus showing that the parliament then thought the common law to be what Lord Coke says it was. That the common law remained the law of Mississippi, so far as suitable to our surroundings, and the act of 1833 was neces-

sarily passed in view of that, by every rule of construction, and England, at common law, was in the same situation as Mississippi in 1833, hirsute with virgin forest, of which it was of great public interest to have it denuded. The common law of England and of Mississippi as to cultivated farms has no bearing on this question. If, as it is strangely enough argued, the statutes of Marlbridge and Gloucester are in force in Mississippi as common law, the lessees of forests are liable in treble damages, which is nonsense.

Recovery for waste in this case would be in the face of the law taxing *the fee* instead of the *lease,* against the lessee, and giving the lessee the right to sue for and recover, and *pocket,* damages for waste. The whole tenor of all the statutes shows the legislative idea that these leases gave fee simple rights for the term. As instanced in the debate, if there was a lease in the Dismal Swamp, in the statutory terms, even without legislative and popular interpretation, could a court hold that the lessee could not cut trees? In the numerous acts of our legislature, special for counties, before and since 1833, many do and many do not provide against waste, thus recognizing the common law. Entirely different principles control as to leases of cultivated farms. As to them, the common law, as applicable to Mississippi and her conditions, is to be known by the interpretation of custom and legislative action throughout the history of the state, and this principle should be applied here. Any effort to assimilate these sixteenth section leases to sales for homesteads is a boomerang. Leases of these sections are open to the bids of all comers. Homestead sales are for the *specific purpose* of homes, and for homes only. Where the meaning of a contract is not plain from its terms, the construction derivable from continuous general public usage is conclusive. It is believed that no case can be found in contradiction of this doctrine. Especially must it be true in arriving at the intent of parties contracting in good faith and in reliance on the universal understanding of the state and people. *Warren Co.* v.

*Nall,* 78 Miss., 727, 744 (s.c., 29 South. Rep., 755). Here there seems to be no doubt on the face of the laws. It is to my mind clear that the act of 1833 considered the whole matter, and repealed the requirements as to waste in the acts of 1818 and 1824. Superadded to this, the public construction, the forms of the leases prepared by the attorney-general, the fact that the *land itself,* and not the lease, is taxed, the fact of the statutory words for the lease, the fact of the language of the code of 1880, referred to, and its reference to "payment *for the lands,"* and common sense as applied to the situation, and it does not seem to me that there can be any doubt. This court was precisely right, in *Davany* v. *Koon,* 45 Miss., on page 75, in saying that the trustees of sixteenth section lands "are authorized *by law to sell for a limited time* the school lands." That case was also right in holding that a lessee of such lands might sue in trespass for cutting timber, which right, in ordinary leases, pertains to the *owner of the fee.*

Calling attention again to the concrete case this court has in hand, it will be noted that the bill of appellee, the board of supervisors of Harrison county, itself says: "That said land, by reason of *the character of the soil, is unfit for cultivation,* and that the *only value it possesses* is given it by the *merchantable pine timber growing thereon."* The same bill shows that the lessee paid $835 for the lease. So we have, on appellee's contention, the purchase of the lease, the money paid and gone forever to the public, for absolutely nothing, and yet the *lessee is bound to pay the taxes for ninety-nine years on the full value of the timber which he cannot use!* Consideration of these admitted facts makes to my mind the grotesque absurdity of appellee's contention glaringly apparent, and makes the public disgrace of compliance with it painfully manifest. The ultimate effect of public injustice is public injury. "He respiteth, but suffereth not to escape." The result of the appellee's contention is that, though appellant paid $835 in cash, the appraised value, for absolutely worthless land, yet he must pay

taxes on it for its full value, with the timber on it, for ninety-nine years, and yet acquired no right whatever, except the privilege of looking at the timber, which alone gave it value. If the view not in accord with this opinion be correct, it follows that no land, which has value only because of its timber, ever can be leased.

Nothing said in the original opinion, or the original concurring opinion by Judge TRULY, or in this present opinion, holds that there is no remedy in case of *malicious* waste. What is held, and what I stand by, is that neither under the statute of 1833 nor the code of 1880 is waste, as ordinarily known in the books, punishable. If the land is worthless, except for its timber, it may be stripped of its *merchantable* timber for sale and profit. If it is suitable for cultivation, it may be entirely cleared for cultivation, and this often largely increases its value. In short, the tenant owns the fee for the term for every purpose of every action done in good faith for his profit. Homestead acts have no pertinency. The original opinion discusses the question through the whole history of legislation, from the act of 1818 up to and including the code of 1880; the purpose being to treat this grave public question on all leases of all dates.

I do not think that the fact of the lease going as an asset to the administrator, as chattels do, prevents the construction of the contract to be that the lessee took with *fee-simple rights* in the use of the property by him, or those to whom it might go in the course of the administration of his estate. A lease with the right of a fee-simple owner may be provided by contract, whether it be for one or more years, and I think such rights went to the lessee under the statutes of 1833 and 1880. The particular words of the lease are of no sort of moment, as all know that the statute, and not the scrivener, makes the instrument. A prudent owner of the absolute fee would have cut the *merchantable* timber. I think a lease for any length of time of a forest, in the statutory terms or on statutory power, where the lands are valueless, would carry the right to cut the *merchant-*

*able* timber. It is folly to suppose that any lessor or lessee would think that absolutely nothing went by the lease. See all the decisions as to leasing of mines, etc. If a lake is leased, may not the lessee fish in it? While the particular lease in controversy here was made after the enactment of the code of 1880, I nevertheless think that an inquiry, as to waste involves also the construction of the statute of 1833 and the precedent statutes on the subject of such leases. At the same time I think the code of 1880 conclusive, of itself, of the concrete case.

After the whole substance of this opinion was written, for use in chief or as dissent, as the case might be, I thought the public, in so important a matter, should have all the light obtainable. Accordingly, with the full concurrence of Judge MAYES, who was then considering the record, I sent a note to Judge J. A. P. Campbell, the Nestor and the Ajax of Mississippi jurists, requesting his views, which he was kind and patriotic enough to give, and which are as follows:

"The lease was under the code of 1880, which contains a complete set of rules for the sixteenth sections and their disposition and proceeds, and superseded all former legislation on the subject, except as contained in it. Whatever may be true as to the act of 1833 in reference to its effect on the act of 1824, it is certain that after the code of 1880 no former legislation on the subject of sixteenth sections was in force. The question is: What right did a lessee of a sixteenth section under the code of 1880 acquire? Although by ancient common law only tenants in chivalry, dower, and curtesy were liable for waste (none of which tenants we have), and the statutes of Marlbridge and Gloucester are not of force here as statutes, I assume that we have a law of waste, in the breast of the judges, to be declared and applied by the courts, and that, when a lessee is exercising rights he claims, but has not, to the injury of the fee, the court will interpose and apply a remedy. In England the law of waste varies in different counties, because of varying conditions and customs among the people. What is consid-

ered waste in one is not in another.    Why is not that true in our state, which has regions widely different by nature, in soil, growth, climate, and pursuits of the inhabitants?    Both the terms and purposes of a lease are to be considered in determining the right of the lessee.    *Heil* v. *Strong,* 44 Pa., 264.    Here the statutes contain the terms of the lease.    By it the *land* was to be appraised, and the *land* was to be leased for ninety-nine years.    No distinction is made between the term and the fee, but the right of the best bidder was that of a lessee for ninety-nine years.    It must be that he acquired the right to make such use of it, and all constituting part of it, as it was capable of, adapted to, and suitable for.    He could make such use of it, surely, as was the customary and approved use of like lands in the region in which it lay.    He could not sell it, except for his unexpired term.    He would have no right to destroy it, if he could; but he has the right to occupy it, and use it, and make profit of it, by devoting it to the purposes to which such land was devoted by the custom of the country, and for which alone it was suitable.    If it was suitable for agriculture, he could convert it into a plantation.    If it was a lake, valuable for water and fish, etc., he could make use of it, but would have no right to destroy it, by draining or otherwise.    If it was fit only for the trees growing on it, he had the right to fell and dispose of them for his own profit, if that was the customary use made of it, or for which alone it was suitable.    He got that, or nothing, if that was all the land was adapted to.    Such must have been the understanding of the lawmakers and of all the actors in the making of the lease.    It is not for the courts to undertake to correct what they may now think was improvident legislation a quarter of a century ago.

"When the law for leasing was passed, a large part of the lands of the state were at very low value.    The pine lands of southeast Mississippi were considered of little value.    There were many thousands of acres of land held by the United States and offered for sale at $1.25 per acre.    The act of 1880 safeguarded

the value by requiring appraisement of the land and forbidding a lease for less than the appraised value.    In this case it is reasonably certain that the appraisement was $1.25 per acre, the price of government lands, and the lease was for a little more. It cannot be doubted that the universal popular understanding was that the lessee got the right to appropriate all the timber during his lease.    The only factors of value were the trees.    It is important to remember that this is not the care of arable lands, but of those whose whole value consisted in the pine trees; nor is it a case of lands part of which are arable, as in a case (40 N. C., 308) in which Ruffin, C. J., discussed the doctrine of waste.    It certainly was intended by the law, and by all the actors, that the lessee should get the right to use the land for his own profit, according to its nature and capability.    If valuable only for timber, he must have the right to use the timber; and, if any, what limit can be placed on his right?    I see none, except to confine him to the trees which became *merchantable* during the term.    The inquiry is : What right did the law contemplate to be conferred on the lessee ?    That is determinable by many pertinent considerations, which suggest themselves, and which I need not enumerate."

This recited opinion shows the comprehensiveness, force, and condensation which always characterizes Judge CAMPBELL.    I request particular attention of inquirers to the whole case of *Davis* v. *Gilliam,* 40 N. C., 308, cited in it, and quoted from in the opinion in chief on this suggestion of error.    It falls among those decisions classified in my original opinion.    Carefully read, it supports my view, as I think.    I desire to say, also, that cutting merchantable timber is no hurt to a forest in ninety-nine years.    If the cutting was of the younger growing trees, there might be a question here, perhaps.    But the cutting of merchantable timber, the land being useless for cultivation, as here, or, in cases where the land is cultivable, an entire clearing for cultivation, cannot be waste under our sixteenth section statutes.    See Judge RUFFIN's opinion in *Davis*

v. *Gilliam,* 40 N. C., 308.   It is thumb-paper learning that, in cases of doubt, a contract is to be taken most strongly against the grantor or lessor.   Who can say, at the least, in this case, that there is no doubt that the statute designed to carry impeachment of waste?

It is not to be seen what chapters 40 and 41, p. 62, of the Acts of 1898, or the Constitution of 1890, have to do with the contract in this case, which was made in 1882.   They deal with lands not then under lease, changing the terms and character of future leases, and authorizing sales of timber and leases for turpentine purposes.   In this the legislature acted very wisely, on the greatly increasing value of timber at that time becoming apparent.   But it did not attempt to, and could not, affect precedent contracts.   It is too plain to argue that section 211 of the constitution of Mississippi supports my view, in that it provides in the then future that the leases shall be for shorter terms, and says: "In case of uncleared lands," etc., "may lease them for such short term as may be deemed *proper in consideration of the improvement thereof.*"   Such great men as Harris, George, Simrall, and others knew what the precedent law meant. They had no idea of interfering, if they could, with previous contracts or jarring the public integrity.   Judge SIMRALL delivered the opinion in *Davany* v. *Koon,* in 1871, nineteen years before.

Why *Sackett* v. *Sackett,* 8 Pick. (Mass.), 309, is cited, is not easily seen, since it shows that the statute of Gloucester was expressely adopted as law by Massachusettts.   *"Ex uno disce omnes."   Profit* v. *Henderson,* 29 Mo., 325, was a life estate under a will, recognizes the right to clear for cultivation, sheds no light on our statutes, or public leases where there can be no cultivation, and is silent as to whether, in such case, it could be waste to cut merchantable timber, but really implies that it would not.   It is no help to appellee.   *U. S.* v. *Bostwick,* 94 U. S., 53 (24 L. ed., 65), was a lease of a house by the month, and its destruction by fire, and simply announces, what is held

in a thousand cases, that every lease carries "an implied obligation on the part of the lessee to so use the property *as not unnecessarily to injure it."* I fail to see the application. *Parrott v. Barney,* 18 Fed. Cas., 1236, was about the destruction of property by an express company because of nitro-glycerine, and simply holds the tenant by the year responsible for this permissive waste. *Thurston v. Mustin,* 3 Cranch, 335 (Fed. Cas. No. 14,013), was cited in my original opinion, and I rely on it on one branch of the instant case. There is no need of appellee to stint in space or number of cases. They can be stacked up as high as the dome of the capitol, and I might well approve them all with the utmost liberality. But they do not touch the matter in hand.

I cannot give my feeble sanction to the contention of appellee to support the idea that the statute, when it says "convey the title," does not mean it to the innocent lessee, or that, when it says, "shall appraise the value *of the land,"* it does not mean "land" to the innocent lessee, or that Judge SIMRALL, in *Davany v. Koon,* 45 Miss., 75, was talking loosely when he said the board was "authorized by law to sell for a limited time the school lands." He only said what everybody then thought was true. Neither can I assent to the idea that, in appraising the value of the land and leasing with that as a minimum, it was all a mere farce, and nothing in fact leased for the money paid, and yet the unfortunate lessee was to pay taxes on it for ninety-nine years. No case in law or morals approves this. No decision sustains a construction which makes the statutes mean the precise opposite of what they say.

Afterwards, following the second decision of the case, the appellants' solicitors,

*Ford & White,* and *Green & Green,* filed a suggestion of error, but the court overruled the same, the majority opinion being an oral one, but

CALHOON, J., delivered the following opinion, dissenting from the decree overruling the suggestion of error:

My view is that the majority opinion is in violation of the contract clauses of both state and federal constitutions. The purchaser here bought the lease:

(1) In the light of the interpretation by the public understanding and usage of seventy years.

(2) In the light of *Davany* v. *Koon*, 45 Miss., 71, holding these leases to be sales for the term.

(3) In the light of *Bond* v. *Griffin,* 74 Miss., 599 (s.c., 22 South., 187), holding, in a lease the same as this, that the lessee owned the timber, and could himself and for himself recover its value from a trespasser.

(4) In the light of *State* v. *Fitzgerald,* 76 Miss., 502 (s.c., 24 South., 872), holding that the purchaser from the lessee could bring replevin for the timber removed from the land.

(5) In the light of the very terms of the authorized lease in the act of 1883.

(6) In the light of Revised Code 1880, § 494, taxing the lessee the value of the land, under which code this lease was made (secs. 732–735).

(7) And in the light of the other matters set forth in the original and concurring opinions in this case, and in my dissent from the last announcement.

Under these circumstances the purchaser should be protected by every rule of right and every decision on the subject.